# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 9:18-CV-80771-ROSENBERG/REINHART

ROBERT W. OTTO & JULIE H. HAMILTON,

     Plaintiffs,

v.

CITY OF BOCA RATON, FLORIDA, &
COUNTY OF PALM BEACH, FLORIDA,

     Defendants.

_____/

## <u>ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

**Table of Contents**

I. Introduction ........................................................................................................ 2
II. Summary of Analysis ........................................................................................ 3
III. Background ...................................................................................................... 5
   A.   The Plaintiffs .............................................................................................. 5
   B.   The Ordinances .......................................................................................... 6
   C.   Procedural Posture of the Litigation.......................................................... 9
IV. Plaintiffs' Standing ........................................................................................ 10
V. Preliminary Injunction Standard of Review................................................... 13
VI. Success on the Merits: Plaintiffs' Free Speech Claim................................... 15
   A.   The First Amendment Landscape ........................................................... 15
   B.   Determining the Appropriate Standard of Review................................... 17
   C.   The Governments' Interest in the Ordinances......................................... 33
   D.   The Relationship between the Ordinances and the Governments' Interest .................. 42
   E.   Viewpoint Discrimination ....................................................................... 50
   F.   Conclusions on Plaintiffs' Free Speech Claim ....................................... 54
VII. Plaintiffs' Prior Restraint Claim .................................................................. 55
VIII. Plaintiffs' Vagueness Claim ........................................................................ 56
IX. Plaintiffs' *Ultra Vires* Claim ......................................................................... 58
X. Conclusions .................................................................................................... 60

# I. INTRODUCTION

"[T]his case presents a conflict between one of society's most cherished rights—freedom of expression—and one of the government's most profound obligations—the protection of minors." *American Booksellers v. Webb*, 919 F.2d 1493, 1495 (11th Cir. 1990) (citation omitted). Plaintiffs, licensed therapists, seek to provide talk therapy to minors with the goal of changing their sexual orientation and/or gender identity. Defendants, governmental entities, have passed ordinances to prohibit this practice by the therapists, because they believe that such "conversion therapy" or "sexual orientation change efforts" ("SOCE") are contraindicated and harmful to all persons, but especially minors. At its core, this case is about whether Defendants can prohibit the licensed therapists from administering SOCE therapy to minors where the available medical and subject matter literature concludes that the therapy is harmful to minors.

The case is before the Court on Plaintiffs Robert Otto and Julie Hamilton's Renewed Motion for Preliminary Injunction ("the Motion"), DE 8. In their Motion, Plaintiffs seek to enjoin Defendants from enforcing the two ordinances, passed in 2017, which ban the use of conversion therapy by licensed medical providers on minor patients.

Defendants City of Boca Raton (the "City") and Palm Beach County (the "County") (collectively referred to as "Defendants") filed responses at DE 83 and DE 85, and Plaintiffs filed a consolidated reply at DE 95. The Court granted leave to the Trevor Project, Equality Florida, and the Alliance for Therapeutic Choice to file amicus briefs at DE 73 and DE 116, which were filed at DE 90 (Trevor Project), DE 91 (Equality Florida), and DE 115 (Alliance for Therapeutic Choice). The Court also had the benefit of a full day of oral argument regarding the Motion on October 18, 2018. Following oral argument, the Court requested that the parties

submit proposed findings of fact and conclusions of law, and they were filed at DE 132, DE 133, and DE 134. The Motion is fully ripe for review.

The Court has considered all of the briefings referenced above, the record, and is otherwise fully advised in the premises. For the reasons stated below, the Renewed Motion for Preliminary Injunction is **DENIED**.

## II. SUMMARY OF ANALYSIS

In moving for a preliminary injunction, Plaintiffs must demonstrate that they have a substantial likelihood of success on the merits, that they will suffer irreparable harm in the absence of this preliminary relief, that the balance of equities tip in their favor, and that an injunction serves the public interest.

The Court concludes that the Plaintiffs have not met their burden of showing that the ordinances violate the Free Speech Clause of the First Amendment, and thus a preliminary injunction barring their enforcement shall not issue. In reaching this result, the Court examines the three possible standards of review for Plaintiffs' free speech claim. Succinctly, rational basis review requires Plaintiffs to show that Defendants acted irrationally or unreasonably in enacting the ordinances. Intermediate scrutiny requires Defendants to show that they had a substantial interest in passing the ordinances and that the ordinances are narrowly drawn to achieve that interest. Strict scrutiny requires Defendants to show that they had a compelling interest in passing the ordinances, that the ordinances are narrowly tailored to achieve that interest, and that no other less restrictive means could serve that interest.

The Court concludes that the law is unsettled as to which of these standards should apply to the facts of this case. The ordinances regulate conversion therapy that is effectuated entirely

through speech, which suggests that the ordinances are subject to a standard greater than rational basis review. The ordinances also arguably are content-based, as they apply "to particular speech because of the topics discussed or the idea or message expressed."

While content-based laws ordinarily are subject to strict scrutiny, that conclusion in this case is not clear. The case does not involve a heartland content-based speech regulation. No public forum restrictions exist in the ordinances. The ordinances define the reach of their prohibitions by topic or subject matter, but they do so only to identify the type of therapy covered, not the content of communications outside of the therapy itself. It is the type of therapy that is regulated. The regulation touches speech only when it is a part of conversion therapy. The ordinances do not prohibit or limit proponents or opponents of conversion therapy to speak about gender or sexual orientation conversion publicly and privately, including to their minor clients in forms other than therapy. And, the therapeutic prohibition of conversion therapy is plenary; it does not choose sides.

Regardless of the level of review applied to the ordinances, the Court concludes that Defendants have identified a compelling interest in protecting the safety and welfare of minors. Protecting minors may be the paradigm example of a compelling interest. Defendants have pointed to and relied upon extensive credible evidence of the damage that conversion therapy inflicts. This body of information comes from well-known research organizations and subject matter experts.

At this early stage of the litigation, the Court need not resolve whether strict scrutiny is the applicable standard and whether the ordinances are the *least* restrictive means that Defendants could have used to achieve their interest in order to reach a decision regarding the

Motion. While at trial Defendants will have the burden of demonstrating the constitutionality of their ordinances, at the preliminary injunction stage, the burden is on the Plaintiffs to establish that they have a substantial likelihood of success on the merits at trial. The Court analyzes the challenged ordinances through the lenses of all three methods of review, and concludes that the ordinances pass rational basis review, withstand intermediate scrutiny, and may survive strict scrutiny. The Plaintiffs, therefore, have not met their burden of showing that they have the requisite substantial likelihood of success on the merits. As such, the preliminary injunction shall not issue on Plaintiffs' free speech claim.

The Court also concludes that Plaintiffs have not demonstrated a substantial likelihood of success on the merits as to their prior restraint and vagueness claims, so the preliminary injunction shall not issue on these grounds.

Finally, on their claim that Defendants acted outside their authority based on Florida state law, Plaintiffs have not demonstrated that an irreparable injury will occur in the absence of a preliminary injunction. Accordingly, the preliminary injunction shall not issue on this ground.

## III. BACKGROUND

A. The Plaintiffs

Plaintiff Robert W. Otto, Ph.D, LMFT, is a licensed marriage and family therapist. DE 1 ¶ 122.[1] Dr. Otto maintains a counseling practice in the City of Boca Raton and in other parts of Palm Beach County, including regular appointments in unincorporated Palm Beach County. DE 121-7, Otto Dep. 19:21–20:5, 143:23–144:2; DE 1 ¶¶ 125, 127. Dr. Otto practices exclusively talk therapy, consisting of client-centered and client-directed conversations with his clients, concerning the clients' goals. DE 121-7, Otto Dep. 20:23–21:22 ("I want to make a distinction

---

[1] The facts of the Verified Complaint, DE 1, are accepted as true for the purposes of this Motion. *See* DE 83, 2 n.5.

that the therapy I provide is 100 percent speech . . . ."). Dr. Otto's talk therapy practice does not include any form of aversive treatment, which is treatment involving reprimand, punishment, or shame to turn a person away from certain thoughts or behaviors. DE 1 ¶ 72; DE 121-7, Otto Dep. 121:22–23.

Plaintiff Julie H. Hamilton, Ph.D., LMFT, is a licensed marriage and family therapist as well. DE 1 ¶ 140. Dr. Hamilton practices throughout Palm Beach County, including in the City of Boca Raton. DE 121-8, Hamilton Dep. 329:3–335:15; DE 96-1. In her current practice, Dr. Hamilton provides individual, marital, and family therapy for a wide variety of issues, including the issues of "unwanted same-sex attractions" and "gender identity confusion." DE 1 ¶ 142. Dr. Hamilton's practice also consists only of talk therapy, which is a conversation that takes place between herself and the client. Dr. Hamilton does not engage in aversive or coercive techniques. DE 1 ¶ 72. Dr. Hamilton does not coerce her clients into any form of counseling, engages in SOCE counseling only with those clients who desire and consent to it, and permits her clients to set the goals of any counseling she offers. DE 1 ¶¶ 77, 131, 144.

B. The Ordinances

Drs. Otto and Hamilton challenge two ordinances passed by Defendants in the fall of 2017 that ban mental health providers from engaging in conversion therapy with minor patients. The two ordinances are very similar, although not identical.[2]

_____

[2] The City Ordinance differs from the County Ordinance in that the penalties are different. The City Ordinance provides that "[a]ny person that violates any provision of this article shall be subject to the civil penalty prescribed in section 1-16" of the City's Ordinance, which provides for a fine "not exceeding $500.00." DE 1-4. The County, in contrast, penalizes a first violation of the Ordinance with a fine of $250.00 and a second violation with a fine of $500.00. DE 1-5, 13:26–28.

1.      *The City Ordinance*

On October 10, 2017, the City enacted the Ordinance, which prohibits the practice of conversion therapy on minors by licensed providers (the "City Ordinance"). DE 1-4.  The City Ordinance defines conversion therapy as:

> Any counseling, practice or treatment performed with the goal of changing an individual's sexual orientation or gender identity, including, but not limited to, efforts to change behaviors, gender identity or gender expression, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender or sex.

*Id.* at 6:10-14.

The City Ordinance does not restrict anyone's conduct or speech outside of a formal therapy session. *Id.* at 4:21–22 ("[The City Ordinance] does not intend to prevent mental health providers from speaking to the public about SOCE.").

> The Ordinance also excludes from its definition of conversion therapy, any counseling that provides support and assistance to a person undergoing gender transition or counseling that provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and development, including sexual orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as such counseling does not seek to change sexual orientation or gender identity.

*Id.* at 6:14–19.

The City Ordinance only prohibits formal treatment by licensed providers that has the goal of changing an individual's sexual orientation or gender identity. Thus, even within a therapy session, the City Ordinance does not prevent licensed therapists from "expressing their views to patients; recommending SOCE to patients … or referring minors to unlicensed counselors, such as religious leaders." *Id.* at 4:21–5:2.

The City's Ordinance defines "provider" as:

> [A]ny person who is licensed by the State of Florida to provide professional counseling, or who performs counseling as part of his or her professional training under chapters 456, 458, 459, 490 or 491 of the Florida Statutes, as such chapters may be amended, including but not limited to, medical practitioners, osteopathic practitioners, psychologists, psychotherapists, social workers, marriage and family therapists, and licensed counselors. The term "provider" does not include members of the clergy or other religious leaders who are acting in their roles as clergy or pastoral counselors, or are providing religious counseling or instruction to congregants, provided they do not hold themselves out as providing conversion therapy pursuant to any of the aforementioned Florida Statutes licenses.

*Id.* at 6:21–7:3.

### 2. *The County Ordinance*

On December 19, 2017, the County passed Ordinance 2017-046 (the "County Ordinance").[3] DE 1-5; DE 121-3, 12/19/17 County Commissioners' Meeting Tr. 100. The County Ordinance bans providers from engaging in "conversion therapy" on minors. Conversion therapy is defined as:

> [T]he practice of seeking to change an individual's sexual orientation or gender identity, including but not limited to efforts to change behaviors, gender identity, or gender expressions or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender or sex.

DE 1-5, 13.

The County Ordinance states:

> Conversion therapy … does not include counseling that provides support and assistance to a person undergoing gender transition, or counseling that: provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and identity exploration and development, including sexual-orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices; and does not seek to change an individual's sexual orientation or gender identity.

*Id.*

---

[3] The City Ordinance and County Ordinance are hereinafter referred to simply as "the ordinances."

The County's Ordinance defines "provider" as "any person who is licensed by the State of Florida to perform counseling pursuant to Chapters 456, 458, 459, 490 or 491 of the Florida Statutes ..." *Id.* at 13. The County Ordinance does not "prevent mental health providers from speaking to the public about SOCE; expressing their views to patients; recommending SOCE to patients; administering SOCE to any person who is 18 years of age or older; or referring minors to unlicensed counselors, such as religious leaders." *Id.* at 11. Furthermore, the County Ordinance does not prevent "unlicensed providers, such as religious leaders, from administering SOCE to children or adults" or "minors from seeking SOCE from mental health providers in other political subdivisions" outside of Palm Beach County. *Id.* The County Ordinance does not ban advertisement. DE 121-1, County Ordinance 2017-046; *see also* DE121-7, Otto Dep. 149:16–18.

C. Procedural Posture of the Litigation

Plaintiffs filed the instant case on June 13, 2018, at DE 1, to permanently enjoin enforcement of the ordinances, and moved for a preliminary injunction the following day, DE 3. After serving Defendants, Plaintiffs filed this Renewed Motion for Preliminary Injunction. DE 8. The Court set the case for trial at DE 11, and set a limited discovery plan for the purposes of considering the preliminary injunction, DE 25 (amended at DE 50). In addition to briefing the Motion addressed by the Order, the parties also have briefed Defendants' Motions to Dismiss, filed on August 1, 2018. *See* DE 34; DE 39; DE 62; DE 82; DE 84. The Motions to Dismiss are ripe, and the Court will address those in a separate order.

Plaintiffs allege that the ordinances violate their constitutional rights and state law in eight separate counts. In Count I, Plaintiffs allege that the ordinances violate their free speech

rights as protected by the First Amendment. DE 1, 36. Count II alleges that the ordinances violate Plaintiffs' clients' First Amendment right to receive information. *Id.* at 39. Count III alleges violations of Plaintiffs' First Amendment free exercise rights. *Id.* at 40. Counts IV and V allege violations of the Florida Constitution, specifically, Plaintiffs' rights to liberty of speech and right to free exercise. *Id.* at 43, 46. Count VI alleges that the ordinances are *ultra vires*. *Id.* at 48. Count VII alleges that the ordinances violate Plaintiffs' rights under Florida's Patient's Bill of Rights and Responsibilities. *Id.*at 51. Finally, Count VIII alleges that the ordinances violate Florida's Religious Freedom Restoration Act ("FRFRA"), Fla. Stat. Ann. § 761.03.

Plaintiffs moved for a preliminary injunction on fewer grounds than alleged in their Complaint, which seeks a permanent injunction. *See* Hr'g. Tr. 107:9–18. The Motion contends that a preliminary injunction should issue based on Plaintiffs' freedom of speech and *ultra vires* arguments. *See* DE 8, ii. Specifically, Plaintiffs argue that the ordinances are viewpoint discriminatory, and therefore per se unconstitutional. In the alternative, they assert that the ordinances are content-based, and do not survive strict scrutiny. Plaintiffs also contend that the ordinances are unconstitutional prior restraints on their expression and unconstitutionally vague. Finally, Plaintiffs claim that the ordinances were passed outside of the Defendants' authority, and therefore are void.

## IV. PLAINTIFFS' STANDING

In their Motions to Dismiss, DE 34 and DE 39, Defendants challenge the Plaintiffs' standing to pursue this case. Defendants also address standing in their responses to the Motion. *See* DE 83; DE 85. The City challenges Dr. Hamilton's standing, as she does not currently practice in the City. DE 83, 14. Both Defendants challenge Dr. Otto's standing, alleging that he

does not seek to change his clients, and therefore does not have a practice of performing SOCE. DE 83, 15; DE 85, 1–2. Defendants also challenge the named Plaintiffs' ability to sue on behalf of their minor clients. DE 83, 16; DE 85, 2.

To establish standing, a plaintiff must establish three elements, which are the "irreducible constitutional minimum" to pursue a case in federal court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'' *Id.* (citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'" *Id.* (citations omitted). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561.

The Court finds that Dr. Otto and Dr. Hamilton have standing to challenge both ordinances. Both are practitioners in Palm Beach County, with practices that would be impacted by the City's Ordinance: Dr. Otto maintains a counseling practice in the City of Boca Raton and in other parts of Palm Beach County, including regular appointments in unincorporated Palm Beach County. DE 121-7, Otto Dep. 19:21–20:5, 143:23-144:2; DE 1 ¶¶ 125, 127. Dr. Hamilton practices throughout Palm Beach County, including in the City of Boca Raton. DE 121-8, Hamilton Dep. 329:3–335:15; DE 96-1, Hamilton Dec. Dr. Hamilton has not consistently practiced in Boca Raton, but the Court is satisfied that she likely will be regulated by the City's Ordinance if enforced. DE 121-8, Hamilton Dep. 341:7–342:3; DE 126-29, Hamilton Decl.

(describing Hamilton's efforts to obtain Boca Raton and Palm Beach County business tax receipts for annual periods ending September 30, 2018 and September 30, 2019). And, both named Plaintiffs have counseled minors on their unwanted same sex attractions. DE 1, ¶¶ 132–36, 149–57 (describing Plaintiffs' performance of SOCE on minors prior to the ordinances' enactment); DE 121-7, Otto Dep. 59:19–25 ("Q: How many clients have you had where the issue to be addressed is the minor's same-sex sexual attractions? A: I've dealt with four."). Therefore, the Court finds that Drs. Otto and Hamilton will be regulated by the ordinances, and, if they establish their constitutional claims, will suffer "an injury in fact" that is not "hypothetical."

As to the Plaintiffs' minor clients: A person "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalsi v. Tesmer*, 543 U.S. 125, 129 (2004) (citations omitted). "This rule assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation." *Id.* The doctrine therefore expresses a "'healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed,' the courts might be 'called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions.'" *Id.* (citations omitted).

This rule is not absolute. Third-party standing may be appropriate when "the party asserting the right has a 'close' relationship with the person who possesses the right" and when "there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.* This rule may be more forgiving in the First Amendment context. *Id.* at 130.

While Plaintiffs may have "close" relationships with their clients, they have not sufficiently demonstrated that their clients would be hindered in advancing their own litigation challenging the ordinances. Plaintiffs argue that their minor clients would not want to bring litigation for fear of stigma and exposing intimate details of their therapy. DE 95, 14. These generalized statements are not enough to confer third-party standing. "While a fear of social stigma can in some circumstances constitute a substantial obstacle to filing suit, Plaintiffs' evidence does not sufficiently establish the presence of such fear here." *King v. Gov. of N.J.*, 767 F.3d 216, 244 (2014). Further, the Court notes, as the Third Circuit did in *King*, that "minor clients have been able to file suit pseudonymously" in other cases challenging bans on SOCE. *Id.* Accordingly, the Court's consideration of the Motion is limited to the relief Plaintiffs seek for themselves.

## V. PRELIMINARY INJUNCTION STANDARD OF REVIEW

The party seeking a preliminary injunction must establish:

(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (citation omitted); *see also Alabama v. United States Army Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005). "A preliminary injunction is an 'extraordinary and drastic remedy,' and [Plaintiff] bears the 'burden of persuasion' to *clearly* establish all four of these prerequisites." *Wreal, LLC*, 840 F.3d at 1247 (emphasis added) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en

banc)). Failure to show any of the four required elements is fatal. *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cty Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

A preliminary injunction is "never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008); *see also United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983). "[I]njunctive relief is an extraordinary remedy that may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (emphasis added) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972, (1997) (per curiam)). Plaintiffs face a "tough road in establishing [the] four prerequisites to obtain a preliminary injunction in the first instance." *Wreal, LLC*, 840 F.3d at 1247.

Furthermore, granting a preliminary injunction is a "powerful exercise of judicial authority." *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). In evaluating the request for a preliminary injunction that would enjoin enforcement of a duly passed legislative enactment, courts must tread especially carefully:

> When a federal court before trial enjoins the enforcement of a municipal ordinance adopted by a duly elected city council, the court overrules the decision of the elected representatives of the people and, thus, in a sense interferes with the processes of democratic government. Such a step can occasionally be justified by the Constitution (itself the highest product of democratic processes). Still, preliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a *clear* showing that the injunction before trial is *definitely* demanded by the Constitution and by the other strict legal and equitable principles that restrain courts.

*Id.* at 1285 (emphasis added).

## VI. SUCCESS ON THE MERITS: PLAINTIFFS' FREE SPEECH CLAIM

The Court begins its analysis of Plaintiffs' primary claim – that the ordinances violate their free speech rights under the First Amendment – with the first prong of the standard for a preliminary injunction: substantial likelihood of success on the merits.

Plaintiffs' first two claims allege that the ordinances unconstitutionally discriminate on the basis of viewpoint, or in the alternative, unconstitutionally discriminate on the basis of content. The parties vigorously contest whether the ordinances implicate the First Amendment's Free Speech Clause, and if so, what level of scrutiny is appropriate – rational basis review, some form of heightened but intermediate review, or strict scrutiny.

A. The First Amendment Landscape

The Free Speech Clause of the First Amendment commands that Congress, and the states, through the Fourteenth Amendment, "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I; *see, e.g.*, *Gitlow v. New York*, 268 U.S. 652, 667 (1925) (noting the First Amendment's application to the states). Nonetheless, it is also a "long established" and "fundamental principle" that "the freedom of speech . . . does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity for every possible use of language." *Gitlow*, 268 U.S. at 667 (collecting cases). "From 1791 to the present, . . . our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992). Accordingly, First Amendment case law acknowledges the fundamental importance of freedom of speech on the one hand, but also recognizes that the freedom of speech must occasionally be restricted or limited to accommodate

other important governmental interests on the other. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). In grappling with how to strike this critical balance, the Supreme Court has recognized varying levels of scrutiny for analyzing laws that in some way curtail individuals' free speech rights. Laws that limit speech based on the content of that speech are generally subject to strict scrutiny – the most stringent form of review in the panoply of standards of statutory review. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565–67 (2011). Content-neutral restrictions on speech are usually subjected to intermediate scrutiny. *See Holder*, 561 U.S. at 26–27. Regulations that do not affect protected speech, or only incidentally do so, are subject to rational basis review. Determining whether the First Amendment applies to the ordinances and the appropriate level of review are critical, and potentially dispositive questions in this case.

This case and the instant Motion present a matter of first impression in the Southern District of Florida and the Eleventh Circuit[4] regarding whether prohibitions on the use of SOCE therapy by licensed medical providers in treating minor patients are constitutional.

Similar bans have survived constitutional challenges however, in other federal courts. The Third and Ninth Circuits have considered the conversion therapy bans passed in New Jersey and California, respectively. Both concluded that such bans, which are nearly identical to those at issue here, are constitutional. The Ninth Circuit held in *Pickup v. Brown*, that the California law was constitutional because it regulated professional conduct, and thereby did not implicate the First Amendment at all. 740 F.3d 1208 (9th Cir. 2014). The Third Circuit in *King v.*

---

[4] Plaintiffs' counsel, representing another litigant, is simultaneously pursuing a similar challenge to a conversion therapy ban in the Middle District in *Vazzo v. City of Tampa*, Case No. 8:17-CV-02896 (M.D. Fla. 2017). In that case, the magistrate judge has issued two Reports and Recommendations on the motion to dismiss and motion for preliminary injunction. However, the district court has not yet ruled on the motions.

*Governor of the State of New Jersey* concluded that the law regulated speech, but only *professional* speech, and therefore was subject to intermediate scrutiny, which the law passed. 767 F.3d 216 (3rd Cir. 2014). While the Court looks to *Pickup* and *King* as examples for possible analysis, it is not bound by these decisions. The Court does not have the benefit of case law from the Eleventh Circuit on this particular matter.

Since these cases were decided, the Supreme Court has issued two opinions, *Reed v. Town of Gilbert* and *National Institute of Family and Life Advocates v. Becerra* ("*NIFLA*"), which raise questions as to the validity of the Third and Ninth Circuits' reasoning. 135 S. Ct. 2218 (2015); 138 S. Ct. 2361 (2018). The Eleventh Circuit also issued its *en banc* opinion in *Wollschlaeger v. Governor of Florida*, which was critical of the Ninth Circuit's opinion in *Pickup*, and is binding precedent on this Court. 848 F.3d 1293 (11th Cir. 2017).

These opinions and others show that the landscape of relevant First Amendment precedent is a morass when trying to address the specific facts in this case, that is, licensed professionals administering treatments, effectuated through speech, on minors. At least three possible approaches emerge from the case law, employing different standards of review.

B. <u>Determining the Appropriate Standard of Review</u>

*1. Conduct v. Speech*

A preliminary question, before applying the appropriate level of review, is whether the ordinances regulate speech or conduct. The Free Speech Clause of the First Amendment prohibits regulation of *speech*, so it is only implicated by laws that regulate or restrict *speech or certain types of expressive conduct*.

The difference between speech and conduct is not always easy to discern and the distinction is frequently criticized. *Wollschlaeger*, 848 F.3d at 1307 ("In cases at the margin, it may sometimes be difficult to figure out what constitutes speech protected by the First Amendment."); *see also King,* 767 F.3d at 228 ("[T]he enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation."). Nonetheless, the speech/unprotected conduct dichotomy is a distinction repeatedly employed in First Amendment case law. "While drawing the line between speech and conduct can be difficult, [the Supreme Court's] precedents have long drawn it." *NIFLA*, 138 S. Ct. at 2373 (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949); *United States v. Stevens*, 559 U.S. 460, 468 (2010)).

Where speech and conduct overlap, courts have recognized that restrictions on non-expressive conduct that only *incidentally* burden speech, do not implicate the First Amendment's protections. *See Sorrell*, 564 U.S. at 567. "Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("*FAIR*"). "[I]t has never been deemed an abridgement of speech or press to make a course of conduct illegal merely because the conduct was *in part* initiated, evidenced or carried out by means of language." *Id.* at 62 (emphasis added) (quoting *Giboney*, 336 U.S. at 502).

In the space between speech and conduct, the Supreme Court also has recognized that some conduct is inherently expressive and deserving of *some* degree of First Amendment protection. *See United States v. O'Brien*, 391 U.S. 367 (1968); *see also FAIR*, 547 U.S. at 65. In *O'Brien*, the Court considered the constitutionality of a law banning the destruction of draft cards. *O'Brien*, 391 U.S. at 371. The Court rejected the proposition that *any* conduct could be labelled "speech" and receive First Amendment protection. *Id.* at 376 ("We cannot accept the view that an apparently limitless variety of conduct be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). However, the Court assumed in *O'Brien* that the burning of a draft card *was* sufficiently expressive to implicate the First Amendment, and tested the law against a heightened standard of review. *Id.* The Court concluded that the law was constitutional:

> [W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no great than is essential to the furtherance of that interest.

*Id.* at 377.

Since the speech/conduct issue is germane to all three levels of scrutiny, the analysis is further discussed and incorporated into each section below as appropriate.

In *Pickup v. Brown*, the Ninth Circuit reviewed two district court decisions[5] on preliminary injunction motions in cases very similar to this case. 740 F.3d 1208, 1221 (9th Cir. 2014). The *Pickup* court found that California's ban on SOCE regulated conduct, and was

---

[5] The district courts' decisions in *Pickup* came to opposite conclusions – one granted a preliminary injunction of a similar ban on licensed medical providers performing SOCE on minor clients, and one denied the preliminary injunction. *See id.* The district court opinions were issued within one day of each other. *Compare Welch*, 907 F. Supp. 2d 1102 (issued December 3, 2012) *with Pickup*, 42 F. Supp. 3d 1347 (issued December 4, 2012).

therefore subject to rational basis review. If subject to rational basis review, Plaintiffs must demonstrate that the ordinances do not "bear[] any rational relationship to a legitimate [government] interest." *Id.* at 1231. As a result, the court held that the ban was a constitutionally valid regulation of "professional conduct." *Id.* at 1225–1231 ("The statute does not restrain Plaintiffs from imparting information or disseminating opinions; the regulated activities are therapeutic, not symbolic. And an act that 'symbolizes nothing,' even if employing language, is not 'an act of communication' that transforms conduct into First Amendment speech."). "[T]he key component of psychoanalysis was the *treatment* of emotional suffering and depression, *not* speech." *Id.* at 1226 (emphasis original) (citation omitted). "[A]ny effect [the law] may have on free speech interests is merely incidental, [so the law] is subject to only rational basis review." *Id.* at 1231. Thus, the ban "survives the constitutional challenges presented here." *Id.* at 1236.

Defendants urge the Court to adopt the Ninth Circuit's reasoning and conclude that the ordinances regulate conduct, or only incidentally burden speech. *See* DE 83, 2; DE 85, 5–6. Defendants' theory is appealing in its simplicity and its consistency with common conceptions of talk therapy as a form of mental health care.

This outcome, however, is stymied by the Eleventh Circuit's analysis in *Wollschlaeger*, 848 F.3d 1293, 1311 (11th Cir. 2017). There, Floridian doctors challenged provisions of Florida's Firearms Owners' Privacy Act (FOPA), which among other restrictions, prohibited doctors from inquiring into their patients' firearm ownership or from recording knowledge of patients' firearm ownership in patients' medical records. *Id.* at 1300–01. Upon rehearing of the case,[6] the *en banc* court found that the "record-keeping and inquiry provisions expressly limit the

---

[6] The case was reheard *en banc*, after the divided panel issued three separate opinions, "each using a different First Amendment standard of review" when the case was first heard. *Id.*

ability of certain speakers—doctors and medical professionals—to write and speak about a certain topic—the ownership of firearms." *Id.* at 1301. Therefore, FOPA "restrict[ed] their ability to communicate and/or convey a message." *Id.* The Eleventh Circuit determined that the First Amendment was implicated, but did not determine whether strict scrutiny or intermediate scrutiny applied. *Id.* at 1308. Despite not answering the question regarding the applicable test, the court was clear that "we do not think it is appropriate to subject content-based restrictions on speech by those engaged in a certain profession to mere rational basis review."[7] *Id.* at 1311. "[S]peech is speech, and it must be analyzed as such for purposes of the First Amendment." *Id.* at 1307 (quoting *King*, 767 F.3d at 229).

The ordinances in this case regulate therapies.[8] But as applied to the Plaintiffs in this case, the ordinances impact their speech to patients because Plaintiffs Otto and Hamilton's therapeutic practices are entirely speech-based. "Speech is the *only* tool [they] use in their counseling with minors seeking to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity. The *only* thing that happens in their counseling sessions is speech." DE 1, ¶ 74 (emphasis added). The Plaintiffs' treatment of their patients is not just carried out *in part* through speech: the treatment provided by Drs. Otto and Hamilton *is entirely* speech. "Saying that restrictions on writing and speaking are merely incidental to speech is like saying that limitations on walking and running are merely incidental to ambulation." *Wollschlaeger*, 848 F.3d at 1308. The Court concludes that the ordinances, as applied to Plaintiffs, likely cannot be construed as regulating conduct only or as mere incidental burdens on speech in light of

---

[7] The Eleventh Circuit, however, found *Pickup* "distinguishable on its facts." 848 F.3d at 1309.
[8] Therapies may include aversive practices such as "inducing nausea, vomiting, or paralysis; providing electric shocks; or having the individual snap an elastic band around the wrist when the individual became aroused to same-sex erotic images or thoughts." DE 1-6, APA Task Force Report 31.

*Wollschlaeger*. Therefore, the ordinances are not likely to be subject to rational basis review, and must be reviewed under intermediate or strict scrutiny.

2. *Content Based v. Content Neutral Regulations: Application of Strict Scrutiny*

Assuming that the ordinances regulate protected speech, the Court must next determine whether the ordinances are content-based or content-neutral. "[C]ontent-based laws – those that target speech based on its communicative content – are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve a compelling government interest." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *see also Wollschlaeger*, 848 F.3d at 1308 ("Content-based restrictions on speech normally trigger strict scrutiny.") (collecting cases). In *Reed*, the plaintiffs challenged a municipal sign code, which regulated temporary directional signs differently from other kinds of signs. 135 S. Ct. 2218, 2227 (2015). The plaintiffs, members of a church group without a physical building, challenged the sign code because it interfered with their ability to post signs directing their parishioners to their weekly worship services. *Id.* at 2226. The Supreme Court subjected the sign code to strict scrutiny, because the sign code on its face regulated on the basis of content, and found that it failed to survive review. *Id.* at 2231. In contrast, intermediate scrutiny is applied to content-neutral regulations: a "content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 26–27 (2010).

If the ordinances are content-based, the Court also must consider whether the ordinances are viewpoint discriminatory, and therefore, unconstitutional. DE 8, 3; Hr'g. Tr. 26–29. "In the

ordinary case it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint discriminatory." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011). Viewpoint discrimination is a subset of content discrimination. *Rosenberger v. Rector*, 515 U.S. 819, 828–29 (1995). A viewpoint-based law goes beyond mere content-based discrimination and regulates speech based upon agreement or disagreement with the particular position the speaker wishes to express." *McKay v. Federspiel,* No. 14-CV-10252, 2014 WL 7013574, at *10 (E.D. Mich. Dec. 11, 2014), *aff'd*, 823 F.3d 862 (6th Cir. 2016) (citations omitted). Viewpoint discrimination occurs when the government favors "one speaker over another." *Rosenberger*, 515 U.S. at 828. Viewpoint discrimination also occurs when speech is prohibited "because of its message." *Id.* Thus, the government may not target "particular views taken by speakers on a subject." *Id.* at 829. But, "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, *no significant danger of viewpoint discrimination exists.*" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) (emphasis added). The Court analyzes viewpoint discrimination as applied to the facts of this case separately in Section VI.E *infra*.

"Deciding whether a particular regulation is content-based or content-neutral is not always a simple task." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642 (1994). "Content based laws [are] those that target speech based on its communicative content." *Reed*, 135 S. Ct. at 2226. A regulation is content based "if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broadcasting System*, 512 U.S. at 643. A law "would

be content based if it required 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation [of the law] has occurred." *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014).

*Reed* would seem to compel the conclusion that if the ordinances are content-based, they are subject to strict scrutiny. The ordinances identify certain speech–speech aimed at changing minor patients' sexual orientation–for prohibition because the speech constitutes conversion therapy. The ordinances target *what* Plaintiffs say to their minor patients.

### 3.  Content-Based Regulations Subject to less than Strict Scrutiny

Beyond the content-based/content-neutral dichotomy, there are several lines of cases that exempt content-based laws from automatically being considered under strict scrutiny. "[C]ontent-based restrictions on speech have been permitted, as a general matter, [but] only when confined to the few 'historic and traditional categories [of expression] long familiar to the bar.'" *United States v. Alvarez*, 567 U.S. 709, 717 (2012). It does not appear that these traditional exemptions have been upset by *Reed. Cf. Flanigan's Enterprises, Inc. of G.A. v. City of Sandy Springs*, 703 F. App'x 929, 935 (11th Cir. 2017).

One set of categories of content-based laws that are not subject to strict scrutiny include "inciting imminent lawless action, . . . obscenity, . . . defamation, . . . speech integral to criminal conduct, . . . so-called 'fighting words,' . . . fraud, . . . child pornography, . . . true threats, . . . and speech presenting some grave and imminent threat [that] the government has the power to prevent." *Alvarez*, 567 U.S. 709, 717 (citing case law for each category of speech). "From 1791 to the present, . . . our society, like other free but civilized societies, has permitted restriction on the content of speech in a few limited areas, which are 'of such slight social value as a step to

truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *R.A.V.*, 505 U.S. at 382 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942)). *Reed* has not eliminated these traditional categories, which are exempt from strict scrutiny. *Cf. Flanigan's Enterprises*, 703 F. App'x at 935. The ordinances at issue in this case do not fall within these limited areas in which restrictions on the content of speech has been historically recognized.

Another category of content-based speech, "commercial speech," also is subject to heightened review, and not strict scrutiny. *See Sorrell,* 564 U.S. at 571–72. There is a "commonsense distinction" between "speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of N.Y.*, 447 U.S. 557, 562 (1980) (quoting *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455–56 (1978)). "In commercial speech cases, then, a four-part analysis has developed" that is less exacting than a strict scrutiny analysis. *See Central Hudson Gas & Elec. Corp.*, 447 U.S. at 566. "Under a commercial speech inquiry, it is the State's burden to . . . show at least that the statute directly advances a substantial government interest and that the measure is drawn to achieve that interest." *Sorrell*, 564 U.S. at 571–72.

The ordinances in this case may not fit neatly into any of the categories outlined above. However, they demonstrate that a strict First Amendment rule will not always work for all cases.

### 4. The Speech of Licensed Providers

Against this backdrop of First Amendment case law, the Court must also consider how the First Amendment applies to doctors in treating their patients. Talk-based conversion therapy, as both a treatment to be provided and an utterance to be said, cannot easily be analyzed using

case law decided in the context of public hearings, signage regulations, and school-based activities, yet so much of traditional First Amendment case law is decided in those contexts. As a result, the Court must pay close attention to cases that bear directly on the question of how provider speech can be regulated.

The speech of medical providers is routinely limited through prescription drug laws, medical malpractice lawsuits, accreditation requirements, and other means. As discussed below, case law demonstrates a simultaneous judicial commitment to protecting the conversation between doctors and their patients, and a recognition of the government's ability to regulate the practice of medicine and to protect patients from harmful practices. Quite simply, "[t]here is a difference, for First Amendment purposes, between regulating professionals' speech to the public at large versus their direct, personalized speech with clients." *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011).

*Casey v. Planned Parenthood* considered the constitutionality of certain disclosures about pregnancy and abortion that Pennsylvania required its doctors to make to their patients prior to performing an abortion. 505 U.S. 833 (1992). The majority of the joint opinion addresses whether the disclosures violate the mother's constitutional rights. *See id.* However, the opinion also briefly addressed whether the doctor's right to free speech was implicated by the disclosure requirements. *See id.* at 884. The joint opinion concluded that "the physician's First Amendment rights" were only "implicated . . . as part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Id.* Although some of the disclosures required by the law in *Casey* were part of obtaining informed consent, some of the disclosures were not. *See NIFLA*,

138 S. Ct. 2361, Tr. 23:25–24:2 ("But there were definitely requirements in *Casey* that don't have much to do with informed consent.") (Kagan, J.).

In *NIFLA*, the Supreme Court considered a challenge to California's Reproductive Freedom, Accountability, Comprehensive Care, and Transparency (the "FACT Act"), which, among other directives, required licensed clinics to "notify women that California provides free or low-cost services, including abortions, and give them a phone number to call." 138 S. Ct. 2361, 2368. The Court *did not determine* what level of scrutiny should be applied to the FACT Act, but found that the notification requirement would not survive even intermediate scrutiny.[9] *Id.* at 2375. *NIFLA* found that California's FACT Act violated the First Amendment in compelling certain disclosures about abortion to patients, but the FACT Act is distinguishable from the ordinances at issue here. There, the doctors were compelled to speak, despite the fact that the required notice "is not an informed-consent requirement or . . . tied to a procedure at all." *Id.* at 2373.

In *Wollschlaeger*, the Eleventh Circuit declined to say whether intermediate or strict scrutiny would be the appropriate standard of review. 848 F.3d 1293, 1308 (11th Cir. 2017). Importantly, the court there was concerned that Florida's FOPA impacted doctors' ability to "speak frankly and openly to patients," because FOPA prohibited the *discussion* of firearm ownership with patients. *Id.* at 1313 (internal quotations omitted). In *Conant v. Walters*, the Ninth Circuit upheld a permanent injunction against a government policy of investigating doctors who *recommended* marijuana for medical use to their patients. 309 F.3d 629 (9th Cir. 2002). There, the court found the policy restricting doctors' recommendations to "strike at core First

---

[9] The Court remanded the case with the instruction that the Plaintiff-doctors would be "likely to succeed on the merits of their claim that the FACT Act violates the First Amendment." *Id.* at 2378.

Amendment interests of doctors and patients" because communication is an "integral component of the practice of medicine." *Id.* at 636.

Furthermore, the Third Circuit recognized professional speech as a category of speech subject to intermediate scrutiny. In *King*, the Third Circuit considered New Jersey's ban on SOCE performed on minors and reviewed the district court's order on summary judgment, which was entered against the plaintiff-doctors who challenged the statewide SOCE ban. *See* 767 F.3d 216 (3rd Cir. 2014); *King v. Christie*, 981 F. Supp. 2d 296 (D.N.J. 2013) The *King* court disagreed with the district court's analysis (which had followed *Pickup's* lead in applying rational basis review), and rejected the proposition that the ban should only be subject to rational basis review. *See King*, 767 F.3d at 246. Instead, the court found that "intermediate scrutiny is the applicable standard of review in this case" and that a conversion therapy ban on minors is a "permissible prohibition of professional speech." *See id.* [10]

Plaintiffs insist that *NIFLA* abrogated the "professional speech" standard that the Third Circuit employed, 138 S. Ct. 2361 (2018). There, the Court observed that its "precedents do not recognize such a tradition for a category called 'professional speech'" and thus appeared to reject the Third Circuit's analysis in *King*. 138 S. Ct. 2361, 2372 (2018) (collecting cases). [11] Even though the Court rejected professional speech as a recognized exceptional category, it acknowledged that "under [Supreme Court] precedents, States may regulate professional

---

[10] The District of New Jersey considered New Jersey's SOCE ban a second time in *Doe v. Christie*, 33 F.Supp.3d 518 (2014). This second challenge to the New Jersey law arose out of a case brought by minors who wished to have SOCE provided to them by their therapists and their parents. *Id.* There, the district court relied on its prior opinion in finding that the law did not violate the Free Speech Clause of the First Amendment and granted the State's motion to dismiss. *Id.* The court also found the plaintiff-children's free exercise claim and the parents' "right to direct the upbringing of children" to be without merit. *Id.* The Third Circuit affirmed in *Doe v. Christie*, 783 F.3d 150 (3rd Cir. 2014).

[11] The *NIFLA* majority, however, did "not foreclose the possibility that some such reason" for "treating professional speech as a unique category that is exempt from ordinary First Amendment principles." *Id.* at 2375.

*conduct*, even though that conduct incidentally involves speech." *Id.* at 2372 (emphasis added) (citing *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884 (1992) (O'Connor, J.)).

Taken collectively, these cases instruct that this case may fall outside of *Reed*'s onerous edict that all content-based laws must be subject to strict scrutiny. While *NIFLA* disparaged the use of "professional speech" as a separate category of speech, it did not foreclose the possibility that reasons might exist for treating professional speech as a separate category. *See* 138 S. Ct. 2361, 2375 (2018). Although the "First Amendment stands against any 'freewheeling authority to declare new categories of speech outside the scope of the First Amendment,' the Court has acknowledged that perhaps there exist 'some categories of speech that have been historically unprotected . . . but have not yet been specifically identified or discussed . . . in our case law." *United States v. Alvarez*, 567 U.S. 709, 722 (2012) (citations omitted). It is not clear that a separate category for professional speech is required to recognize this case's unique features, given the Supreme Court's recognition in *Casey* that regulations of doctors' speech that are incidental to a treatment (or in this case, effectuating a treatment) do not offend the First Amendment.

The ordinances here are much closer to the regulation at issue in *Casey* than the regulations in *Wollschlaeger*, *Conant*, and *NIFLA*. The speech not only is directly related to the treatment, it *is the manner of delivering* the treatment. Plaintiffs are essentially writing a prescription for a treatment that will be carried out verbally. In contrast to *Wollschlaeger*, *Conant*, and *NIFLA*, the ordinances do *not* prohibit a dialogue between patient and provider. *See Wollschlaeger*, 848 F.3d at 1309 (observing that the SOCE ban in *Pickup* "did not restrict what

the practitioner could say or recommend to a patient or client"). The regulated treatment is both speech and conduct – directed at minors – administered by a licensed medical professional, as part of "the practice of medicine," as in *Casey*.

Accordingly, applying intermediate scrutiny to medical treatments that are effectuated through speech would strike the appropriate balance between recognizing that doctors maintain some freedom of speech within their offices, and acknowledging that *treatments* may be subject to significant regulation under the government's police powers. The First Amendment is of paramount importance to our democracy, but, as quoted above, "the freedom of speech . . . does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity for every possible use of language." *Gitlow v. New York*, 268 U.S. 652, 667 (1925) (collecting cases).

### 5. *First Principles of the First Amendment*

Furthermore, this case demonstrates why an unbending, categorical approach to the First Amendment proves unwieldy to the point of unworkable. In fact, the exemptions to the automatic "trigger" of strict scrutiny illustrate a recognition that an ironclad, categorical approach is untenable in applying the First Amendment to seemingly endless permutations and circumstances. "[C]ategories alone cannot satisfactorily resolve the legal problem before us. The First Amendment requires greater judicial sensitivity both to the Amendment's expressive objectives and to the public's legitimate need for regulation than a simple recitation of categories, such as 'content discrimination' and 'strict scrutiny' would permit." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2234 (2015) (Breyer, J., concurring); *see also Reed*, 135 S. Ct. at 2238 (Kagan, J., concurring); *Williams Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1673 (2015) (Breyer, J.,

concurring) ("I view this Court's doctrine referring to tiers of scrutiny as guidelines *informing* our approach to the case at hand, not tests to be mechanically applied.") (citations omitted) (emphasis added); *Wollschlaeger*, 848 F.3d at 1334 ("Rather than relying on strict categorical definitions as automatic triggers for particular levels of constitutional scrutiny, we should instead embrace an approach focused on the values underlying the jurisprudential significance of those categories.") (Tjoflat, J., concurring). One way to avoid the pitfalls of a strictly categorical approach to the First Amendment is to glean the common principles from the relevant cases and apply them in a coherent manner to this set of facts.

Applying intermediate scrutiny to this case is entirely consistent with the historic understandings of the First Amendment and its purpose. The First Amendment's "purpose [is] 'to preserve an uninhibited marketplace of ideas in which the truth will ultimately prevail.'" *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984)). "The First Amendment, said Judge Learned Hand, 'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.'" *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964) (quoting *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y. 1943)). Indeed, "[t]he best test of truth is the power of thought to get itself accepted in the competition of the market." *Id.* at 2375 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994). Justice Thurgood Marshall

observed that "[t]he First Amendment services not only the needs of the polity but also those of the human spirit – a spirit that demands self-expression." *Procunier v. Martinez*, 416 U.S. 396, 427 (1974) (Marshall, J., concurring). It is a "guiding First Amendment principle" that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *McCullen v. Coakley*, 134 S. Ct. 2518, 2539 (2014) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).

This case presents facts in which speech is not always expressive, and thus warrants less scrutiny. *Cf. O'Brien*, 391 U.S. 367 (1968). Plaintiffs' words serve a function; their words constitute an *act* of therapy with their minor clients, which makes Plaintiffs' speech different from the protected dialogues in *Wollschlaeger* and *NIFLA*, and from highly protected, political speech in the metaphoric or literal "public square."

The ordinances do not limit or change in any way advocacy for SOCE. Plaintiffs retain their right and prerogative to seek greater acceptance of SOCE, to lobby Defendants to repeal the ordinances, and to lobby the State of Florida to explicitly preempt the ordinances. The public marketplace of ideas is not limited in any way. What *is* limited, is the therapy (delivered through speech and/or conduct) by a licensed practitioner to his or her minor patient, within the confines of a therapeutic relationship. In the context of the relationship between a minor and his or her therapist, there is *no* competitive marketplace of ideas to infringe upon. Given the multitude of avenues of expression available to Plaintiffs, intermediate or heightened level of review is consistent with the justifications for and principles of the First Amendment.

6.      *Conclusions Regarding the Appropriate Standard of Review*

The Court concludes that it is unclear what standard of review should apply to this case. It seems likely that the ordinances are subject to more than rational basis review, but beyond that determination, it is unclear whether intermediate or strict scrutiny should apply. *Reed* suggests that strict scrutiny is appropriate, but case law specifically addressing the regulation of licensed providers indicates that a lower standard of review would be appropriate. As such, intermediate review may be the correct standard to apply, to acknowledge that licensed providers are not completely stripped of their freedom of expression in their offices and exam rooms, but governments can readily regulate treatments provided by licensed providers.

In the following two sections, the Court evaluates the ordinances using the principles found in all three levels of review.

C.  The Governments' Interest in the Ordinances

If the ordinances are subject to rational basis review, it is the Plaintiffs' burden to show that there was no legitimate government interest in passing the ordinances. *See Pickup v. Brown*, 740 F.3d 1208, 1231 (9th Cir. 2014). If the ordinances are subject to intermediate scrutiny, it is Defendants' burden to show that they had a "substantial" interest in passing the ordinances. *See Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293, 1312 (11th Cir. 2017).  If the ordinances are subject to strict scrutiny, it is Defendants' burden to show they had a "compelling" interest in passing the ordinances. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2231 (2015).

In this case, both Defendants assert a "compelling interest in protecting the physical and psychological well-being of minors . . . and in protecting its minors against exposure to serious harms caused by sexual orientation and gender identity change efforts" within the body of the

ordinances. DE 1-4; DE 1-5. This Court finds these interests are legitimate, substantial, and compelling. *See Sable Commc'ns of Cal., In. v. FCC*, 492 U.S. 115, 126 (the state has a "compelling interest in protecting the physical and psychological well-being of minors"); *New York v. Ferber*, 458 U.S. 747, 756–57 ("It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'") (citations omitted).

In concluding that SOCE is harmful and should be prevented, the Defendants considered multiple publications by major research and professional organizations. The following are examples of the conclusions of studies and position papers regarding the harms of conversion therapy (including therapy relating to both same-sex attractions and gender identity on both minors and adults), which Defendants relied upon in enacting the ordinances:

- According to the American Academy of Pediatrics, "Therapy directed at specifically changing sexual orientation is contraindicated, since it can provoke guilt and anxiety while having little or no potential for achieving changes in orientation." DE 1-4, 2; DE 1-5, 9; DE 128-2, 633; DE 121-12, 633.

- In 1998, the American Psychiatric Association "published its opposition to any psychiatric treatment, including reparative or conversion therapy." DE 1-4, 3; DE 1-5, 9. "The potential risks of 'reparative therapy' are great and include depression, anxiety, and self-destructive behavior, since therapist alignment with societal prejudices against homosexuality may reinforce self-hatred already experienced by the patient." DE 128-3; DE 121-13.

- The American Psychological Association ("APA") created a task force in 2009 to

conduct a "systematic review of peer-reviewed journal literature on sexual orientation change efforts (SOCE)." DE 128-4 at v; DE 121-14 at v. The report "concluded that efforts to change sexual orientation are unlikely to be successful and involve some risk of harm, contrary to the claims of SOCE practitioners and advocates." *Id. See also* DE 1-4, 3; DE 1-5, 9.

- The APA Task Force found:

  > [S]ome recent studies document that there are people who perceive that they have been harmed though SOCE . . . . Among those studies reporting on the perceptions of harm, the reported negative social and emotional consequences include self-reports of anger, anxiety, confusion, depression, grief, guilt, hopelessness, deteriorated relationships with family. Loss of social support, loss of faith, poor self-image, social isolation, intimacy difficulties, intrusive imagery, suicidal ideation, self-hatred, and sexual dysfunction.

  DE 128-4, 42; DE 121-14, 42.

- The Task Force also found that children may not understand the consequences of SOCE. "Children and adolescents are often unable to anticipate the future consequences of a course of action and are emotionally and financially dependent on adults. Further, they are in the midst of developmental processes in which the ultimate outcome is unknown. Efforts to alter that developmental path may have unanticipated consequences." *Id.* at 77.

- The Task Force concluded:

  > [T]here is a dearth of scientifically sound research on the safety of SOCE. Early and recent research studies provide no clear indication of the prevalence of harmful outcomes among people who have undergone efforts to change their sexual orientation or the frequency of occurrence of harm because no study to date of adequate scientific rigor has been explicitly designed to do so. Thus, we cannot conclude how likely it is that harm will occur from SOCE. However, studies from both periods indicate that attempts to change sexual orientation may cause or exacerbate distress and poor mental health in some individuals, including

depression and suicidal thoughts. The lack of rigorous research on the safety of SOCE represents a serious concern, as do studies that report perceptions of harm.

*Id.* at v.

- The American Psychological Association Council of Representatives has adopted a policy statement against SOCE, which noted that "[d]istress and depression were exacerbated" in individuals subjected to such therapy. DE 121-15; DE 128-5. *See also* DE 1-4, 3; DE 1-5, 9.

- The Pan American Health Organization, an office of the World Health Organization, has stated, "'Reparative' or 'conversion therapies' have no medical indication and represent a severe threat to the health and human rights of the affected persons. They constitute unjustifiable practices that should be denounced and subject to adequate sanctions and penalties." DE 121-19, 2012 Pan American Health Organization Position Statement 2. *See also* DE 1-4, 4; DE 1-5, 10.

- "Psychoanalytic technique does not encompass purposeful attempts to 'convert,' 'repair,' change or shift an individual's sexual orientation, gender identity or gender expression. Such directed efforts are against fundamental principles of psychoanalytic treatment and often result in substantial psychological pain by reinforcing damaging internalized attitudes," according to the American Psychoanalytic Association in 2012. DE 121-16; DE 128-6. *See also* DE 1-4, 3–4; DE 1-5, 9–10.

- The American Academy of Child & Adolescent Psychiatry's Practice Parameter states, "Just as family rejection is associated with problems such as depression, suicidality, and substance abuse in gay youth, the proposed benefits of treatment to eliminate gender discordance in youth must be carefully weighed against such possible deleterious

effects."  DE 121-17, 969; DE 128-7, 969. *See also* DE 1-4, 4; DE 1-5; 10.

- "Given that there is no evidence that efforts to alter sexual orientation are effective, beneficial, or necessary, and the possibility that they carry the risk of significant harm, such interventions are contraindicated," contrary to the claims of SOCE practitioners and advocates.  DE 121-17, 968; DE 128-7, 968.

- According to the American School Counselor Association, "School counselors recognize the profound harm intrinsic to therapies alleging to change an individual's sexual orientation or gender identity and advocate to protect LGBTQ students from this harm." DE 121-20, 37; DE 128-9, 37. *See also* DE 1-4, 4; DE 1-5, 10.

- The report prepared by U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration found as follows: "Conversion therapy perpetuates outdated views of gender roles and identities as well as the negative stereotype that being a sexual or gender minority or identifying as LGBTQ is an abnormal aspect of human development.  Most importantly, it may put young people at risk of serious harm."  DE 121-21; DE 128-10, SAMHSA Report. *See also* DE 1-4, 4–5; DE 1-5, 10–11.

The sources cited in the ordinances all conclude that rigorous research on the safety and effectiveness of seeking to change sexual orientation is deficient,[12] but that there already is substantial evidence and consensus in the medical community that conversion therapy can cause harm, including depression, self-harm, self-hatred, suicidal ideation, and substance abuse. *See,*

---

[12] Notably, the APA Task Force Report suggests that the lack of rigorous studies is *because* SOCE is harmful. *See e.g.*, DE 1-6, pp. 51, 76 ("High dropout rates[of participants] characterize early treatment studies and may be an indicator that research participants experience these treatments as harmful."); DE 1-6, p. 33 ("Behavior therapists became increasingly concerned that aversive therapies designed as SOCE for homosexuality were inappropriate unethical, and inhumane.").

*e.g.*, DE 1-6, 59 ("Participants in studies . . . described the harm they experienced as (a) decreased self-esteem and authenticity to others; (b) increased self-hatred and negative perceptions of homosexuality; (c) confusion, depression, guilt, helplessness, hopelessness, shame, social withdrawal, and suicidality; (d) anger at and a sense of betrayal by SOCE providers; (e) an increase in substance abuse and high-risk sexual behaviors; (f) a feeling of being dehumanized and untrue to self; (g) a loss of faith; and (h) a sense of having wasted time and resources. Interpreting SOCE failures as individual failures was also reported in this research, in that individuals blamed themselves for the failure (i.e. weakness, and lack of effort, commitment, faith, or worthiness in God's eyes)."). *See generally* DE 121, Exhibits 12, 13, 15; 17–22; DE 128, Exhibits 2–11. The small number of reports of harm from minors is understood in light of the retrospective reports and delayed perceptions of harm noted by the sources cited by the ordinances. *See* DE 121-21, 2015 SAMHSA Position Statement 33; DE 121-15, 2009 APA Resolution 50.

The County identified six providers within incorporated parts of Palm Beach County who practiced conversion therapy. *See* DE 121-39, 1. At the first reading of the County Ordinance, on December 5, 2017, mental health professionals spoke out against conversion therapy. A resident of Palm Beach County and mental health professional stated:

> As a therapist, the first rule of thumb is to do no harm. Conversion therapy not only violates this ethic, but it implies that a therapist has the ability to change one's sexual orientation. As great as we are, therapists are far and wide [sic] unable to pinpoint the therapeutic intervention which can make an individual change this part of who they are. ...

DE 121-2, 12/05/17 County Commissioners' Meeting Tr. 49–50. A psychologist and certified sex therapist, who practices in the County, also advised the County that:

> Research has actually found that efforts and so-called therapies aimed at changing one's gender, identity, or sexual orientation can result in a number of mental health issues for minors; including shame, guilt, depression, decreased self-esteem, increased self-hatred, ... feelings of anger and betrayal, loss of friends, social withdrawal, problems in sexual and emotional intimacy, high-risk behaviors, confusion, self-harm, substance abuse, and suicidal ideation.

*Id.* at 11–14.

The County Commission heard from the leader of a local human rights group, who reported receiving complaints about minors who were being subjected to conversion therapy within Palm Beach County. *Id.* at 65; *see also* DE 121-3, 12/19/17 County Commissioners' Meeting Tr. 80–81.

On December 19, 2017, the County heard from a local licensed clinical social worker and a family therapist who had been practicing for more than thirty years. DE121-3, 12/19/17 County Commissioners' Meeting Tr. 15. He advised the County that he had "worked with youth and families [his] entire career" and that "conversion therapy" was "an extremely dangerous and unethical practice that does not work." *Id.* The County also heard testimony from many community members and practitioners who strongly opposed the ban. *See, e.g.*, DE 121-2, 21–22 (community member explaining that voluntary SOCE worked for him); DE 121-2, 34–36 (licensed mental health counselor urging the Board of Commissioners to oppose the ordinance because "if a minor, an adolescent, wants to line their life up with a belief, a core heart belief that they want a heterosexual life and marriage and wants help," counselors should be allowed to provide that help).

At oral argument on the Motion, Plaintiffs challenged the quality of the above-cited authorities, describing them as "no evidence at all." Hr'g. Tr. 48:9–13. The Court disagrees. Far from anecdotal remarks that constitute mere conjecture, the authorities relied upon by

Defendants in adopting the ordinances are overwhelmingly the official position statements of major medical and mental health organizations. While their findings and views may differ as to degree, they present a consistent position that conversion therapy is harmful or potentially harmful to all people, and especially to minors. Defendants could properly find that the research about the dangers of conversion therapy, particularly for minors, was "overwhelming." DE 128-1, 11. *But, cf. Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293, 1316 (11th Cir. 2017) ("There is no claim, much less any evidence, that routine questions to patients about the ownership of firearms are medically inappropriate, ethically problematic, or practically ineffective.").

To the extent Plaintiffs quarrel with the empirical nature of the cited position papers and studies, courts "have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and 'simple common sense.'" *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (quotations omitted). "Legislatures are entitled to rely on the empirical judgments of independent professional organizations that possess specialized knowledge and experience concerning the professional practice under review, particularly when this community has spoken with such urgency and solidarity on the subject." *Id.* "We do not, however, require that 'empirical data come . . . accompanied by a surfeit of background information . . . .'" *Id.*; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009) (noting certain recognized harms will necessarily be lacking empirical support); *Collins v. Texas*, 223 U.S. 288, 297–98 (1912) (recognizing the "right of the State to adopt a policy even upon medical matters concerning which there is difference of opinion and dispute"); *King*, 767 F.3d at 238 (recognizing that the same studies and position papers relied upon by

Defendants showed "substantial" evidence of the serious health risks accompanying conversion therapy).

Moreover, the Defendants need not wait for a minor to publicly confess that the minor had agreed to try to change his or her sexual orientation through therapy only to experience self-hatred and suicidal ideation after the therapy failed. *See King*, 767 F.3d at 239 (3d Cir. 2014) ("[A] state legislature is not constitutionally required to wait for conclusive scientific evidence before acting to protect its citizens from serious threats of harm."). Given the stakes, legislative bodies do not need to wait for further evidence of the negative and, in some cases, fatal consequences of SOCE before acting to protect their community's minors. The APA Task Force, in its 2009 Report, explained that scientifically rigorous studies of SOCE had dropped off precipitously when homosexuality was delisted as a "disorder" in the DSM (Diagnostic and Statistical Manual of Mental Disorders) and practitioners were made aware of the harms of SOCE. *See* DE 1-6, p. 33 ("Following the removal of homosexuality from the DSM, the publication of studies of SOCE decreased dramatically, and nonaffirming approaches to psychotherapy came under increased scrutiny."). The Supreme Court made a similar observation when considering a change in FCC rules on indecency in broadcasts: "there are some propositions for which scant empirical evidence can be marshaled, and the harmful effect of broadcast profanity on children is one of them. One cannot demand a multiyear controlled study, in which some children are intentionally exposed to indecent broadcasts, . . . and others are shielded from all indecency." *Fox Television Stations*, 556 U.S. at 519. Here too, Plaintiffs cannot demand a multiyear controlled study in which some minors, even those who would voluntarily seek SOCE, are subjected to SOCE and some are not.

Plaintiffs also argue that Defendants' failure to outright ban all SOCE or conversations about SOCE vitiates Defendants' interest in preventing the identified harm from SOCE. However, the limits of the SOCE ban, for instance to apply only to licensed professionals, does not defeat the compelling interest here. "We will not punish [a government] for leaving open more, rather than fewer, avenues of expression, especially when there is no indication that the selective restriction of speech reflects a pre-textual motive." *Williams Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1670 (2015).

Having considered Defendants' evidence, and Plaintiffs' objection to this body of publications, the Court concludes that Defendants have a legitimate, compelling interest in protecting minors in their communities from the harms of SOCE. This compelling interest satisfies Defendants' burden under all levels and types of scrutiny.

D. <u>The Relationship between the Ordinances and the Governments' Interest</u>

All levels of judicial review require a relationship between the government interest and the ordinances, and an evaluation of the closeness of that relationship. If the ordinances are subject to rational basis review, it is Plaintiffs' burden to show that there is no "rational relationship" between the ordinances and the governments' legitimate interest. *See Pickup*, 740 F.3d at 1231. If the ordinances are subject to intermediate scrutiny, it is Defendants' burden to show that the ordinances "directly advance" and are "drawn" to achieve Defendants' substantial interest. *Wollschlaeger*, 848 F.3d at 1312. Defendants must demonstrate that there is "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *King v. Gov. of N.J.*, 767 F.3d 216, 239 (3rd Cir. 2014) (quoting *Board of Tr. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480

(1989)). If the ordinances are subject to strict scrutiny, it is Defendants' burden to show the ordinances are "narrowly tailored" to satisfy the compelling government interest. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2231 (2015). Furthermore, the ordinances must be "the least restrictive means or the least intrusive means of serving the government's interest." *See McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014) (internal quotes omitted).

The Court first evaluates the scope of the ordinances.

*1. The Scope of the Ordinances: Application to Minor Clients Only*

The ordinances are drafted to prohibit only the practice of, as opposed to any discussion or recommendation of, conversion therapy by licensed professionals on minors, which is condemned by numerous professional organizations as contraindicated, harmful, and ineffective, because minors' "immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely."[13]

*2. The Scope of the Ordinances: General Speech vs. the Performance of SOCE*

The ordinances were drafted in such a way that Plaintiffs are not hindered in their expression of their views about SOCE, their advocacy of SOCE, and even their discussions with minor clients about SOCE. *See* DE 1-4; DE 1-5. As mentioned *supra*, "There is a difference, for First Amendment purposes, between regulating professionals' speech to the public at large versus their direct, personalized speech with clients." *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011); *see also Wollschlaeger*, 848 F.3d at 1335 (Tjoflat, J., concurring). Plaintiffs do not deny that they continue to publicly advocate for SOCE. *See, e.g.*, DE 77-1, Hamilton Dep. 19:12–17 ("I speak about it [SOCE] all the time because I'm so appalled that the county has

---

[13] *See Hodgson v. Minnesota*, 497 U.S. 417, 444 (1990); *see also* DE 1-6, 86 ("Children and adolescents are often unable to anticipate the future consequences of a course of action and are emotionally and financially dependent on adults.").

taken away our freedom of speech in the therapy office. So I talk about it with my friends, my family. Yes I talk about it a lot on a personal . . .").  Plaintiffs also may discuss the benefits of SOCE with their minor clients and their parents. *See* DE 1-4; DE 1-5.

The Court next addresses whether the Defendants considered alternative means to the ordinances.

### 3.  *Alternative Means*

Defendants concluded that their interest in preventing harm to minors was not adequately protected by existing regulations. Plaintiffs argue the ordinances are not narrowly tailored to the government interests. Plaintiffs rely heavily on *McCullen v. Coakley*, in which the Supreme Court considered the constitutionality of a thirty-five foot buffer zone around entrances to abortion providers in Massachusetts, 134 S. Ct. 2518 (2014). Hr'g. Tr. 77–78. There, the Court struck down the buffer zone law after finding the law was not narrowly tailored. *McCullen*, 134 S. Ct. 2518, 2534. Massachusetts had not seriously considered "less intrusive tools readily available to it" and had not "considered different methods that other jurisdictions have found effective." *Id.* at 2539.

As in *McCullen*, Defendants arguably could have used other laws to prevent harm to minors from SOCE. When asked, the Florida Department of Health had no records regarding complaints against medical providers regarding SOCE.   *See* DE 1-9. The lack of complaints to the Florida Department of Health, however, is not dispositive of whether the Defendants could have taken less restrictive actions, such as engaging in a publicity campaign - urging minors who feel they have been harmed to make a formal complaint about their providers - or passing a

44

resolution condemning SOCE and encouraging concerned citizens to come forward with their complaints.[14]

The lack of SOCE-based complaints to the State could instead lead to the conclusion that existing regulations, such as the providers' codes of ethics and child abuse laws, were not sufficient to prevent this harm. Indeed, Plaintiffs have not interpreted the blanket and general prohibitions against discrimination and "harming minors" to prohibit them from exposing minors to the risk of conversion therapy. *See* DE 1, ¶¶ 132–36, 149–57 (describing Plaintiffs' performance of SOCE on minors prior to the ordinances' enactment); DE 121-7, Otto Dep. 59:19–25 ("Q: How many clients have you had where the issue to be addressed is the minor's same-sex sexual attractions? A: I've dealt with four."). Nor has the requirement that Plaintiffs "meet the minimum standards of performance in professional activities when measured against generally prevailing peer performance" caused Plaintiffs to heed the judgments of prevailing professional organizations that conclude that conversion therapy is contraindicated. *See id.* Thus, no other regulation, according to the Defendants, has effectively prevented the harms associated with conversion therapy. And, Defendants believed they needed to provide a specific mechanism for minors exposed to SOCE to come forward to make a complaint. *See* DE 121-3, 86:20–87:13 ("[Commissioner Berger:] [M]y strong feeling is that there's a young man or a young lady who wants to come forward with a complaint, . . . So I support the ordinance . . . completely.").

Furthermore, the communities and states that have addressed the problem of SOCE have adopted nearly identical ordinances and laws to the ordinances here. Thus, this case is distinguishable on its facts from *McCullen*, where the Commonwealth of Massachusetts had not

---

[14] Notably, Defendants' code enforcement officers did make recommendations to pass a resolution as opposed to an ordinance. *See* DE 126-26.

considered methods that other jurisdictions had found to be effective. 134 S. Ct. at 2539. Defendants passed bans on SOCE that mirror similar bans enacted or passed by fifteen state legislatures and dozens of local governments.[15] The vast majority of these bans prohibit medical providers from performing SOCE on minors.[16]

### 4. *Alternative Means: Informed Consent or Voluntary SOCE*

Plaintiffs also argue that informed consent protocols could have protected minors from coerced SOCE. However, Defendants maintain that informed consent does not adequately prevent the harms associated with conversion therapy. *See King v. Gov. of N.J.*, 767 F.3d 216, 240 (2014). First, it is questionable whether minors *could* consent to such a treatment. *See* DE

---

[15] For statewide bans on conversion therapy performed on minors, *see*, Cal. Bus. & Prof. Code § 865 (West 2013) ("Under no circumstances shall a mental health provider engage in sexual orientation change efforts with a patient under 18 years of age."); Conn. Gen. Stat. Ann. § 19a-907a (West 2017) ("No health care provider shall engage in conversion therapy."); 24 Del. Admin. Code § 3514 (2018); D.C. Code § 7-1231.14a (2015) ("A provider shall not engage in sexual orientation change efforts with a consumer who is a minor."); Haw. Rev. Stat. § 453J-1; 405 Ill. Comp. Stat. An.. 48/1 (West 2016) ("Youth Mental Health Protection Act"); Md. Code Ann., Health Occ. § 1-212.1 (West 2018) ("A mental health or child care practitioner may not engage in conversion therapy with an individual who is a minor."); Nev. Rev. Stat. § 629,600 ("Conversion Therapy Prohibited. A psychotherapist shall not provide any conversion therapy to a person who is under 18 years of age regardless of the willingness of the person or his or her parent or legal guardian to authorize such therapy."); N.J. Stat. Ann. § 45:1-55 (2013) ("Prohibition upon imposing sexual orientation change efforts upon a person under 18 years of age"); N.H. Rev. Stat. § 332-L:2; N.M. Stat. Ann. § 61-1-3.3 (West 2017) (A person who is licensed to provide professional counseling . . . shall not engage in conversion therapy with a person under 18 years of age."); N.Y. Educ. Law §6531-a (2019) ("It shall be professional misconduct for a mental health professional to engage in sexual orientation change efforts upon any patient under the age of eighteen years."); Or. Reg. Stat. § 675.850 (2015) ("Practice of conversion therapy on recipients under 18 years of age prohibited"); 23 R.I. Gen. Laws Ann. § 23-94-3 (West, 2017) (Conversion therapy efforts for minors prohibited"); VT. Stat. Ann. Tit. 18, § 8352 (West 2016) ("A mental health care provider shall not use conversion therapy with a client younger than 18 years of age."); Wash. Rev. Code Ann. § 18.130.180 (West, 2018) (defining unprofessional conduct as "[p]erforming conversion therapy on a patient under age eighteen.").

For examples of local bans on conversion therapy performed on minors, *see, e.g.*, Milwaukee, WI Code of Ordinances 75-19 ("It is unlawful for any person to practice conversion therapy with anyone under 18 years of age."); Columbus, OH Code of Ordinances § 2331.10 ("No mental health professional shall knowingly engage, within the geographic boundaries of the City of Columbus, in sexual orientation or gender identity change efforts with a minor, without regard to whether the mental health professional is compensated or receives any form of remuneration for his or her services."); Pittsburg, PA Code of Ordinances, § 628.02 ("No mental health professional shall engage, within the geographic boundaries of the City of Pittsburgh, in sexual orientation or gender identity or expression conversion efforts with a minor without regard to whether the mental health professional is compensated or receives any form of remuneration for his or her services.").

[16] In fact, the County relied on other jurisdictions' existing language to draft their ordinance. *See* DE 121-9, Hvizd Dep. 249:17–23 ("This is an amalgamation of several different ordinances, including West Palm Beach . . . .").

126-39, 3 ("[P]ursuant to Florida law, Minors are incapable of consenting to SOCE counseling."), DE121-10, Ginsburg Dep. 25:19–26:8, 28:10–19 ("I believe [the question] was why – why couldn't they consent. . . . And I think that – you know, that speaks to minors not being fully cognitively and emotionally developed. Their prefrontal cortex, their frontal lobes are – are not fully developed. And so they're not able to engage in consequential thinking and executive functions that would be needed to make informed decisions."); *see also King*, 767 F.3d at 240 ("Minors constitute an especially vulnerable population, and may feel pressured to receive SOCE counseling by their families and their communities despite their fear of being harmed.") (quotations omitted).

Indeed, Defendants have presented evidence that the alleged desires of some minors to eliminate same sex attractions may be generated by the minor's parents. DE 1-6, 81 ("There is no published research suggesting that children are distressed about their sexual orientation per se. Parental concern or distress about a child's behavior, mental health, and possible sexual orientation plays a central role in referrals for psychotherapy."); *see also* DE 1-6, 55–60, 82 ("The absence of evidence for adolescent sexual orientation distress that results in requests for SOCE and the few studies in the literature on religious adolescents seeking psychotherapy related to sexual orientation suggest that such distress is most likely to occur among adolescents in families for whom a religion that views homosexuality as sinful and undesirable is important.").

In addition, even if minors were legally able to consent, publications "have cautioned against providing interventions that have very limited evidence of effectiveness, run counter to current scientific knowledge, and have the potential for harm, *despite client requests*." DE 1-6,

78 (emphasis added) (quotations omitted). Defendants were entitled to conclude that an informed consent protocol would not adequately protect minors from this harm.

Plaintiffs also criticize the studies relied upon by Defendants, because they argue that the studies do not differentiate between coerced and consented-to SOCE. To the contrary, the studies relied upon by Defendants demonstrate that most of the collected data about SOCE comes from individuals who did voluntarily engage in the practice. DE 1-6, 8 ("[T]he task force concluded that the population that undergoes SOCE tends to have strongly conservative religious views that lead them to seek to change their sexual orientation."); DE 1-6, 13 ("Many religious individuals desired to live their lives in a manner consistent with their values (telic congruence), . . . "); DE 1-6, 25 ("Most of the recent studies on SOCE focus on populations with strong religious beliefs" who seek SOCE) (citing seven separate publications).

### 5. *Alternative Means: Prohibition of Aversive Therapies Only*

Plaintiffs also argue that Defendants could have passed ordinances that ban aversive therapy, but not talk therapy. To the extent this alternative was raised in public hearings before the County, the County did consider this alternative, and apparently rejected it. *See, e.g.*, DE 121-3, 38. No community members spoke at the City's public hearing. *See* DE 128-17, 3.

The publications relied upon by the Defendants recognize a lack of research on non-aversive SOCE: "We found that nonaversive and recent approaches to SOCE have not been rigorously evaluated." DE 1-6, 52. This may be due to the reluctance of practitioners and research institutions to engage in *any* SOCE practices. Still, Defendants' cited authorities did not limit their recommendations against conversion therapy to only coercive, behavioral, or aversive techniques. *See, e.g.*, DE 128-6, Am. Psychoanalytic Ass'n Position Statement ("Psychoanalytic

technique does not encompass purposeful attempts to 'covert,' 'repair,' change or shift an individual's sexual orientation, gender identity or gender expression. Such directed efforts are against fundamental principles of psychoanalytic treatment and often result in substantial psychological pain by reinforcing internalized attitudes"); DE 128-10, SAMHSA Report 1 ("[C]onversion therapy – efforts to change an individual's sexual orientation, gender identity, or gender expression – is a practice that is not supported by credible evidence and has been disavowed by behavioral experts and associations….Most importantly, it may put young people at risk of serious harm."). Rather, the authorities that the Defendants relied upon for enactment of the ordinances warn against all conversion therapy, including the type of "talk therapy" performed by Plaintiffs on minors.

Requiring Defendants to produce specific evidence that engaging in SOCE through talk therapy is as harmful as aversive techniques would likely be futile when so many professional organizations have declared their opposition to SOCE. *See, e.g.*, DE 1-6, 20, 33.

      *6.    Conclusions Regarding the "Fit" of the Ordinances to the Governments' Interests*

If the ordinances are subject to rational review, the ordinances are "rationally related" to their purpose. Under intermediate scrutiny as well, these limitations are sufficient to show that the ordinances were "narrowly drawn."

However, if the ordinances are subject to strict scrutiny, Defendants must also demonstrate that the ordinances are *the least restrictive* means to accomplish their objectives of limiting harmful SOCE therapeutic practices on minors. This is a heavy burden for Defendants: "[I]t is the rare case" in which a government is able to demonstrate "that a speech restriction is narrowly tailored to serve a compelling interest." *Williams Yulee v. Fla. Bar*, 135 S. Ct. 1656,

1665–66 (2015) (internal quotations omitted). It is not clear from the record at this stage that the ordinances are the "least restrictive means" to protect minors from the documented harms of SOCE. Furthermore, there may be slight, but important differences between the Defendants' respective deliberative processes. The County has nearly two hundred pages of public hearing transcripts containing community members' support and opposition to the County Ordinance, including recommendations on limiting the ordinance. *See* DE 121-2; DE 121-3. These public hearing records may demonstrate the County "considered" less restrictive alternatives. The City's ordinance did not encounter such opposition publicly, *see* DE 128-17, and therefore there is no similar record of the City's consideration of alternative means. That being said, the standard articulated in *McCullen* cannot mean that one ordinance fails, because it received *less* public opposition than a nearly identical ordinance, which was vociferously opposed. Regardless, the Court need not probe the depths of the least restrictive means requirement at this stage. For now, it is sufficient to conclude that whether one or both of the ordinances survive the least restrictive means analysis is a close question, and Plaintiffs have not met their burden of demonstrating substantial likelihood of success on this point.

E. Viewpoint Discrimination

Finally, the Court returns to Plaintiffs' argument that the ordinances are viewpoint discriminatory. Although this issue is theoretically dispositive, courts often may not reach this question, because they decide the challenged law fails under a strict scrutiny analysis. *See, e.g.*, *Conant v. Walters*, 309 F.3d 629, 637–39 (9th Cir. 2002).

Plaintiffs argue that the ordinances discriminate against the viewpoint of those "who wish to reduce or eliminate behaviors, identity, or expressions that differ from their biological sex."

DE 8, 4; *see also* Hr'g. Tr. 26–29 ("So, what makes th[is] viewpoint discriminatory is not that it prohibits equally change in either direction, from heterosexual to homosexual, that is not discriminatory; what is discriminatory is the viewpoint that they share is one that *affirms* the current state of affairs and disaffirms or disavows any kind of change, your Honor.") (emphasis added). In addition, Plaintiffs argue that the exclusion of counseling that "provides support and assistance to a person undergoing gender transition" from the definition of conversion therapy demonstrates that the ordinances are viewpoint discriminatory. DE 1-4, 6; DE 1-5, 13; *see* DE 8, 4.

The Court finds that the alleged viewpoint discrimination against those who believe that it is possible to change a person's sexual orientation or attractions is not distinguishable from the subject matter being regulated. The ordinances may be construed to be content-discriminatory, because they may prohibit speech based on the ideas, or the message that it conveys. But, "[w]hen the basis for the content discrimination consists *entirely* of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). To illustrate this point, the Supreme Court explained that obscenity could be regulated for "*its prurience*," but not for including "offensive *political* messages." *Id.* (emphases in original).

The plaintiffs in *R.A.V.* challenged a statute which prohibited displays that would arouse "anger, alarm, or resentment . . . on the basis of race, color, creed, religion or gender." 505 U.S. at 380. The Court explained that the law was both content-based and viewpoint-based, because it chose a side in a debate, when both sides posed a harm to the public: "One could hold up a sign saying, for example, that all 'anti-Catholic bigots' are misbegotten; but not that all 'papists' are

for that would insult and provoke violence 'on the basis of religion.'" *Id.* at 391–92. Both signs could cause public unrest, but only one side was prohibited, so the law was viewpoint-discriminatory. "[The government] has no such authority to license one side of a debate to fight freestyle[.]" *Id.* at 391–92.

In this case, Defendants purport that SOCE is regulated because the harm or potential harm is in the treatment itself, not because of the viewpoint or beliefs of the speaker. The ordinances do not regulate Plaintiffs' views about SOCE, homosexuality, or human attraction more generally. The ordinances also do not indicate a preference between heterosexual or homosexual individuals seeking to change their sexual orientation one way or another. *See* DE 1-4; DE 1-5; Hr'g. Tr. 26–29 ("So, what makes the viewpoint discriminatory is *not* that it prohibits equally change in either direction, from heterosexual to homosexual, that is *not* discriminatory.") (emphasis added); *see also* Hr'g. Tr. 119:2–8. The ordinances do regulate the practices of licensed medical providers in trying to change a child's sexual orientation. This *practice* is what is regulated, not any particular viewpoint on the subject. And, the "proposition that a particular instance of speech can be proscribable on the basis of one feature (*e.g.,* obscenity) but not on the basis of another (*e.g.,* opposition to the city government) is commonplace." *R.A.V.*, 505 U.S. at 385. The rationale of preventing harm to minors by prohibiting a type of therapy could be construed as viewpoint neutral. If the Court concludes that SOCE may be regulated, then the perspective that SOCE is beneficial also may be regulated. To find otherwise would swallow the subdivision of viewpoint-discrimination from content-discrimination.

In addition, the ordinances do not prohibit or affect the expression of Plaintiffs' views regarding the benefits of SOCE, sexual orientation or any issue related to it. The ordinances do

not ban change, or the expression of the viewpoint that change in sexual orientation is possible. The ordinances do ban efforts, through a medical intervention, by a licensed provider, to therapeutically change a minor's sexual orientation. Presented with a minor client seeking to change his or her sexual orientation or gender identity, Plaintiffs may commend and recommend conversion therapy. Plaintiffs cannot *perform* SOCE in Palm Beach County or the City Boca Raton. *See Keeton v. Anderson-Wiley*, 664 F.3d 865, 875 (11th Cir. 2011) (remediation plan that required a student to comply with a universally applicable code of ethics prohibiting her from imposing her religious values on patients, including those regarding homosexuality, was viewpoint neutral).

The Court does not agree that the ordinances are viewpoint-based because they exclude from the definition of "conversion therapy" practices that support a minor who is already undergoing gender transition. *See* DE 126-20, 5; DE 126-27, 6. The "counseling" and "support" that is excluded from the definition of conversion therapy is different in kind from SOCE, and is consistent with the modes of communication still available to Plaintiffs. The exclusion of counseling for persons undergoing gender transition underscores the fact that the ordinances only ban *the practice of SOCE*, but licensed professionals are entitled to provide counseling and support to their minor patients on a wide variety of topics, including the benefits of SOCE and/or coping strategies for patients undergoing gender transition. "The First Amendment does not require States to regulate for problems that do not exist." *McCullen v. Coakley*, 134 S. Ct. 2518, 2532 (2014) (quoting *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion)). Here, Defendants did not identify any problem with therapists providing coping strategies and support to children; they have identified problems with therapists providing SOCE.

Finally, the exclusion of religious leaders, and the focus of the law on licensed providers makes sense in light of doctors' role in society. "It is of course true that 'an exemption from an otherwise permissible regulation of speech may represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people." *McCullen*, 134 S. Ct. at 2533 (2014). But that does not seem to be the case here. *Cf. id.* As licensed providers, doctors are cloaked with the authority of science and the state. They are expected to be objective providers of care for their patients. While both religious leaders and licensed providers enjoy deep respect from their parishioners and patients, the source of that respect is different – licensed providers enjoy that respect in part because of the approval of their practice by the state. In addition, it is worth noting that the studies relied upon by Defendants are self-reflective studies of the practice of various forms of mental health care provided by licensed providers. The studies are about licensed providers, and intended to give guidance to licensed providers, not religious leaders. Finally, Defendants' failure to prohibit all SOCE from all sources does not vitiate their prerogative to enact legislation to attempt to curtail SOCE from other sources. *Williams Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1670 (2015) ("We will not punish [a government] for leaving open more, rather than fewer, avenues of expression, especially when there is no indication that the selective restriction of speech reflects a pre-textual motive.").

For the foregoing reasons, the Court concludes that the ordinances likely are viewpoint neutral, and therefore are not per se unconstitutional.

F.  Conclusions on Plaintiffs' Free Speech Claim

For all of the foregoing reasons, the Court declines to announce a standard of review for this case. Based on *Wollschlaeger*, the ordinances likely affect protected speech, and are

therefore subject to a higher level of review than rational basis review. The ordinances also seem to regulate on the basis of their content, which would compel strict scrutiny under *Reed*. However, the Court is unconvinced that strict scrutiny is necessarily the appropriate standard of review, when the ordinances apply to a licensed provider's *treatment* of a minor patient.

The Court finds that if either rational basis review or intermediate review were applied to the ordinances, the ordinances would survive this constitutional challenge. The analysis under strict scrutiny is a closer call, and the Court is unconvinced that Plaintiffs have demonstrated that they are substantially likely to succeed on the merits.

## VII.    PLAINTIFFS' PRIOR RESTRAINT CLAIM

Plaintiffs next argue that the ordinances are unconstitutional prior restraints on protected speech. DE 8, 22–23. "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis and quotation marks omitted) (stating that temporary restraining orders and permanent injunctions that forbid speech activities are classic examples of prior restraints); *see also Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017) (defining the phrase "prior restraint" as a situation where "the government can deny access to a forum for expression before the expression occurs" and stating that a classic example of a prior restraint is a requirement that a would-be speaker obtain a permit or license before speaking). A prior restraint is not unconstitutional *per se*, but must be accomplished with the following procedural safeguards designed to obviate the dangers of a censorship system: (1) the censor must bear the burden of proving that the expression is unprotected; (2) prompt and final judicial review must be

available; and (3) any restraint prior to judicial review may be imposed only for a specified, brief period and only for the purpose of preserving the *status quo*. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558–60 (1975).

A prior restraint on speech is distinguishable from a penalization of past speech. *See Alexander*, 509 U.S. at 553–54 (stating that "our decisions have steadfastly preserved the distinction between prior restraints and subsequent punishments"); *Barrett*, 872 F.3d at 1223 ("Prior restraints contrast with subsequent punishments, which regulate a given type of speech by penalizing the speech only after it occurs." (emphasis and quotation marks omitted)); *see also Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) ("If it can be said that a threat of criminal or civil sanctions after publication chills speech, prior restraint freezes it at least for the time." (quotation marks omitted)). Plaintiffs' argument—that the ordinances are prior restraints because they suppress speech before it occurs—ignores this key distinction. The ordinances do not establish a permit or licensing scheme enabling the government to allow or forbid speech in advance, but rather penalize providers who have practiced conversion therapy. *See* DE 1-4, 8; DE 1-5, 7. Plaintiffs have not demonstrated a substantial likelihood of succeeding on the merits of their claim that the ordinances are prior restraints on speech, so a preliminary injunction shall not issue on this ground. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).

## VIII. PLAINTIFFS' VAGUENESS CLAIM

Plaintiffs also argue that the ordinances are unconstitutionally vague because "sexual orientation and gender identity are fluid and changing concepts," and, therefore, licensed professionals and officers who would enforce the ordinances are uncertain about what the

ordinances prohibit. DE 8, p. 23-24. A law is impermissibly vague if it (1) fails to provide a person of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited or (2) authorizes or encourages arbitrary and discriminatory enforcement. *Hill v. Colorado*, 530 U.S. 703, 732 (2000). The standards for permissible vagueness are particularly strict in the area of free expression, so as to prevent an unnecessary chilling effect on speech. *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 604 (1967).

However, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). An ordinance is not unconstitutionally vague if "it is clear what the ordinance as a whole prohibits." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). The language of a law may be flexible and need not be defined with mathematical certainty. *Id.* When a law does not define a term, that term is given its common and ordinary meaning, absent an established technical definition. *Konikov v. Orange Cty.*, 410 F.3d 1317, 1329 (11th Cir. 2005).

Although Plaintiffs are correct that the ordinances do not define the phrases "sexual orientation" and "gender identity," the Court is unconvinced that Plaintiffs will succeed on their claim that the use of those phrases renders the ordinances vague. Both phrases have a common and readily-ascertainable meaning, such that a person of ordinary intelligence would understand the type of therapy that is prohibited. *See, e.g.*, The American Heritage Dictionary of the English Language (5th ed. 2019) (defining "gender identity" as "[a]n individual's self-identification as being male, female, neither gender, or a blend of both genders" and defining "sexual orientation" as "[t]he direction of a person's sexual interest, as toward people of a different sex, toward people of the same sex, or without regard to sex").

In fact, the Supreme Court has used the phrase "sexual orientation" in numerous opinions, with no apparent difficulty in understanding the phrase's meaning. *See, e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018) (considering a cease and desist order precluding a shop from discriminating against potential customers based on sexual orientation); *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) (concluding that marriage is a fundamental right and liberty, of which same-sex couples may not be deprived). Similarly, the United States Court of Appeals for the Eleventh Circuit has used the phrase "gender identity" in opinions with no apparent difficulty. *See, e.g.*, *Kothmann v. Rosario*, 558 F. App'x 907 (11th Cir. 2014) (concluding that a transgender prisoner pled a plausible Eighth Amendment violation by alleging that a prison denied her requests for hormone treatment); *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) (holding that discrimination on the basis of gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause).

Consequently, the Court is unconvinced that licensed professionals and officers who would enforce the ordinances would be unclear about what the ordinances prohibit. Plaintiffs have not demonstrated a substantial likelihood of succeeding on the merits of their claim that the ordinances are unconstitutionally vague, so a preliminary injunction shall not issue on this ground. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016)

## IX. PLAINTIFFS' *ULTRA VIRES* CLAIM

In their Motion, Plaintiffs finally contend that that the ordinances are *ultra vires* because "the State has impliedly preempted the field of regulation of mental health professionals" and because "the Ordinances conflict with Florida law." DE 8, 18. On these bases, Plaintiffs maintain that they are entitled to a preliminary injunction. Plaintiffs argue in just three paragraphs that

they are suffering an irreparable injury, and they focus their argument entirely on the irreparable injury they suffer at the loss of their speech. DE 8, 19–20. Plaintiffs have not articulated a separate irreparable injury for the Defendants' alleged overreach into a subject area preempted by the State of Florida. If the County and City have overstepped their legislative mandate, Plaintiffs may have suffered and continue to suffer, during the pendency of this action, an injury insofar as they are unable to engage in a form of treatment that they would otherwise perform for their minor clients. This may result in the loss of current clients who seek SOCE and the loss of future clients who are specifically seeking SOCE-providers. *See* DE 1, ¶¶ 132–36, 149–57.

However difficult it may be to calculate the lost income and professional growth from this injury, this is not the "irreparable" injury required to justify the extraordinary remedy of a preliminary injunction. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 88 (1974). "A showing of irreparable harm is 'the sine qua non of injunctive relief.'" *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir.1978)). Furthermore, "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Id.*

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285 (quoting *Sampson*, 415 U.S. at 90); *accord United States v. Jefferson Cty.*, 720 F.2d 1511, 1520 (11th Cir. 1983).

Plaintiffs have not met their burden of demonstrating that they will suffer an *irreparable* injury if the County and City have outstepped their bounds. The Court need not reach the remaining three elements for a preliminary injunction. *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cty Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Accordingly, a preliminary injunction shall not issue on Plaintiffs' *ultra vires* claim.

## X. CONCLUSIONS

Accordingly, for the all of the reasons stated above, it is hereby **ORDERED AND ADJUDGED**

1. The Renewed Motion for Preliminary Injunction [DE 8] is **DENIED**.

2. The Court will set a status conference in this case in a separate order.

**DONE AND ORDERED** in Chambers, West Palm Beach, Florida, this 13th day of February, 2019.

Copies furnished to:
Counsel of Record

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE