

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 29, 2022

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  19-10604-AA
Case Style: Robert Otto, et al v. City of Boca Raton, Florida, et al
District Court Docket No: 9:18-cv-80771-RLR

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision
was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion
was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

**UNITED STATES COURT OF APPEALS**
**For the Eleventh Circuit**

_____

No. 19-10604

_____

District Court Docket No.
9:18-cv-80771-RLR

ROBERT W. OTTO,
JULIE H. HAMILTON,

Plaintiffs - Appellants,

versus

CITY OF BOCA RATON, FLORIDA,
COUNTY OF PALM BEACH, FL,

Defendants - Appellees.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is
entered as the judgment of this Court.

Entered: November 20, 2020
For the Court: DAVID J. SMITH, Clerk of Court
By: Jeff R. Patch

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10604

_____

D.C. Docket No. 9:18-cv-80771-RLR

ROBERT W. OTTO,
JULIE H. HAMILTON,

Plaintiffs-Appellants,

versus

CITY OF BOCA RATON, FLORIDA,
COUNTY OF PALM BEACH, FLORIDA,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 20, 2020)

Before MARTIN, GRANT, and LAGOA, Circuit Judges.

GRANT, Circuit Judge:

Boca Raton and Palm Beach County prohibit therapists from engaging in

counseling or any therapy with a goal of changing a minor's sexual orientation,

reducing a minor's sexual or romantic attractions (at least to others of the same gender or sex), or changing a minor's gender identity or expression—though support and assistance to a person undergoing gender transition is specifically permitted. These restrictions apply even to purely speech-based therapy. Two therapists argue that the ordinances infringe on their constitutional right to speak freely with clients. They appeal the district court's denial of their motion for a preliminary injunction. We understand and appreciate that the therapy is highly controversial. But the First Amendment has no carveout for controversial speech. We hold that the challenged ordinances violate the First Amendment because they are content-based regulations of speech that cannot survive strict scrutiny.

## I.

### A.

In late 2017, Palm Beach County, Florida and the City of Boca Raton joined a growing list of states and municipalities that prohibit controversial therapies called sexual orientation change efforts (SOCE).[1] The City and the County both passed ordinances based on legislative findings that SOCE poses a serious health risk to minors. These findings cited various studies and the position papers of numerous medical and public health organizations.

The City and County ordinances are substantially identical, differing

---

[1] We are mindful that the terminology itself is contested. Plaintiffs reject the often-used label "conversion therapy," which they associate with "shock treatments, involuntary camps, and other chimerical or long-abandoned practices." We will proceed with the broad (if imperfect) term "sexual orientation change efforts." This term is used in both ordinances, and all parties seem to accept it.

primarily in how they penalize violations.[2]  The City's ordinance applies to "any

person who is licensed by the State of Florida to provide professional counseling,"

except for clergy.  The ordinance bars covered providers from treating minors with

> any counseling, practice or treatment performed with the goal of
> changing an individual's sexual orientation or gender identity,
> including, but not limited to, efforts to change behaviors, gender
> identity, or gender expression, or to eliminate or reduce sexual or
> romantic attractions or feelings toward individuals of the same gender
> or sex.

The County enacted a similar ordinance banning covered providers from

engaging in SOCE with minor clients.  Its definition of provider is consistent with

the City's.  The County ordinance bans

> the practice of seeking to change an individual's sexual orientation or
> gender identity, including but not limited to efforts to change behaviors,
> gender identity, or gender expressions or to eliminate or reduce sexual
> or romantic attractions or feelings toward individuals of the same
> gender or sex.

But both ordinances contain a significant carveout: they expressly

allow "counseling that provides support and assistance to a person

undergoing gender transition."

B.

Robert Otto and Julie Hamilton are licensed marriage and family therapists

with practices in Palm Beach County, including within the City of Boca Raton.

Among other services, they provide counseling to minors who have unwanted

same-sex attraction or unwanted gender identity issues.  Plaintiffs characterize

---

[2] The City penalizes violations with a fine not exceeding $500, whereas the County penalizes a
first violation with a $250 fine and subsequent violations with a $500 fine.

their counseling as "talk therapy"—that is, therapy conducted solely through speech.

Before the ordinances went into effect, plaintiffs often saw clients who presented with depression and anxiety due to internal conflicts over their sexuality or gender identity. Both therapists disclaim any ability to "change" any person's sexual orientation; they believe, however, that through speech-based therapy, their clients who wish to do so can reduce same-sex behavior and attraction and eliminate what they term confusion over gender identity.

Plaintiffs say their therapy is voluntary and client-directed. Their clients typically have "sincerely held religious beliefs conflicting with homosexuality, and voluntarily seek SOCE counseling in order to live in congruence with their faith and to conform their identity, concept of self, attractions, and behaviors to their sincerely held religious beliefs."

Neither the City nor the County disputes that plaintiffs' practices consisted entirely of speech. But the defendants maintain that SOCE, in any form, poses serious health risks to children and adolescents. Specifically, they cite a seriously increased risk of depression and suicide.

Plaintiffs filed suit to permanently enjoin enforcement of both ordinances. The next day, they moved for a preliminary injunction on two grounds: that the ordinances violate the First Amendment and that the ordinances are preempted by state law. After receiving briefing on the matter, and holding a full day of oral argument, the district court denied the motion. On the First Amendment claim, the court found that plaintiffs failed to demonstrate a substantial likelihood of success

on the merits.  As to the state preemption claim, the court found that, even if

plaintiffs could demonstrate a likelihood of success on the merits, they could not

demonstrate irreparable harm.  Plaintiffs immediately filed this interlocutory

appeal.

## II.

We review the district court's order denying a preliminary injunction for

abuse of discretion.  *See Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000)

(en banc).  A preliminary injunction is an "extraordinary and drastic remedy." *Id.*

at 1176 (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir.

1998)).  The party seeking one must make four showings: "(1) it has a substantial

likelihood of success on the merits; (2) irreparable injury will be suffered unless

the injunction issues; (3) the threatened injury to the movant outweighs whatever

damage the proposed injunction may cause the opposing party; and (4) if issued,

the injunction would not be adverse to the public interest." *Id.*

## III.

The First Amendment prohibits the political restriction of speech in simple

but definite terms: "Congress shall make no law . . . abridging the freedom of

speech."  U.S. Const. amend. I.  Those same terms, and their guarantee of free

speech, now apply to states and municipalities as well as to the federal

government.  *See Cruz v. Ferre*, 755 F.2d 1415, 1418 (11th Cir. 1985).  At the

heart of that guarantee is "the principle that each person should decide for himself

or herself the ideas and beliefs deserving of expression, consideration, and

adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994).

The plaintiffs claim that the SOCE ordinances violate that principle by restricting speech-based therapy because the local governments disagree with the message, ideas, subject matter, and content of the words spoken during their clients' therapy.  The local governments counter that their only intention is to protect minors from the harm that is surely caused by that speech, and say that because it is professional speech or conduct they have the power to limit it.

This is a case about what speech the First Amendment allows the government to ban, and under what circumstances.  So the first question we need to consider is whether the ordinances are content-based regulations.  If they are, we analyze them under strict scrutiny; if not, they receive the lighter touch of intermediate scrutiny or perhaps even rational basis review.  "In cases at the margin, it may sometimes be difficult to figure out what constitutes speech protected by the First Amendment.  But this is not a hard case in that respect." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc).  The answer to the content-based-or-not question turns out to be as easy here as it was in *Wollschlaeger*: because the ordinances depend on what is said, they are content-based restrictions that must receive strict scrutiny.

The local governments' characterization of their ordinances as professional regulations cannot lower that bar.  The Supreme Court has consistently rejected attempts to set aside the dangers of content-based speech regulation in professional settings: "As with other kinds of speech, regulating the content of professionals' speech 'pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information.'" *Nat'l*

*Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2374 (2018) (alteration in original) (quoting *Turner*, 512 U.S. at 641).

Nor can the local governments evade the First Amendment's ordinary presumption against content-based speech restrictions by saying that the plaintiffs' speech is actually conduct. We can understand why they would make this claim; if the ordinances restricted only non-expressive conduct, and not speech, then they would not implicate the First Amendment at all. Our Court, though, has already rejected the practice of relabeling controversial speech as conduct. In a case quite similar to this one, we laid down an important marker: "the enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation." *Wollschlaeger*, 848 F.3d at 1308 (quotation omitted). And between that decision and this one, the Supreme Court also rejected an attempt to regulate speech by recharacterizing it as professional conduct. *See NIFLA*, 138 S. Ct. at 2373–74. So too here. The local governments cannot rescue their ordinances by calling the plaintiffs' speech conduct.

Strict scrutiny ordinarily applies to content-based restrictions of speech, and this case is no different. That means we must consider whether the ordinances are "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Laws or regulations almost never survive this demanding test, and these ordinances are not outliers. Forbidding the government from choosing favored and disfavored messages is at the core of the First Amendment's free-speech guarantee. *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

A.

A content-based law is one that "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. Few categories of regulation have been as disfavored as content-based speech restrictions, which are "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). That's because, "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Mosley*, 408 U.S. at 95. So regulations that are grounded in the content of speech, and that allow the government "to discriminate on the basis of the content" of that speech, "cannot be tolerated under the First Amendment." *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (quotation omitted).

The "mere assertion of a content-neutral purpose" is not enough "to save a law which, on its face, discriminates based on content." *Turner*, 512 U.S. at 642–43. So the first question is not about a law's purpose, but about its effect—whether it restricts or penalizes speech on the basis of that speech's content. It is not always easy to determine whether a law is content-based—but sometimes it is. "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter." *Reed*, 576 U.S. at 163. Two laws held unconstitutional, by the Supreme Court and this Court, respectively, provide useful examples: a federal statute that prohibited the sale and possession of videos depicting animal cruelty, and the Florida law in *Wollschlaeger*, which prevented doctors from "asking questions concerning the ownership of a firearm or

ammunition by the patient." *See United States v. Stevens*, 559 U.S. 460, 464 (2010); *Wollschlaeger*, 848 F.3d at 1303 (quoting Fla. Stat. § 790.338(2) (2011)). If adorable videos of puppies are allowed and horrifying videos of puppy abuse are not, that restriction is based on content, no matter how desirable it may be. And if Florida doctors may ask their patients about ownership of anything other than a firearm, that too is a content-based restriction. Those rules were obviously content-based because they regulated certain subject matters but not others.

One reliable way to tell if a law restricting speech is content-based is to ask whether enforcement authorities must "examine the content of the message that is conveyed" to know whether the law has been violated. *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)). Take a recent example from the Supreme Court. To see if a robocall was legal, authorities needed to know what the call was about: collecting government debt or anything else. "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (plurality opinion); *see also League of Women Voters*, 468 U.S. at 383 (to determine whether a particular statement was prohibited, "enforcement authorities must necessarily examine the content of the message that is conveyed").

Other regulations are more obviously content neutral. An anti-demonstration statute, for example, that prohibited such activities within 35 feet of an abortion clinic was deemed content neutral. *See McCullen*, 573 U.S. at 479–85. Proving whether a demonstrator broke the law required showing physical proximity to an abortion clinic, but it would make no difference whether a

demonstration supported or opposed the clinic's work.  *See id.*  Similarly, a municipal ordinance was not content-based when it required bands using the city's outdoor stage to also use the city's sound system (which controlled volume and sound mix).  *See Ward v. Rock Against Racism*, 491 U.S. 781, 792 (1989).  That regulation applied to all bands equally, and was not conditioned on the messages in songs or the political views of band members; in other words, it could be "justified without reference to the content of the regulated speech."  *Id.* at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

        We cannot see how the regulations here can be applied without considering the content of the banned speech.  Indeed, and as we said in *Wollschlaeger*, "this is not a hard case in that respect."  848 F.3d at 1307.  The regulations are plainly "speaker-focused and content-based restrictions on speech": they limit a category of people—therapists—from communicating a particular message.  *Id.*  Consider again the similarities to *Wollschlaeger*.  There, a Florida law prevented doctors from speaking to their patients about firearm ownership.  *See id.* at 1302–03.  Whether a doctor violated that law turned solely on the content of the message conveyed to the patient.  Here too.  Whether therapy is prohibited depends only on the content of the words used in that therapy, and the ban on that content is because the government disagrees with it.  And whether the government's disagreement is for good reasons, great reasons, or terrible reasons has nothing at all to do with it.  All that matters is that a therapist's speech to a minor client is legal or illegal under the ordinances based solely on its content.

The governments point out that the therapists have other, similar avenues of expression.  To be sure, the therapists remain free to describe SOCE to the public or recommend that a client receive SOCE in another jurisdiction.  But (contrary to the dissent's contention) the ordinances plainly prohibit the therapists from having certain conversations with clients.  In any event, the constitutional problem posed by speech bans like this one is not mitigated when closely related forms of expression are considered acceptable.  Imagine, for instance, if the government of Skokie, Illinois had defended the state court's injunction on a pro-Nazi parade by assuring the Supreme Court that people were welcome to *advocate* for a pro-Nazi demonstration; it's just that they could not actually hold the demonstration.  *See Nat'l Socialist Party of Am. v. Village of Skokie*, 432 U.S. 43 (1977).  The First Amendment does not protect the right to speak about banned speech; it protects speech itself, no matter how disagreeable that speech might be to the government.  And what good would it do for a therapist whose client sought SOCE therapy to tell the client that she thought the therapy could be helpful, but could not offer it?  It only matters that some words about sexuality and gender are allowed, and others are not.

Equally irrelevant is the district court's observation that plaintiffs retain "their right and prerogative to seek greater acceptance of SOCE."  The plaintiffs in *Wollschlaeger* who wished to talk with their patients about gun safety also retained the "right and prerogative" to seek wider appreciation for their desire to do so.  But speech does not need to be popular in order to be allowed.  The First Amendment

exists precisely so that speakers with unpopular ideas do not have to lobby the government for permission before they speak.

So the ordinances discriminate on the basis of content—at a minimum. They also discriminate on the basis of viewpoint. After all, the plaintiffs' counseling practices are grounded in a particular viewpoint about sex, gender, and sexual ethics. The defendant governments obviously hold an opposing viewpoint—one that they surely have the right to promote. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) (the Free Speech Clause "does not regulate government speech"); *see also Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1074 (11th Cir. 2015). But they cannot engage in "bias, censorship or preference regarding [another] speaker's point of view." *Messer v. City of Douglasville*, 975 F.2d 1505, 1509 (11th Cir. 1992).

That the defendants did precisely that becomes even more obvious when considering the "exception" outlined in both ordinances. The exception expressly allows "counseling that provides support and assistance to a person undergoing gender transition." No such carveout exists for sexual orientation. The ordinances thus codify a particular viewpoint—sexual orientation is immutable, but gender is not—and prohibit the therapists from advancing any other perspective when counseling clients. That viewpoint may be widely shared in the communities that passed the ordinances, but widespread agreement is beside the point; the question is whether a speaker's viewpoint determines his license to speak. Here, the answer is yes.

12

Viewpoint-based regulations like these are "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). Indeed, there is an argument that such regulations are unconstitutional per se; the Supreme Court has said that "the First Amendment *forbids* the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) (emphasis added). In that case, it applied heightened scrutiny only after finding that the challenged law was viewpoint neutral. *See id.* at 804–05. As *Rosenberger* said, "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." 515 U.S. at 829. And we have not shied away from the same point: "The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis." *Searcey v. Harris*, 888 F.2d 1314, 1325 (11th Cir. 1989). Those holdings do not leave a lot of breathing room for viewpoint-based speech restrictions.

Still, the Supreme Court has not explicitly adopted a per se rule, and we have no need to do so here. We only conclude that these ordinances are content- and viewpoint-based restrictions on speech.

### B.

The district court and the defendants suggest that the ordinances here—even if based on the content of a therapist's speech—fall into a kind of twilight zone of "professional speech" or "professional conduct." To be sure, certain types of speech receive either less protection or no protection under the First Amendment.

Unprotected categories include obscenity, defamation, fraud, incitement, and speech integral to criminal conduct.  *See Stevens*, 559 U.S. at 468.  No one has argued that the ordinances fall into these categories of unprotected speech, and we do not see how they could.

Lesser-protected categories include commercial speech, as well as incidental speech swept up in the regulation of professional conduct.  *See, e.g.*, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980) (commercial speech); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456–57 (1978) (incidental speech).  But neither of these existing categories are a good fit for the ordinances, and we decline the invitation to recognize a new category of less protected speech.  To begin, the ordinances do not regulate commercial speech.  *See, e.g.*, *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017).  Here, what is being regulated is not, say, an advertisement for therapy, but the therapy itself.  No one argues that commercial speech is at issue.

As for "incidental speech swept up in the regulation of conduct," the ordinances are direct, not incidental, regulations of speech.  Moreover, they are not connected to any regulation of separately identifiable conduct.  We recognize, of course, the long-standing principle that valid regulations of conduct might sweep up some speech at their margins.  A law against discriminatory hiring would prohibit a "White Applicants Only" sign, a local ordinance against setting outdoor fires would cover flag burning, and an antitrust law directed against "agreements in restraint of trade" would restrict the speech necessary to form such an agreement.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (citing cases).  And there

is no doubt that "States may regulate professional conduct, even though that conduct incidentally involves speech." *NIFLA*, 138 S. Ct. at 2372. That is because "words can in some circumstances violate laws directed not against speech but against conduct." *R.A.V.*, 505 U.S. at 389.

But there is a real difference between laws directed at conduct sweeping up incidental speech on the one hand and laws that directly regulate speech on the other. The government cannot regulate speech by relabeling it as conduct. As we have said, "characterizing speech as conduct is a dubious constitutional enterprise," and "labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation." *Wollschlaeger*, 848 F.3d at 1308–09 (quotation omitted).

The local governments are not entirely wrong when they characterize speech-based SOCE as a course of conduct. SOCE, after all, is a therapy, and plaintiffs say they want to "engage" in it. But plaintiffs have the better of the argument. What the governments call a "medical procedure" consists—entirely—of words. As the district court itself recognized, plaintiffs' therapy "is not just carried out *in part* through speech: the treatment provided by Drs. Otto and Hamilton *is entirely* speech." If SOCE is conduct, the same could be said of teaching or protesting—both are activities, after all. Debating? Also an activity. Book clubs? Same answer. But the law does not require us to flip back and forth between perspectives until our eyes hurt. Our precedent says the opposite:

"Speech is speech, and it must be analyzed as such for purposes of the First Amendment." *Wollschlaeger*, 848 F.3d at 1307 (alteration omitted).[3]

    *Cohen v. California* is a good example. *See* 403 U.S. 15, 18 (1971). There, the Supreme Court reviewed the violation of a state law prohibiting "maliciously and willfully disturbing the peace or quiet of any neighborhood or person by offensive conduct." *Id.* at 16 (punctuation altered). The defendant had worn a profanity-emblazoned jacket in front of women and children. *Id.* Because the "only 'conduct' which the State sought to punish" was "the fact of communication," the Court invalidated the conviction as "resting solely upon 'speech,' not upon any *separately identifiable conduct*." *Id.* at 18 (emphasis added) (internal citation omitted). So putting on the shirt was not the issue; it was the message communicated by the shirt.

    The defendants' ordinances also target a message: the advice that therapists may give their clients. As the Supreme Court said in another case purportedly addressing conduct, if "the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (quotation omitted). The same is true here. If speaking to clients is not speech, the world is truly upside down. These ordinances sanction speech directly, not incidentally—the only "conduct" at issue is speech. Simply put, it is never enough for the government to show how

---

[3] The dissent also repeatedly characterizes speech-based SOCE as a "medical practice," but again, it is not medical at all—it is a client-directed conversation consisting entirely of speech. Dissenting Op. at 35, 42 & n.5, 46. Still, this Court's en banc decision in *Wollschlaeger*, which invalidated restrictions on physician speech during medical examinations, shows that this distinction would not make a difference in any event. 848 F.3d at 1319.

speech can also be framed as conduct.  "Saying that restrictions on writing and speaking are merely incidental to speech is like saying that limitations on walking and running are merely incidental to ambulation." *Wollschlaeger*, 848 F.3d at 1308.

Declaring itself "stymied by the Eleventh Circuit's analysis in *Wollschlaeger*," the district court found refuge in a proposed category of less protected speech, which it described as "professional speech."  The problem is that courts do not have a "freewheeling authority to declare new categories of speech outside the scope of the First Amendment." *United States v. Alvarez*, 567 U.S. 709, 722 (2012) (quoting *Stevens*, 559 U.S. at 472).  And "professional speech" is not a traditional category of speech that falls within an exception to normal First Amendment principles.  We have already rejected the suggestion that the government's ability to regulate entry into a profession entitles it to regulate the speech of professionals. *See Wollschlaeger*, 848 F.3d at 1309.  In *Wollschlaeger*, the fact that the speech about gun safety was offered in the context of a profession did not mean the government could restrict that speech.  This case, like *Wollschlaeger*, is not about licensure requirements.[4]  *See id.* (discussing *Locke v. Shore*, 634 F.3d 1185 (11th Cir. 2011)).  It is about speech.

---

[4] The dissent cites *Locke* for the proposition that governments have a "compelling interest in the practice of professions within their boundaries" and "have broad power to establish standards for licensing practitioners and regulating the practice of professions."  Dissenting Op. at 34 (quoting *Locke*, 634 F.3d at 1196).  But this Court, sitting en banc, recognized that *Locke* "is not of much help" in cases that "implicate constitutionally protected activity under the First Amendment" because the law there was "not one which limited or restricted what licensed interior designers could say on a given topic in practicing their profession." *Wollschlaeger*, 848 F.3d at 1309

Indeed, if professional speech were not protected under normal First Amendment principles, the government might "easily tell architects that they cannot propose buildings in the style of I.M. Pei, or general contractors that they cannot suggest the use of cheaper foreign steel in construction projects, or accountants that they cannot discuss legal tax avoidance techniques." *Id.* at 1311. The list could go on.  Perhaps examples from areas that are not enmeshed in political controversy make the risks easier to see.  But the same limits apply everywhere.

The Supreme Court's decision in *NIFLA* also refused to recognize professional speech as a new speech category deserving less protection.  There, the Court refused to give governments "unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement."  *NIFLA*, 138 S. Ct. at 2375.  The First Amendment's core speech protections could not very well withstand that sort of restriction-via-professionalization.[5]

In fact, the *NIFLA* decision not only addressed similar doctrinal issues to those we face here—it directly criticized other circuit decisions approving of SOCE bans.  In *Pickup v. Brown*, the Ninth Circuit reviewed California's anti-

---

(quoting *Locke*, 634 F.3d at 1191).  And, in any event, as the dissent itself accepts, the ordinances here are content-based speech restrictions subject to the First Amendment.

[5] An extraordinary variety of licensing schemes have been found to pass constitutional muster, so a rule that professional licensure implies a power to regulate the speech of license holders would grant the government awesome power.  *See, e.g.*, *Locke*, 634 F.3d at 1195–97 (upholding Florida's licensing requirement for interior designers); *Kagan v. City of New Orleans*, 753 F.3d 560 (5th Cir. 2014) (upholding municipal licensing requirement for tour guides); *Powers v. Harris*, 379 F.3d 1208, 1225 (10th Cir. 2004) (upholding Oklahoma's licensing requirement for funeral directors).

SOCE law under the rational basis standard.  *See* 740 F.3d 1208, 1231 (9th Cir. 2014).  And in *King v. Governor of New Jersey*, the Third Circuit reviewed New Jersey's similar law under intermediate scrutiny.  *See* 767 F.3d 216, 234–37 (3d Cir. 2014).  *NIFLA* disapproved of both courts' willingness to "except professional speech from the rule that content-based regulations of speech are subject to strict scrutiny."  138 S. Ct. at 2371.  "Speech is not unprotected merely because it is uttered by 'professionals.'"  *Id.* at 2371–72.

We take that statement to heart.  The idea that the ordinances target "professional speech" does not loosen the First Amendment's restraints.  Although *NIFLA* did "not foreclose the possibility" that some reason might exist for finding that professional speech is a "unique category that is exempt from ordinary First Amendment principles," the defendants have not provided one.  138 S. Ct. at 2375.  And because *NIFLA* directly criticized *Pickup* and *King*—cases with very close facts to this one—we do not think there is much question that, even if some type of professional speech might conceivably fall outside the First Amendment, the speech at issue here does not.  But to whatever extent *NIFLA* failed to bind us with a direct holding on that point, we now make that holding ourselves.  These ordinances are content-based regulations of speech and must satisfy strict scrutiny.

## C.

Under strict scrutiny, content-based restrictions "are presumptively unconstitutional."  *Reed*, 576 U.S. at 163.  And they can be justified "only if the government proves that they are narrowly tailored to serve compelling state

19

interests."[6]  *Id.*  It is indisputable "that a State's interest in safeguarding the

physical and psychological well-being of a minor is compelling."  *New York v.*

*Ferber*, 458 U.S. 747, 756–57 (1982) (internal quotation marks omitted).  We have

no doubt that the local governments here have a strong interest in protecting

children.  Their legitimate authority to protect children, however, "does not include

a free-floating power to restrict the ideas to which children may be exposed."

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794–95 (2011).  So while protecting

children is a crucial government interest, speech "cannot be suppressed solely to

protect the young from ideas or images that a legislative body thinks unsuitable for

them."  *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975).

   Additionally, it is not enough for the defendants to identify a compelling

interest.  To survive strict scrutiny, they must prove that the ordinances "further[]"

that compelling interest and are "narrowly tailored to that end."  *Reed*, 576 U.S. at

171.  According to the Supreme Court, it is "rare that a regulation restricting

speech because of its content will ever be permissible."  *Brown*, 564 U.S. at 799

(internal citation omitted).  The government carries the burden of proof and,

"because it bears the risk of uncertainty, ambiguous proof will not" satisfy the

"demanding standard" it must meet.  *Id.* at 799–800 (internal citation omitted).

And as this Court has explained, our review under strict scrutiny is "properly

---

[6] Cases where this standard is met are few and far between.  *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 26 (2010) (Congress could prohibit certain speech "to, under the direction of, or in coordination with" a foreign terrorist organization); *Morse v. Frederick*, 551 U.S. 393, 397 (2007) (public high school could confiscate banner promoting marijuana use); *Burson v. Freeman*, 504 U.S. 191, 211 (1992) (plurality opinion) (state could require solicitors stand at least 100 feet from entrance to polling places).

skeptical of the government's ability to calibrate the propriety and utility of speech on certain topics." *Wollschlaeger*, 848 F.3d at 1308.

Defendants say that the ordinances "safeguard[] the physical and psychological well-being of minors." Together with their amici, they present a series of reports and studies setting out harms. But when examined closely, these documents offer assertions rather than evidence, at least regarding the effects of purely speech-based SOCE. Indeed, a report from the American Psychological Association, relied on by the defendants, concedes that "nonaversive and recent approaches to SOCE have not been rigorously evaluated."[7] In fact, it found a "complete lack" of "rigorous recent prospective research" on SOCE. As for speech-based SOCE, the report notes that recent research indicates that those who have participated have mixed views: "there are individuals who perceive they have been harmed and others who perceive they have benefited from nonaversive SOCE." What's more, because of this "complete lack" of rigorous recent research, the report concludes that it has "no clear indication of the prevalence of harmful outcomes among people who have undergone" SOCE.[8] We fail to see how, even

---

[7] The dissent's claim that a "mountain of rigorous evidence" supports the ordinances is in serious tension with this acknowledgment of the *lack* of rigorous research on nonaversive SOCE. Dissenting Op. at 42.

[8] We focus our attention on the APA's 2009 task force report because it "performed a systematic review of the peer-reviewed literature" to assess SOCE. Many of the other reports cited by the dissent—including those from the World Health Organization and the U.S. Department of Health and Human Services—primarily rely on the APA's task force report to draw their own conclusions about SOCE. So we choose instead to discuss the APA's report directly. Additionally, we discuss the APA's 2009 report, rather than its 1998 resolution, because the 2009 task force was specifically asked to "[r]eview and update" the 1998 resolution. Finally, we note that very little of the APA report considers evidence solely related to purely speech-based therapy.

completely crediting the report, such equivocal conclusions can satisfy strict scrutiny and overcome the strong presumption against content-based limitations on speech.[9]

Still, they say, our confidence should not be shaken: the "relative lack of empirical studies on SOCE is not evidence of lack of harm . . . . If anything, the lack of studies on SOCE may be indicative of the risk of harm." The district court agreed: "Requiring Defendants to produce specific evidence that engaging in SOCE through talk therapy is as harmful as aversive techniques would likely be futile when so many professional organizations have declared their opposition to SOCE." In other words, evidence is not necessary when the relevant professional organizations are united.

But that is, really, just another way of arguing that majority preference can justify a speech restriction. The "point of the First Amendment," however, "is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content." *R.A.V.*, 505 U.S. at 392. Strict scrutiny cannot be satisfied by professional societies' opposition to speech. Although we have no reason to doubt that these groups are composed of educated men and women acting in good faith, their institutional positions cannot define the boundaries of constitutional rights. They may hit the right mark—but they may also miss it.

_____

[9] We reiterate that strict scrutiny is a "demanding standard," and because the government bears the risk of uncertainty, "ambiguous proof" will not suffice. *Brown*, 564 U.S. at 799–800. Permitting uncertain evidence to satisfy strict scrutiny would blur the lines that separate it from lesser tiers of scrutiny—that is, intermediate scrutiny and rational basis review.

Sometimes by a wide margin, too.  It is not uncommon for professional organizations to do an about-face in response to new evidence or new attitudes, but one example stands out as we consider this case.  In the first three printings of the *Diagnostic and Statistical Manual of Mental Disorders*, the American Psychiatric Association considered homosexuality a paraphilia, disorder, or disturbance.[10]  Only in 1987 was homosexuality completely delisted from the Manual.[11]  The Association's abandoned position is, to put it mildly, broadly disfavored today.  But the change itself shows why we cannot rely on professional organizations' judgments—it would have been horribly wrong to allow the old professional consensus against homosexuality to justify a ban on counseling that affirmed it.  Neutral principles work both ways, so we cannot allow a new consensus to justify restrictions on speech.  Professional opinions and cultural attitudes may have changed, but the First Amendment has not.[12]

We pause to note that this can be a difficult conclusion.  But it does not mean that society is powerless to remedy harmful speech.  While the First Amendment rejects the governments' approach here, it does not stand in the way of "[l]ongstanding torts for professional malpractice" or other state-law penalties

---

[10] *See* American Psychiatric Association, DSM-I (1952); DSM-II (1968); DSM-II 6th printing change (1973); DSM-III (1980).

[11] *See* American Psychiatric Association, DSM-III-R (1987).

[12] None of this is meant to suggest that the ordinances could necessarily be saved with just one more appropriately scoped, double-blind, peer-reviewed study.  Because the ordinances discriminate based on viewpoint, their problems may go beyond insufficient evidence.  As we mentioned earlier, viewpoint-based restrictions may be unconstitutional per se.  *See, e.g.*, *Taxpayers for Vincent*, 466 U.S. at 804–05.  But we need not decide that here because the ordinances are plainly unconstitutional under the ordinary test for content-based speech restrictions.

for bad acts that produce actual harm. *NIFLA*, 138 S. Ct. at 2373 (citing *NAACP v. Button*, 371 U.S. 415, 438 (1963)). People who actually hurt children can be held accountable, but "[b]road prophylactic rules in the area of free expression are suspect." *Button*, 371 U.S. at 438. In other words, "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply." *Brown*, 564 U.S. at 804–05.

One final point. We do understand the temptation to say that some speech goes too far and is too risky to permit. But the First Amendment requires that content-based speech restrictions satisfy strict scrutiny. *Id.* at 799. And unless restrictions meet that "demanding standard," whether the speech they target should be tolerated is simply not a question that we are allowed to consider, or a choice that we are allowed to make. *Id.* "The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it." *Stevens*, 559 U.S. at 470.

## IV.

So the therapists meet the first requirement for a preliminary injunction. They also meet the remaining requirements as a necessary legal consequence of our holding on the merits. The second requirement is "irreparable injury." Because the ordinances are an unconstitutional "direct penalization" of protected speech, continued enforcement, "for even minimal periods of time," constitutes a per se irreparable injury. *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983)

(quotation omitted); *see also FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) ("[A]n ongoing violation of the First Amendment constitutes an irreparable injury.").

The nonmovant is the government, so the third and fourth requirements— "damage to the opposing party" and "public interest"—can be consolidated.  It is clear that neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance.  *See, e.g.*, *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

V.

Aside from their First Amendment claims, plaintiffs argue that the ordinances are ultra vires because they regulate an area—the licensure of mental health professionals—preempted by the State of Florida's licensure scheme.  It's true that federal courts should "avoid reaching constitutional questions if there are other grounds upon which a case can be decided."  *BellSouth Telecomms., Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1176 (11th Cir. 2001).  That doctrine, however, is not implicated here.  It only comes into play when "a *dispositive* nonconstitutional ground is available."  *Hagans v. Lavine*, 415 U.S. 528, 547 (1974) (emphasis added).

The main reason the doctrine is not implicated, then, is that the state preemption claim is not dispositive here.  In considering that claim, the district court ruled that the plaintiffs failed to show irreparable harm, but it did not address the other preliminary injunction factors.  Were we to reverse, we would need to remand to the district court to evaluate the remaining factors on remand—we are

"a court of review, not a court of first view."[13]  *Compulife Software Inc. v.
Newman*, 959 F.3d 1288, 1307 (11th Cir. 2020).  Thus, the state law issue
presented on appeal—whether the plaintiffs are suffering irreparable injury from
local legislation in an area impliedly preempted by state law—is not dispositive.
The district court would still need to consider the three remaining factors because,
unlike the First Amendment, state preemption doctrine does not necessarily resolve
the other three factors.

What's more, even if the district court ultimately issued a preliminary
injunction on state-preemption grounds, the plaintiffs would suffer the delay of
further proceedings in the meantime.  Relief is definitionally incomplete if it forces
the plaintiffs to continue holding their First Amendment rights in abeyance.  *See
Cate*, 707 F.2d at 1188; *FF Cosms.*, 866 F.3d at 1298; *cf. Zwickler v. Koota*, 389
U.S. 241, 252 (1967) (forcing plaintiffs to "suffer the delay of state court
proceedings might itself effect the impermissible chilling of the very constitutional
right" they seek to protect).

---

[13] Even if we did consider the preemption issue, we find it unlikely that the record and briefing
before us would support a preliminary injunction on that basis.  Throughout this litigation, state
preemption has been an ancillary issue for the parties; the plaintiffs' motion before the district
court devoted approximately three paragraphs to the merits of the preemption argument, and
their initial brief here, aside from one sentence recapping their argument to the district court,
does not address it at all.  This discussion of course has no bearing on whether the plaintiffs
could prevail at summary judgment, *see, e.g.*, *Vazzo v. City of Tampa*, 415 F. Supp. 3d 1087,
1107 (M.D. Fla. 2019) (finding, on summary judgment, that Tampa's anti-SOCE ordinance was
impliedly preempted by state law), or whether any other party could make the required showing
for a preliminary injunction.

\*      \*      \*

This decision allows speech that many find concerning—even dangerous. But consider the alternative.  If the speech restrictions in these ordinances can stand, then so can their inverse.  Local communities could prevent therapists from validating a client's same-sex attractions if the city council deemed that message harmful.  And the same goes for gender transition—counseling supporting a client's gender identification could be banned.  It comes down to this: if the plaintiffs' perspective is not allowed here, then the defendants' perspective can be banned elsewhere.  People have intense moral, religious, and spiritual views about these matters—on all sides.  And that is exactly why the First Amendment does not allow communities to determine how their neighbors may be counseled about matters of sexual orientation or gender.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  *Texas v. Johnson*, 491 U.S. 397, 414 (1989).  The challenged ordinances violate that principle, and the district court should have enjoined their enforcement.  We therefore **REVERSE** the district court's order and **REMAND** for entry of a preliminary injunction consistent with this opinion.

MARTIN, Circuit Judge, dissenting:

Today's majority opinion puts a stop to municipal efforts to regulate "sexual orientation change efforts" (commonly known as "conversion therapy"), which is known to be a harmful therapeutic practice.  The majority invalidates laws enacted to curb these therapeutic practices, despite strong evidence of the harm they cause, as well as the laws' narrow focus on licensed therapists practicing on patients who are minors.  Although I am mindful of the free-speech concerns the majority expresses, I respectfully dissent from the decision to enjoin these laws.

## I.

As the majority recounts, this case presents a First Amendment challenge brought by Plaintiffs Robert Otto and Julie Hamilton (the "Therapists") against two ordinances (the "Ordinances") passed into law by the City of Boca Raton and the County of Palm Beach, Florida (the "Localities").  The Therapists are licensed mental-health practitioners who practice within the Localities.  The Ordinances prohibit licensed therapists and counselors—but not unlicensed counselors, such as religious leaders—from practicing sexual orientation change efforts ("SOCE") on patients younger than age 18.  The City defines SOCE as follows:

> [A]ny counseling, practice or treatment performed with the goal of changing an individual's sexual orientation or gender identity, including, but not limited to, efforts to change behaviors, gender identity, or gender expression, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender or sex.

Boca Raton, Fla., Code of Ordinances § 9-105(a).  The County's definition is
similar.  See Palm Beach County, Fla., Code of Ordinances § 18-124.

The Ordinances apply to aversive techniques—"treatment involving
reprimand, punishment, or shame to turn a person away from certain thoughts or
behaviors"—as well as nonaversive talk therapy.  Otto v. City of Boca Raton, 353
F. Supp. 3d 1237, 1243, 1251 & n.8 (S.D. Fla. 2019).  The Ordinances do not
prohibit licensed therapists from recommending SOCE to a minor patient,
discussing SOCE with a minor patient, giving a public statement in support of
SOCE, or practicing SOCE on patients 18 years of age or older.  See id. at 1243–
45, 1264.  And, of course, the Ordinances do not prevent the practice of SOCE
outside the County or the City (which is located within the County).

The Therapists' complaint alleges violations of their First Amendment right
to free speech, their First Amendment right to free exercise of religion, their right
to free speech under the Florida Constitution, their right to free exercise of religion
under the Florida Constitution, their rights under the Florida Patient's Bill of
Rights and Responsibilities, their rights under Florida's Religious Freedom
Restoration Act, and their patients' First Amendment right to receive information.
The Therapists also allege that the Florida legislature has preempted any city or
county disciplinary actions for mental health professionals.  The Therapists
separately moved for a preliminary injunction based on the alleged infringements

of their own First Amendment rights.  They also claim the Ordinances exceed the Localities' powers under Florida law.

The District Court held a daylong hearing on the Therapists' motion for a preliminary injunction.  After the hearing, the District Court ordered the parties to submit proposed findings of fact and conclusions of law, and they did.  Three months later, the District Court issued a 60-page order denying the motion on all grounds.  The District Court made findings of fact.  Among other things, the District Court found SOCE to be harmful, particularly to children, and noted the Localities' efforts to remedy these harms through the Ordinances.  See Otto, 353 F. Supp. 3d at 1258–63.

As with all appeals from the denial of a preliminary injunction, our Court reviews the District Court's conclusions of law de novo while reviewing findings of fact for clear error.  Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1317 (11th Cir. 2019).

## II.

The majority says the Therapists are likely to succeed on their free-speech challenge to the Ordinances.  Analyzing this question requires addressing two subsidiary issues: first, the proper level of scrutiny; and second, whether the Ordinances further a compelling government interest in a narrow enough way to satisfy the level of scrutiny.  I would hold the Ordinances satisfy strict scrutiny and

that, as a result, the Therapists are not entitled to an injunction on this claim.  See

ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177, 1198 (11th Cir.

2009) (stating that a movant's "[f]ailure to show" any of the preliminary-injunction

requirements "is fatal").

### A.

When ascertaining the proper level of constitutional scrutiny for the

Ordinances, the key question is whether they regulate conduct or speech.  See

Sorrell v. IMS Health, Inc., 564 U.S. 552, 567, 131 S. Ct. 2653, 2664–65 (2011).

This case does not require us to resolve this difficult question.[1]  This is because,

for the reasons set out below, the Ordinances survive strict scrutiny.  Insofar as the

Ordinances survive strict scrutiny, they necessarily survive lower levels of scrutiny

too.  Thus, my analysis proceeds under the assumption that the Ordinances are

content-based speech restrictions.

---

[1] However, I reject the statement by the majority that whether the Ordinances regulate conduct or speech is an "easy" question.  Maj. Op. at 6.  As the Supreme Court recognized in National Institute of Family & Life Advocates v. Becerra ("NIFLA"), 585 U.S. ___, 138 S Ct. 2361 (2018), strict scrutiny is not the proper lens of analysis for "regulations of professional conduct that incidentally burden speech."  Id. at 2371–73.  An intermediate form of scrutiny is appropriate for reasonable regulations on the practice of medicine.  See id. at 2375 ("[T]he licensed notice cannot survive even intermediate scrutiny.").  It may be possible to distinguish between medical regulations and speech restrictions by asking whether the affected speech is "auxiliary to" or "inconsistent with" the practice of medicine, in which case the highest level of scrutiny is not required.  EMW Women's Surgical Ctr., P.S.C. v. Beshear, 920 F.3d 421, 447 (6th Cir. 2019) (Donald, J., dissenting) (citing NIFLA, 138 S. Ct. at 2372).  Nevertheless, this case does not require us to draw the contours of the line between conduct and speech here.

Before moving on, I must address the majority's holding that the Ordinances discriminate based on the speaker's viewpoint.  Maj. Op. at 12.  While "mere content-based discrimination" occurs when "a law applies to particular speech because of the topic discussed or the idea or message expressed," viewpoint discrimination "goes beyond" that.  Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc., 942 F.3d 1215, 1240–41 (11th Cir. 2019) (quotation marks omitted).  Viewpoint discrimination occurs when the government "punish[es] or suppress[es] speech based on disapproval of the ideas or perspectives the speech conveys."  Matal v. Tam, 582 U.S. ___, 137 S. Ct. 1744, 1765 (2017) (Kennedy, J., concurring in part and concurring in the judgment); accord Cambridge Christian, 942 F.3d at 1241 ("[A] viewpoint-based law . . . regulates speech based upon agreement or disagreement with the particular position the speaker wishes to express." (quotation marks omitted)).  While these concepts are related, viewpoint discrimination is a particularly "egregious form of content discrimination."  Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829, 115 S. Ct. 2510, 2516 (1995).  The majority suggests, but does not hold, that laws that discriminate based on viewpoint are unconstitutional per se.  Maj. Op. at 13.

The majority says that viewpoint discrimination is evidenced by the fact that the Ordinances expressly allow counseling to give "assistance to a person

undergoing gender transition." Id. at 12.  However, this exception simply permits

a minor patient who does not identify with their sex assigned at birth to seek out

counseling or assistance as they carry out a gender transition.  In the same way, the

Ordinances also permit a minor patient who already made a gender transition to

seek support and assistance transitioning back.  Either way, the only practice the

Ordinances prohibit is therapy performed with the aim of convincing minor

patients to change their sexuality or gender identity.  Thus, even if the majority

were correct that "sexual orientation is immutable but gender is not" is a viewpoint

implicated by the Ordinances, id. at 12, I see no discrimination either way.  The

Ordinances simply do not prefer one type of speech over another.

Because the Localities do not "seek[] to impose [their] own message in the

place of [the Therapists'] individual speech, thought, and expression," NIFLA, 138

S. Ct. at 2379 (Kennedy, J., concurring), the Ordinances do not discriminate based

on viewpoint.

B.

A content-based restriction on speech is valid if it is the least-restrictive

means of furthering a compelling government interest.  Solantic, LLC v. City of

Neptune Beach, 410 F.3d 1250, 1258 (11th Cir. 2005).  Although "it is the rare

case in which a State demonstrates that a speech restriction is narrowly tailored to

serve a compelling interest," these "cases do arise."  Williams-Yulee v. Fla. Bar,

575 U.S. 433, 444, 135 S. Ct. 1656, 1665–66 (2015) (quotation marks omitted).  I

believe this is such a case.

1.

The Localities clearly have an interest in protecting minors from harmful

professional practices.  See New York v. Ferber, 458 U.S. 747, 756–57, 102 S. Ct.

3348, 3354 (1982) ("It is evident beyond the need for elaboration that a State's

interest in safeguarding the physical and psychological well-being of a minor is

compelling." (quotation marks omitted)).  They also have "a compelling interest in

the practice of professions within their boundaries, and . . . they have broad power

to establish standards for licensing practitioners and regulating the practice of

professions."  Locke v. Shore, 634 F.3d 1185, 1196 (11th Cir. 2011) (alteration in

original) (quoting Goldfarb v. Va. State Bar, 421 U.S. 773, 792, 95 S. Ct. 2004,

2016 (1975)).  This is particularly true when the regulated profession is medicine.

See Wollschlaeger v. Governor, Fla., 848 F.3d 1293, 1316 (11th Cir. 2017) (en

banc).  Finally, the interest in professional regulation is stronger when the affected

clients are minors.  See King v. Governor of N.J., 767 F.3d 216, 237–38 (3d Cir.

2014), abrogated on other grounds by NIFLA, 138 S. Ct. 2361.

i.

The majority says the interest furthered by the Ordinances is not compelling

for two reasons.  First, the majority frames the Ordinances as "restrict[ing] the

34

ideas to which children may be exposed."  Maj. Op. at 20 (quoting Brown v. Ent.

Merchs. Ass'n, 564 U.S. 786, 794, 131 S. Ct. 2729, 2736 (2011)); accord id. at 21.

This is inexact.  The Ordinances do not protect minors from any information or

ideas.  The Therapists may discuss with their minor patients the perceived benefits

of SOCE.  Beyond that, the Therapists may recommend that their minor patients

receive SOCE treatment from a provider elsewhere in Florida.  For these reasons I

am not persuaded by the majority's comparison to Brown.  In Brown, the Court

struck down a restriction on violent video games that targeted minors.  The Court

held the State had impermissibly "bar[red] public dissemination of" and

"restrict[ed] children's access to" protected materials.  564 U.S. at 794–95, 131 S.

Ct. at 2735–36 (quotation marks omitted).  Here, the Localities have prevented no

information from being distributed from therapists to their minor patients.  The

only thing the Therapists may not do is perform a particular medical practice on

their minor patients.  In my view, the Localities have validly identified a

compelling government interest in protecting minors from a harmful medical

practice.

ii.

The majority opinion says, "[p]eople who actually hurt children can be held

accountable," Maj. Op. at 24, but insists the Ordinances do not further this interest.

As the majority views it, there is "insufficient evidence" that makes it impossible

to conclude that SOCE is so harmful as to merit regulation.  Id. at 23 n.12; see also
id. at 21–22.  I disagree.

In 2007, the American Psychological Association ("APA") commissioned a
report (the "Task Force Report") "to address several concerns that had been raised
in the professional literature and by advocacy organizations about the use of SOCE
on children and adolescents."  Br. of the APA, et al. as Amici Curiae ("APA Br.")
at 7.  The Task Force Report, which came out in 2009, concluded in relevant part
that "there was some evidence to indicate that individuals experienced harm from
SOCE," including nonaversive methods.  Am. Psych. Ass'n Task Force on
Appropriate Therapeutic Responses to Sexual Orientation, Report of the American
Psychological Association Task Force on Appropriate Therapeutic Responses to
Sexual Orientation 43 (2009), https://www.apa.org/pi/lgbt/resources/therapeutic-
response.pdf [hereinafter Report].[2]  The Task Force elaborated: "attempts to
change sexual orientation may cause or exacerbate distress and poor mental health
in some individuals, including depression and suicidal thoughts."  Id. at 42.  The
Task Force Report catalogued recent studies reporting that patients who undergo
SOCE experience negative consequences including "anger, anxiety, confusion,
depression, grief, guilt, hopelessness, deteriorated relationships with family, loss of

---

[2] The Task Force Report is in the record at, inter alia, R. Doc. 1-6.  I cite to the online
version of the Report so that members of the public may access it more easily.

social support, loss of faith, poor self-image, social isolation, intimacy difficulties, intrusive imagery, suicidal ideation, self-hatred, and sexual dysfunction." Id. The Task Force Report acknowledged some recent studies contain accounts of positive initial benefits of SOCE, but that "[m]any participants" in these studies "described experiencing first the positive effects and then experiencing or acknowledging the negative effects later." Id. In another chapter focused on children, the Task Force Report recommended that licensed mental-health practitioners "support adolescents' exploration of identity" and "provide multiculturally competent and client-centered therapies . . . rather than SOCE." Id. at 76, 80; see also APA Br. at 20–21 (discussing minors' particular vulnerability to SOCE).

Despite these findings about the harm caused by SOCE, the majority opinion relies instead on a single statement in the Task Force Report that "rigorous recent prospective research" on SOCE has not been done. Maj. Op. at 21 (quoting Report at 42).[3] But what studies have been done "show that enduring change to an individual's sexual orientation is uncommon," and that there is, in fact, already "evidence to indicate that individuals experience harm from SOCE." Report at 42–

---

[3] This statement comes in the context of the Task Force Report's discussion of safety and efficacy studies. See Report at 42–43. Given that context, I proceed in my discussion by pointing out the serious dangers of conducting safety and efficacy studies of a method known to increase suicidal ideation, and explain why existing studies supply precisely the evidence the majority claims is missing. See Maj. Op. at 21–22. Although the majority opinion says "very little of the APA report considers evidence solely related to purely speech-based therapy," Maj. Op. at 21 n.8, that observation appears to be a misapprehension of the nature of therapy, the Report, or both.

43.  I invite everyone to read the Report for themselves.  But the Task Force

Report is not the only evidence of harm the District Court considered.  As the

District Court also found: the American Academy of Pediatrics has

"contraindicated" SOCE, "since it can provoke guilt and anxiety while having little

or no potential for achieving changes in orientation"; the APA, in 1998, noted the

"great" risks associated with SOCE, including "depression, anxiety, and self-

destructive behavior, since therapist alignment with societal prejudices against

homosexuality may reinforce self-hatred already experienced by the patient"; an

office of the World Health Organization ("WHO") has called SOCE an

"unjustifiable practice[]" that "represent[s] a severe threat to the health and human

rights of the affected persons"; the U.S. Department of Health and Human

Services, Substance Abuse and Mental Health Services Administration, found that

SOCE "may put young people at risk of serious harm"; and so on.  Otto, 353 F.

Supp. 3d at 1258–60 (quotation marks and citations omitted).  These findings are

further support for the Localities' conclusion that SOCE is harmful to minors.

Even in the face of this record, the majority opinion fixes its analysis on the

Task Force Report's statement that "rigorous recent prospective research" on

SOCE has not been done.  Maj. Op. at 21 (quoting Report at 42).  The majority's

preoccupation with having additional research done ignores the harm such studies

would have on children.  Evaluating the impact of SOCE under controlled

conditions would require exposing minors to SOCE.  Cf. Report at 90–91.  And as

the Task Force Report recounted, "[s]afety issues" abound when it comes to

studying SOCE.  Id. at 91.  This is true for both aversive and nonaversive

techniques.  See id. at 90 ("[R]esearch on SOCE . . . has not answered basic

questions of whether it is safe or effective and for whom.").   Moreover, the APA

has cautioned that "[t]o conduct a random controlled trial of a treatment that has

not been determined to be safe is not ethically permissible and to do such research

with vulnerable minors who cannot themselves provide legal consent would be out

of the question for institutional review boards to approve."  APA Br. at 9

(emphasis added)).  To be clear, the very research the majority opinion seems to

demand is "not ethically permissible" to conduct.  Thus one implication of the

majority holding is that because SOCE is too dangerous to study, children can

continue to be subjected to it.  The majority opinion has the result of inviting

unethical research that is nowhere to be found in First Amendment jurisprudence.[4]

Certainly worth considering, too, is the recognition that homosexuality is not

a mental illness, Report at 23–24, as well as the particular vulnerability of minors

as a test-study population, id. at 77.  All of this evidence leads to the inescapable

_____

[4] In saying that "even where the protection of children is the object, the constitutional limits on governmental action apply," the majority opinion relies on a case in which the Supreme Court determined that violent video games are protected under the First Amendment.  Maj. Op. at 24 (quoting Brown v. Entm't Merchants Ass'n, 564 U.S. 786, 804–05 (2011) (quotation marks omitted)).  But the differences between this case, which concerns children's exposure to conversion therapy, and one that concerns video games, are evident.

conclusion that performing efficacy studies for SOCE on minors would be not only

dangerous (by exposing children to a harmful practice known to increase the

likelihood of suicide) but pointless (by studying a treatment for something that is

not a mental-health issue).  As the District Court recognized, legislative bodies

should "not need to wait for further evidence of the negative and, in some cases,

fatal consequences of SOCE before acting to protect their community's minors."

Otto, 353 F. Supp. 3d at 1262 (emphasis added).  SOCE is a practice that has

already been deemed by institutions of science, research, and practice—the

American Academy of Pediatrics, the American Psychiatric Association, the

American Psychological Association Council of Representatives, the American

Psychoanalytic Association, the American Academy of Child and Adolescent

Psychiatry, the American School Counselor Association, the APA, the U.S.

Department of Health and Human Services, and the WHO among them, see Otto,

353 F. Supp. 3d at 1258–60 (citations omitted)—to pose real risks of harm on

children.  It was reasonable for the Localities to enact the Ordinances based on the

existing evidentiary record as to harm.

At the same time, it seems as though no study (or studies) would satisfy the

majority.  The majority says that, "The First Amendment itself reflects a judgment

by the American people that the benefits of its restrictions on the Government

outweigh the costs.  Our Constitution forecloses any attempt to revise that

judgment simply on the basis that some speech is not worth it."  Maj. Op. at 24 (quoting United States v. Stevens, 559 U.S. 460, 470, 130 S. Ct. 1577, 1585 (2010) (quotation marks omitted)).  I disagree with the implication the majority seeks to draw from Stevens.  In Stevens, the federal government attempted to justify a statute criminalizing "the commercial creation, sale, or possession of certain depictions of animal cruelty."  Id. at 464, 130 S. Ct. at 1582.  The Court indeed said that the freedom of speech does not depend on the "balancing of the value of the speech against its societal costs," but this statement came in the context of discussing whether to exempt depictions of animal cruelty from any First Amendment protection whatever.  See Stevens, 559 U.S. at 470, 130 S. Ct. at 1585.  Here, in contrast, the First Amendment applies, and we are conducting strict scrutiny review.  The strict scrutiny test—of whether a content-based restriction on speech is the least-restrictive means of furthering a compelling government interest—necessarily involves evaluating real world facts to assess the weight of the interest and the extent of the restriction.  The evaluation of medical evidence here is undoubtedly appropriate.

Indeed, the majority entirely discounts "professional organizations' judgments" in this case.  Maj. Op. at 23.  When it comes to regulation of allegedly

harmful medical practices,[5] the judgment of professional organizations strikes me as quite relevant.  But, importantly, the Localities did not just rely on statements of organizational disapproval of SOCE.  Instead, as I discussed, this disapproval is backed up by a mountain of rigorous evidence.[6]

The job of the courts is to evaluate the state's justification for a speech restriction.  See, e.g., Williams-Yulee, 575 U.S. at 445–48, 135 S. Ct. at 1666–68 (analyzing in depth the state's compelling interest in judicial integrity); Consol.

---

[5] The majority opinion says SOCE is "not medical at all," apparently misconstruing the legal standard for what counts as "speech" under the First Amendment for what the medical community can define as within its bounds.  See Maj. Op. 16 n.3.  I understand from the APA brief that psychological therapy is itself a medical practice that is subject to evidence-based, peer-reviewed studies.  See APA Br. at 1–2.  As such, SOCE is properly limited as dangerous and ineffective.  See, e.g., id. at 7 ("[T]he APA recommends providing multiculturally competent and client-centered therapies to children, adolescents, and their families rather than SOCE." (quotation marks, brackets, and emphases omitted)); id. at 12 n.5 (discussing, in contrast to SOCE, "[a]ffirmative therapy," which "refers to therapy that is culturally relevant and responsive to LGBQ clients" (quotation marks omitted)); id. at 14–23 & nn. 9–14 (discussing studies of SOCE in peer-reviewed mental health journals with medical professional readership, e.g., J. Sex & Marital Therapy, Aims and Scope, (2017), https://www.tandfonline.com/action/journalInformation?show=aimsScope&journalCode=usmt20 (listing "psychiatrists, psychologists, . . . physicians, nurses" as among its readership)).

[6] This evidence, of course, includes the APA's 130-page report, which catalogued "peer-reviewed journal articles in English from 1960 to 2007."  Report at 2.  While recognizing that "[m]ost studies in this area were conducted before 1981, and only a few studies have been conducted in the last 10 years," the APA's review of the available studies led it to conclude that "it is unlikely that individuals will be able to reduce same-sex attractions or increase other-sex sexual attractions through SOCE," and that there was "evidence to indicate that individuals experienced harm from SOCE."  Report at 2–3.  The majority directs its attention to a single sentence in the Report in which the APA recognizes that "nonaversive and recent approaches to SOCE have not been rigorously evaluated," Report at 43 (emphases added); in so doing, the majority disregards the overall evidence against the efficacy of SOCE.  See Maj. Op. at 21 & n.7, 22.  The majority essentially demands that the scientific community prove that more recent and nonaversive practices of SOCE are harmful to minors before it would uphold the Ordinances under strict scrutiny.  But I do not believe an abstract legal test requires such an infliction of real-world harm on children.  The evidence before us is enough.

Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 530, 543, 100 S.

Ct. 2326, 2336 (1980) ("Mere speculation of harm does not constitute a compelling

state interest."); Wollschlaeger, 848 F.3d at 1316 (holding purported restriction on

medical practice does not pass strict scrutiny because there was no "evidence" that

regulated behavior was "medically inappropriate, ethically problematic, or

practically ineffective").  Even as the majority opinion calls for more "research"

and "evidence," it entirely discounts "professional organizations' judgments" in

this case and deems the substantial literature on SOCE "equivocal," "ambiguous,"

and "uncertain" on the harms SOCE inflicts.  Maj. Op. at 22 & n.9, 23–24 n.12.

This is nothing short of a moving target approach to the First Amendment.  The

scientific and medical communities have done their jobs, the state has done its job,

and now it is for us to do our job in the simple application of the law.

2.

In order to survive strict scrutiny, a content-based speech restriction must

also be the "least restrictive means of achieving a compelling state interest."

McCullen v. Coakley, 573 U.S. 464, 478, 134 S. Ct. 2518, 2530 (2014).  A less

restrictive alternative must be "at least as effective in achieving the legitimate

purpose that the statute was enacted to serve."  Reno v. ACLU, 521 U.S. 844, 874,

117 S. Ct. 2329, 2346 (1997).  A law fails to survive if it is either underinclusive

(that is, if it does not regulate enough conduct) or overinclusive (if it regulates too

much conduct). "[U]nderinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." Williams-Yulee, 575 U.S. at 448, 135 S. Ct. at 1668 (quotation marks omitted). By that same token, a law that "restricts too much" speech may also not be the "least restrictive means" for the State to advance its compelling interest. Id. at 452, 135 S. Ct. at 1670. Either way, the First Amendment requires that a law "be narrowly tailored, not that it be perfectly tailored." Id. at 454, 135 S. Ct. at 1671 (quotation marks omitted).

The Therapists say the Ordinances are "wildly underinclusive" because they "expressly exclude 'conversion therapy' offered by unlicensed religious counselors and clergy." Yet I agree with the Localities that a law regulating religious administration of SOCE might run into Establishment Clause issues. Given this, the Localities' choice to exclude religious counselors and clergy was reasonable. The City also points out that the Ordinances leave "licensed providers free to talk to their minor patients about SOCE and even recommend SOCE." Much like a version of the Ordinances that applied to religious practitioners, a law banning all discussion relating to SOCE would plainly be unconstitutional. Both of these points suggest that the Ordinances are the least restrictive means of carrying out the Defendants' interest in regulating SOCE. See Williams-Yulee at 452, 135 S.

Ct. at 1670 (refusing to punish the State "for leaving open more, rather than fewer, avenues of expression").

The Therapists also argue the Ordinances are overinclusive because the Localities could have banned "only aversive or coercive therapies," or simply enacted an informed consent requirement.  If a government does not show "it considered different methods that other jurisdictions have found effective," McCullen, 573 U.S. at 494, 134 S. Ct. at 2539, or if the government "failed to consider numerous and obvious less-burdensome alternatives," FF Cosmetics FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1301 (11th Cir. 2017), the law may not survive heightened scrutiny.  Here, the Ordinances satisfy these requirements because the Therapists have not shown their proposed alternatives would be effective.  First, as discussed above, the harmfulness of nonaversive SOCE is established by the record.  The Localities therefore did not have to limit themselves to regulating aversive SOCE.  Cf. Wollschlaeger, 848 F.3d at 1316 (a law does not pass strict scrutiny if the harm cited as the cause of the law's enactment is narrower than the reach of the law).

An informed consent requirement also would not be viable.  As the Third Circuit explained:

> Minors constitute an especially vulnerable population and may feel
> pressured to receive SOCE counseling by their families and their
> communities despite their fear of being harmed. Thus, even if SOCE
> counseling were helpful in a small minority of cases . . . an informed

consent requirement could not adequately ensure that only those minors
that could benefit would agree to move forward.

King, 767 F.3d at 240 (citations and quotation marks omitted).  Evidence to this

effect is also in the record of this case.  See Otto, 353 F. Supp. 3d at 1266.  The

Therapists' informed consent alternative is thus no alternative at all.

*     *     *

The majority is correct to say this case implicates sensitive considerations

about when and how government bodies may regulate speech.  Instances in which

a speech restriction is narrowly tailored to serve a compelling interest are

deservedly rare.  But they do exist.  See Williams-Yulee, 575 U.S. at 444, 135 S.

Ct. at 1665–66.  I believe the Localities' narrow regulation of a harmful medical

practice affecting vulnerable minors falls within the narrow band of permissibility.

I would therefore affirm the District Court's denial of a preliminary injunction on

the Therapists' free speech claim.

## III.

The Therapists also say they are entitled to a preliminary injunction on the

grounds that the Ordinances are (1) a prior restraint on speech, (2) void for

vagueness, and (3) preempted by and in conflict with Florida law.  For the reasons

expressed by the District Court, I agree the Therapists are not entitled to an

injunction on any of these grounds.  See Otto, 353 F. Supp. 3d at 1270–73.

**IV.**

I would affirm the District Court's denial of the Therapists' motion for a preliminary injunction.  I respectfully dissent from the majority's decision holding the Ordinances unconstitutional.

## UNITED STATES COURT OF APPEALS
### FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

November 20, 2020

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  19-10604-AA
Case Style:  Robert Otto, et al v. City of Boca Raton, Florida, et al
District Court Docket No:  9:18-cv-80771-RLR

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellees.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call T. L. Searcy, AA at (404) 335-6180.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs