## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-CV-80771-ROSENBERG

ROBERT W. OTTO, PH.D., LMFT,
individually and on behalf of his patients;
JULIE H. HAMILTON, PH.D., LMFT,
individually and on behalf of her patients,

                  Plaintiffs,

v.

CITY OF BOCA RATON, FLORIDA and
COUNTY OF PALM BEACH, FLORIDA,

                  Defendants.

**INJUNCTIVE RELIEF SOUGHT**

---

### FIRST AMENDED COMPLAINT FOR
### <u>DECLARATORY RELIEF, A PERMANENT INJUNCTION, AND DAMAGES</u>

For their FIRST AMENDED VERIFIED COMPLAINT against Defendants CITY OF
BOCA RATON, FLORIDA ("City") and COUNTY OF PALM BEACH, FLORIDA ("County")
(collectively "Defendants"), ROBERT W. OTTO, PH.D. LMFT ("Dr. Otto"), and JULIE
HAMILTON, PH.D., LMFT ("Dr. Hamilton") (collectively "Plaintiffs"), by and through the
undersigned counsel, allege and aver as follows:

### INTRODUCTION

1.      Since time immemorial, the relationship between clients and their licensed mental
health professionals has represented a sacred trust. In this vital relationship, mental health
professionals are tasked with providing essential care to their clients and forming critical
therapeutic alliances that represent the unique relationship between professional and client. This
therapeutic alliance is designed to facilitate the foundational principle of all mental health
counseling: the client's fundamental right to self-determination. Throughout the history of this

learned profession, clients have provided mental health professionals with their goals, desires, and objectives that conform to their sincerely held desires and concept of self, and mental health professionals have provided counseling that aligns with the clients' fundamental right to self-determination. That unique relationship has, until now, been protected, revered, and respected as sacrosanct and inviolable. Defendants, however, sought fit to storm the office doors of mental health professionals, thrust themselves into the therapeutic alliance, violate the sacred trust between client and counselor, and run roughshod over the fundamental right of client self-determination and the counselors' cherished First Amendment liberties. Defendants' purported justifications for such unconscionable actions: they do not like the goals, objectives, or desires of certain clients when it comes to one type of counseling. The First Amendment demands more, and Defendants' actions have caused injury to Plaintiffs' fundamental and cherished liberties.

2.      Plaintiffs bring this civil action to challenge the constitutionality of Boca Raton City Ordinance 5407, "Prohibition Of Conversion Therapy On Minors," ("City Ordinance") and Palm Beach County Ordinance 2017-046, "Prohibition Of Conversion Therapy On Minors," ("County Ordinance") (collectively "the Ordinances"). The City Ordinance came into full effect immediately upon adoption on October 10, 2017, and the County Ordinance came into full effect immediately upon being filed with the Department of State on December 21, 2017.

3.      That the Ordinances are unconstitutional is now indisputable: The Eleventh Circuit has already held that "the challenged ordinances violate the First Amendment because they are content-based regulations of speech that cannot survive strict scrutiny." *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 859 (11th Cir. 2020).

4.      Defendants purportedly repealed the Ordinances on August 23, 2022. But as alleged below, Defendants' purported repeals are merely a transparent attempt to defeat jurisdiction and

moot this case. Indeed, evidence shows that the purported repeals do not reflect a genuine change of course, and Defendants continue to express hostility toward Plaintiffs' religious beliefs and counseling practices, and accordingly intend to continue to chill and deprive Plaintiffs of their First Amendment rights.

5.      In any event, Plaintiffs are entitled to pursue and collect damages caused by Defendants' unconstitutional Ordinances, and by Defendants' ongoing conspiracy to deprive Plaintiffs of their constitutionally protected rights.

6.      Plaintiffs engage in licensed, ethical, and professional counseling that honors their clients' autonomy and right to self-determination, that permits clients to prioritize their religious and moral values above unwanted same-sex sexual attractions, behaviors, or identities, and that enables clients to align their values with a licensed counselor who can address these values. Plaintiffs have First Amendment and state constitutional rights as licensed counselors to engage in and provide counseling consistent with their and their clients' sincerely held religious beliefs, and their clients have First Amendment and state constitutional rights to receive such counseling free from Defendants' viewpoint discrimination against such counseling.

7.      By preventing minors from seeking counseling to address the conflict about or questions concerning their unwanted same-sex sexual attractions, behaviors, and identities and from seeking to reduce or eliminate their unwanted same-sex sexual attractions, behaviors, or identities through counseling, such as sexual orientation change efforts ("SOCE"), the Ordinances denied or severely impaired Plaintiffs' clients and all minors their right to self-determination, their right to prioritize their religious and moral values, and their right to receive effective counseling consistent with those values.

8.      By denying Plaintiffs' clients and all minors access to counseling from licensed

counselors that can best help minors who desire to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity, the Ordinances infringed on the fundamental rights of Plaintiffs' clients, and the rights of the parents of Plaintiffs' clients to direct the upbringing and education of their children, which includes the right to meet each child's individual counseling, developmental, and spiritual needs.

9.      By prohibiting them from engaging in any efforts that seek to eliminate or reduce unwanted same-sex attractions, behaviors, or identity, even when the client, the parents, and the licensed mental health professional all consent to such counseling, the Ordinances also violated the Plaintiffs' constitutional rights.

10.      Despite the value and benefit that Plaintiffs have provided by offering SOCE counseling, the Ordinances prohibited SOCE counseling to minors by licensed professionals, which caused immediate and irreparable harm to Plaintiffs and Plaintiffs' clients.

11.      The Ordinances harmed licensed counselors and their clients by prohibiting minors and their parents from obtaining the counseling services they choose, after receiving full disclosure and providing informed consent, to resolve, reduce, or eliminate unwanted same-sex sexual attractions, behaviors, or identity and harms counselors by placing them in a Catch-22 in which they were forced to choose between violating ethical codes by complying with the Ordinances or violating the law by failing to comply with the Ordinances.

12.      By denying minors the opportunity to pursue a particular course of action that can most effectively help them address the conflicts between their sincerely held religious beliefs and goals to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity, the Ordinances caused those minors confusion and anxiety over same-sex sexual attractions, behaviors, and identity and infringed on their free speech and religious liberty rights.

13.     Having secured preliminary injunctive relief, Plaintiffs now seek permanent injunctive relief against Defendants, their agents, servants, departments, divisions, employees, and those acting in concert and with actual notice, enjoining the enforcement of the Ordinances or their re-enactment because they violate: (1) the rights of Plaintiffs and their clients to freedom of speech and free exercise of religion, guaranteed by the First and Fourteenth Amendments to the United States Constitution, (2) the rights of Plaintiffs to liberty of speech and free exercise and enjoyment of religion, guaranteed by Article I, §§3, 4 of the Florida Constitution, (3) the Florida Patient's Bill of Rights and Responsibilities, Fla. Stat. Ann. §381.026, and (4) and the Florida Religious Freedom Restoration Act, Fla. Stat. Ann. § 761.03.

14.     Plaintiffs also seek permanent injunctive relief enjoining Defendants from enforcing or re-enacting the Ordinances because the Ordinances were void *ab initio* as *ultra vires* acts in excess of the City's and County's authority under Article VIII, Section 2(b) and Article VII, Section 1, respectively, of the Florida Constitution.

15.     Plaintiffs also pray for declaratory relief from this Court declaring that the Ordinances, both on their face and as-applied, were unconstitutional violations of the First and Fourteenth Amendments to the United States Constitution, were void *ab initio* as *ultra vires* acts in excess of the City's and County's authority under Article VIII, Section 2(b) and Article VII, Section 1, respectively, of the Florida Constitution, violated Plaintiffs and their clients rights under the Florida Patient's Bill of Rights and Responsibilities, Fla. Stat. Ann. §381.026, and violated the Florida Religious Freedom Restoration Act, Fla. Stat. Ann. § 761.03.

16.     An actual controversy exists between the parties involving substantial constitutional issues, in that the Ordinances, both facially and as-applied by the City and County, violated Plaintiffs and their clients' rights to free speech and free exercise under the First

Amendment.

## PARTIES

17.     Plaintiff, Robert W. Otto, Ph.D., LMFT, is a licensed marriage and family therapist who is licensed to practice mental health counseling in Florida.

18.     Plaintiff, Julie Hamilton, Ph.D., LMFT, is a licensed marriage and family therapist who is licensed to practice mental health counseling in Florida.

19.     Defendant, City of Boca Raton, is a municipal corporation and political subdivision of the State of Florida, with authority to sue and be sued.

20.     Defendant, County of Palm Beach, is a political subdivision of the State of Florida with authority to sue and be sued.

## JURISDICTION AND VENUE

21.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. §1983. This action also arises under Article I, §§3, 4 of the Florida Constitution, the Florida Patient's Bill of Rights and Responsibilities, Fla. Stat. Ann. § 381.026, and the Florida Religious Freedom Restoration Act, Fla. Stat. Ann. § 761.03.

22.     This Court has jurisdiction under 28 U.S.C. §§1331, 1343, and 1367.

23.     Venue is proper in this Court under 28 U.S.C. §1391(b) because the City and County are situated in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

24.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §2201-02, implemented through Rule 57 of the Federal Rules of Civil

Procedure, and is authorized to grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

25.    This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. §1988.

## GENERAL ALLEGATIONS

### A.    THE CITY ORDINANCE.

26.    On October 10, 2017, the Boca Raton City Council enacted Ordinance 5407 ("City Ordinance"), which created Article VI in Chapter 9 "Miscellaneous Offenses" of the Code of Ordinances. A copy of the City Ordinance is attached hereto as EXHIBIT A and incorporated herein.

27.    The City Ordinance immediately went into effect upon its adoption and approval. (*See* Exhibit A at 7) ("this Ordinance shall take effect immediately upon adoption").

28.    Section 9-106 of the City Ordinance provided that "[i]t shall be unlawful for any provider to practice conversion therapy on any individual who is a minor regardless of whether the provider receives monetary compensation in exchange for such services. (Ex. A at 7).

29.    Section 9-105(a) of the City Ordinance defined "conversion therapy or reparative therapy" as:

> interchangeably, any counseling, practice or treatment performed with the goal of changing an individual's sexual orientation or gender identity, including, but not limited to, efforts to change behaviors, gender identity, or gender expression, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender or sex. Conversion therapy does not include counseling that provides support and assistance to a person undergoing gender transition or counseling that provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and development, including sexual orientation – neutral interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as such counseling does not seek to change sexual orientation or gender identity.

7

(Ex. A at 6).

30.    Section 9-105(c) of the City Ordinance defined "Provider" as:

any person who is licensed by the State of Florida to provide professional counseling, or who performs counseling as part of his or her professional training under chapters 456, 458, 459, 490 or 491 of the Florida Statutes, as such chapters may be amended, including but not limited to, medical practitioners, osteopathic practitioners, psychologists, psychotherapists, social workers, marriage and family therapists, and licensed counselors.

(Ex. A at 6).

31.    Section 9-107 of the City Ordinance stated that "[a]ny person that violates any provision of this article shall be subject to the civil penalty prescribed in section 1-16 and in no instance shall a violation of this article be punishable by imprisonment." (Ex. A at 7).

32.    The civil penalty prescribed in Section 1-16 of the Code of Ordinances provided:

Whenever in this Code or in any ordinance of the city any act is prohibited or is made or declared to be unlawful or an offense, or whenever in such Code or ordinance the doing of any act is required or the failure to do any act is declared to be unlawful, where no specific penalty is provided therefor, the violation of any such provision of the Code or any ordinance shall be punished by a fine not exceeding $500.00 or imprisonment for a term not exceeding 60 days, or by both such fine and imprisonment. Each day any violation of any provision of this Code or of any ordinance continues shall constitute a separate offense.

**B.    THE COUNTY ORDINANCE.**

33.    On December 19, 2017, the Board of County Commissioners of Palm Beach County enacted Ordinance 2017-046 ("County Ordinance"). A copy of the County Ordinance is attached hereto as EXHIBIT B and incorporated herein.

34.    The County Ordinance went into effect upon its filing with the Department of State on December 21, 2017. (*See* Exhibit B at 7).

35.    Section 5 of the County Ordinance stated that "[i]t shall be unlawful for any

provider to practice conversion therapy on any individual who is a minor regardless of whether the provider receives monetary compensation in exchange for such services. (Ex. B at 5).

36.     Section 4 of the County Ordinance defined "conversion therapy" as:

the practice of seeking to change an individual's sexual orientation or gender identity, including but not limited to efforts to change behaviors, gender identity, or gender expressions or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender or sex. Conversion therapy does not include counseling that provides support and assistance to a person undergoing gender transition, or counseling that: provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and identity exploration and development, including sexual-orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices; and does not seek to change an individual's sexual orientation or gender identity.

(Ex. B at 5).

37.     Section 4 of the County Ordinance defined "Provider" as:

any person who is licensed by the State of Florida to perform counseling pursuant to Chapters 456, 458, 459, 490 or 491 of the Florida Statutes as such chapters may be amended, including but not limited to medical practitioners, osteopathic practitioners, psychologists, psychotherapists, social workers, marriage and family therapists, and licensed counselors, or a person who performs counseling as part of the person's professional training for any of these professions.

(Ex. B at 5).

38.     Section 6 of the County Ordinance stated that: "pursuant to section 125.69, Florida Statutes, a violation of this ordinance shall be prosecuted in the same manner as misdemeanors are prosecuted. A violation of any provision of this Ordinance shall be punished by a fine of $250.00 for the first violation and $500.00 for each repeat violation. (Ex. B at 5).

39.     Section 7 of the County Ordinance stated:

In addition to the penalties set forth in Section 6 of this Ordinance, pursuant to section 125.69(4), Florida Statutes, this Ordinance is enforceable by the County's Code Enforcement Officers and by all means provided by law.

9

Additionally, Palm Beach County may choose to enforce this Ordinance by seeking injunctive relief in the Circuit Court of Palm Beach County.

40.     Section 3 of the County Ordinance provided: "This Ordinance shall be applicable within the unincorporated areas of Palm Beach County, and in all municipalities that have not adopted an ordinance in conflict. Unless otherwise provided, nothing in this Ordinance shall be construed to relieve any person from compliance with any applicable county or municipal regulations." (Ex. B at 4).

## C.     DEFENDANTS CONSPIRED WITH LOCAL ACTIVISTS TO CURTAIL PLAINTIFFS' FIRST AMENDMENT RIGHTS.

41.     The Ordinances were the direct result of a conspiracy between Defendants and activist Rand Hoch, president of the Palm Beach County Human Rights Council, to target Plaintiffs as faith-based professional therapists who perform SOCE counseling.

42.     Rand Hoch is the founder and longtime president of the Palm Beach County Human Rights Council, a local LGBTQ activist organization. Under Hoch's leadership, the Council claims to have been "responsible for the enactment of more than 160 laws and policies providing equal rights, protections and benefits for the LGBTQ community" since 1990.

43.     The Palm Beach County Human Rights Council boasts that during Hoch's tenure as president, the Council has been "successful" in "having the County and numerous municipalities ban the practice of conversion therapy for minors by licensed professionals."

44.     Rand Hoch is the principal author and proponent of both Ordinances.

45.     Indeed, the Ordinances existed only because Hoch pressured the City's and the County's elected officials to enact them. Hoch continued his relentless requests for the enactment of the Ordinances even after Defendants' own attorneys repeatedly and unequivocally told him

that regulation of mental health professionals is a classic state issue that cannot be regulated at the local level.

46.     Despite the reluctance by their attorneys and despite knowledge that the Ordinances would violate both law and established rights, Defendants acquiesced to Hoch's pressure campaign and agreed to let him assume sustained and direct control over the Ordinances' drafting and adoption. Thus, as evidenced through email communications and deposition testimony, there was a meeting of the minds and overt acts between Defendants and Hoch to deprive Plaintiffs of their First Amendment right to freely counsel their clients without government interference.

47.     Even after this action was filed, Hoch continued "working behind the scenes" in coordinating the City and County defenses of this case. As part of his efforts, Hoch even offered to pay for Defendants' expenses, including expert witnesses, and secure additional defense counsel.

48.     Hoch told Defendants that he and his organization needed to be involved "behind the scenes" and not overtly in the defense of the Ordinances, so as not to cause the district judge assigned to this case to recuse herself, given the political connections that Hoch and his organization claimed to have with the judge's spouse.

49.     Hoch is also directly involved in advising Defendants regarding their legal positions in the case. For example, when the Supreme Court decided *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018), which abrogated two cases upholding "conversion therapy" bans, *see King v. Governor of the State of New Jersey*, 767 F.3d 216, 232 (3d Cir. 2014) and *Pickup v. Brown*, 740 F.3d 1208, 1226 (9th Cir. 2014), upon which Defendants premised their Ordinances, Defendants emailed Hoch for his advice on the decision's implications, and how they might continue to enforce their unconstitutional Ordinances, notwithstanding the Supreme Court's

clear ruling.

50.     The conspiracy was perpetuated in part because Hoch expected his communications with Defendants' attorneys to be shielded from discovery. As shown above, in Hoch's view, his extensive involvement "working behind the scenes" in enacting the Ordinances and the defense of this case would, if known to Judge Rosenberg, require her recusal.

51.     After the Eleventh Circuit ruled that the Ordinances violated the First Amendment, *the Palm Beach Post* reported that "Hoch's organization pushed for the county and Boca Raton to repeal their ordinances" and not appeal to the Supreme Court so as to avoid an unfavorable decision that would affect conversion therapy bans nationwide, and that would limit Defendants' ability to re-enact the Ordinances (or similar prohibitions) in the future.

52.     Defendants' conspiracy with Hoch to deprive Plaintiffs of their First Amendment rights is motivated in part by invidious discriminatory animus against Plaintiffs' Christian beliefs. Thus, by targeting Plaintiffs' faith-based professional counseling, Defendants and their co-conspirators are intentionally targeting Plaintiffs' religious beliefs, which they view as hateful and bigoted.

53.     Defendants' and Hoch's invidious discriminatory animus—namely, the Ordinances' design, adoption, and enforcement—resulted in the violation of Plaintiffs' fundamental constitutional rights, and injured Plaintiffs.

## D.     DEFENDANTS' LOSS AT THE ELEVENTH CIRCUIT AND SUBSEQUENT SHAM EFFORTS TO DEFEAT JURISDICTION.

54.     Plaintiffs filed this action on June 13, 2018 (Dkt. 1), and moved for injunctive relief the following day (Dkt. 3). The parties then engaged in limited discovery for purposes of Plaintiffs' motion for preliminary injunction.

55.     On February 13, 2019, the district court denied Plaintiffs' Motion for a Preliminary Injunction. *See Otto v. City of Boca Raton, Fla.*, 353 F. Supp. 3d 1237, 1241 (S.D. Fla. 2019), *rev'd and remanded*, 981 F.3d 854 (11th Cir. 2020 (Dkt. 141).

56.     On November 20, 2020, the Eleventh Circuit issued an opinion reversing the district court's denial of Plaintiffs' motion for a preliminary injunction (Dkt. 3). *See Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020). The Court held, among other things, that the Ordinances facially "violate the First Amendment because they are content-based regulations of speech that cannot survive strict scrutiny." *Id*. at 859. The Court found that "the ordinances discriminate on the basis of content" and that "[t]hey also discriminate on the basis of viewpoint," and, as such, they are "an egregious form of content discrimination." *Id.* at 864.

57.     The Eleventh Circuit's opinion was issued almost two years ago, but it did not become effective until July 29, 2022, after the Court issued its mandate following its denial of Defendants' petition for *en banc* rehearing on July 20, 2022. *See Otto v. City of Boca Raton*, No. 19-10604, 2022 WL 2824907 (11th Cir. July 20, 2022).

58.     In the past two months, Defendants embarked on a calculated course of political and legal maneuvering to avoid the consequences of the Eleventh Circuit's decision. Specifically, Defendants have plotted with Rand Hoch and the Palm Beach County Human Rights Council to purportedly "repeal" the Ordinances to defeat jurisdiction and avoid Supreme Court review.

59.     On August 5, 2022, and before the district court followed the Eleventh Circuit's mandate to enter a preliminary injunction for Plaintiffs, the Boca Raton City Council passed an "emergency ordinance," the effect of which, the City contended, "repealed the Challenged Ordinance." (Dkt. 151, at 2). The City asserted that it had declared a "public emergency" enabling it to pass an "emergency" repeal of the Ordinance on less than 24-hours' notice. By enacting the

emergency ordinance, the City contended, it sought "to ensure that the Conversion Therapy Prohibition does not chill protected speech in violation of the First Amendment (and therefore harm practitioners of conversion therapy)." (Dkt. 151, at 3).

60.     The City's declaration of a "public emergency" so that it could bypass the normal legislative channels and enact an "emergency" repeal ordinance before the district court could enter the preliminary injunction mandated by the Eleventh Circuit was a transparent sham to defeat jurisdiction. Having been content to run roughshod over Plaintiffs' protected speech, and to outlaw their counseling practices for the last five years, the City tried to convince the district court and the Eleventh Circuit that—only when suddenly faced with an imminent injunction—the City now deemed that "preventing the chilling of protected speech is an 'emergency affecting life, health, property, or the public peace,' as described in Section 3.14 of the City Charter." (City's "Emergency" Repeal Ordinance, at Exhibit B, dkt. 151-1 at 2, last "WHEREAS" (emphasis added)).

61.     The City Council's "emergency ordinance" was also a red herring. Under the City's own charter, the so-called "emergency" repeal ordinance was merely temporary, because it had an automatic sunset of sixty days, after which it would itself be automatically repealed, thereby reviving the City's unconstitutional ordinance. To permanently repeal its unconstitutional ordinance, the City would be required to introduce another ordinance in the regular legislative channels, allow for public comment, and ultimately take a vote of the City Council.

62.     Beyond the plain language of the "emergency" repeal ordinance, statements made at the "emergency" City Council meeting also plainly confirm that the City was merely trying to

defeat jurisdiction with its "emergency" maneuvers and mootness arguments.[1]

63.     For example, during the meeting, City Attorney Diana Grub Frieser indicated that each City Council member received a communication from Rand Hoch, the leader of the Palm Beach County Human Rights Council, who was the "primary local advocate" for the passage of the City's ordinance in 2017. In that email, Mr. Hoch advised and recommended to the Council to repeal the ordinance and not pursue an appeal, not because the ordinance is unconstitutional, but strategically so as not to jeopardize counseling bans in other jurisdictions with an adverse ruling from the Supreme Court, and expressly to preserve the City's ability to "reassess" its counseling ban with "changes and other developments" "over time."

64.     During the meeting, City Council Member Monica Mayotte stated that she "understand[s] the reasoning why we have to pass this emergency ordinance, it doesn't make me happy, but I understand that we don't want to threaten lawful conversion therapy laws across the state or across the country by appealing this to the Supreme Court." She then proposed that the unconstitutional ordinance be replaced with a City Council resolution "to admonish conversion therapy in our City … **that we support the banning**, we don't agree with conversion therapy here in this City, so I would really like to see us move forward with a resolution when the time is appropriate." (Emphasis added).

65.     City Attorney Diana Grub Frieser assured Council Member Mayotte that, if the Council votes to approve the "emergency" repeal ordinance, then, when the permanent repeal ordinance will be considered at a future date, "I will bring back the resolution that declares from a

---

[1] The official video of the "emergency" City council meeting on the adoption of the "emergency" repeal ordinance is available on the City Council's website at https://bocaraton.granicus.com/player/clip/2331 (last visited Sept. 12, 2022).

policy standpoint" that the City condemns Plaintiffs' protected speech.

66.     Later in the meeting, City Council Member Andrea O'Rourke indicated she fully supports a resolution condemning Plaintiffs' protected speech, because "it's the least we can do," and that she is opposed to Plaintiffs' protected speech but she will vote in favor of the repeal ordinance because she "want[s] to comply" with Rand Hoch's request to repeal the ordinance "because they feel that they won't have success at the higher level." Council Member O'Rourke reiterated that the repeal is "a sad thing to have to approve," but she "would support a resolution saying that we don't abide, **we would not want to abide by this in the City of Boca Raton**." (Emphasis added).

67.     City Council Member Yvette Drucker noted that she also is "100% super not happy about this, but I understand why we are doing it, and I would agree on a resolution" to condemn Plaintiffs' protected speech.

68.     City Mayor Scott Singer, the fourth of five votes on the City Council, indicated that "our policy position is clear," boasted that two out of four federal judges that heard this matter (presumably the district judge and the dissenting judge on the Eleventh Circuit's panel) agreed with the City's ban on Plaintiffs' protected speech, and indicated that he supports the repeal "in light of the information shared and the impact on other jurisdictions."

69.     All these statements made by the City Council members show an ongoing animus by Defendant Boca Raton toward Plaintiffs' religious beliefs and practices, opposition to Plaintiffs' right to work and live according to those beliefs, and a concerted desire to chill and suppress Plaintiffs' First Amendment-protected speech, even while deceitfully purporting to declare that the chilling of protected speech is a public health "emergency."

70.     Nevertheless, the City's "emergency ordinance" ploy fell short, as the district court,

at the renewed direction of the Eleventh Circuit, entered a preliminary injunction enjoining the original Ordinances on August 18, 2022. (Dkt. 168).

71.     Even so, on August 23, 2022, the Boca Raton City Council unanimously passed Ordinance No. 5626, which purportedly "permanently repeals" Ch. 9, Art. VI, which codified Ordinance No. 5407 ("Prohibition of Conversion Therapy on Minors").

72.     Further evincing Defendants' ongoing hostility toward Plaintiffs and their religious beliefs was the Boca Raton City Council's resolution accompanying its repeal of Ordinance 5407. The unanimously passed resolution announces the City's "**strong disagreement**" with the Eleventh Circuit's decision, affirms the City Council's "desire[] to **discourage** [*i.e.*, chill] the practice of SOCE on minors by licensed therapists," and resolves that the City Council "**strongly opposes** and discourages such practice on minors." Res. 84-2022, Boca Raton, Fla. City Council (Aug. 23, 2022) (emphasis added).

73.     The Resolution is proof of Defendants' ongoing animus toward Plaintiffs' religious practices and their desire to deprive Plaintiffs of their constitutionally protected right to live and work according to their sincerely held religious beliefs.

74.     Upon information and belief, Hoch and his organization conceived not only the plan to "repeal" the Ordinances for the time being, to avoid further jurisdiction, but also to replace them with resolutions that would continue to chill Plaintiffs' constitutionally-protected rights until such time that the Ordinances could be re-enacted. Upon information and belief, Hoch pressured both Defendants to enact a resolution condemning Plaintiffs' practices, and he is continuing to pressure the County to follow in the footsteps of the City's enactment of the condemning resolution.

75.     On August 23, 2022, the same day that the Boca Raton City Council supposedly

repealed the City Ordinance, the Board of County Commissioners of Defendant Palm Beach County passed Ordinance 2022-020, which purportedly repeals Ch. 19, Art. V § 18-121, which codified Ordinance No. 2017-046 ("Prohibition of Conversion Therapy on Minors").

76.     Defendants' purported "repeals" of the Ordinances are not a permanent or genuine change of heart by Defendants, but merely a tactic conceived by Hoch and the Palm Beach County Human Rights Council to moot Plaintiffs' claims for injunctive and declaratory relief, so that Defendants could continue to chill and deprive Plaintiffs of their constitutionally protected rights.

77.     For example, according to an article in *The Palm Beach Post*: "Hoch's organization pushed for the county and Boca Raton to repeal their ordinances because 'we want to stop this from getting to the United States Supreme Court. The court is very different now than we started this project back in 2017,' Hoch said." Larry Keller, *Why Gay Activists See County's Repeal of Ban on Conversion Therapy as a Strategic Gain*, The Palm Beach Post (Aug. 26, 2022), https://www.palmbeachpost.com/story/news/2022/08/26/palm-beach-county-repeals-ban-conversion-therapy-lgbtq-gay-rights-groups-say-its-a-strategic-gain/7893573001/. Hoch added, "**It's a strategic move**." *Id*. (emphasis added). He explained: "We don't want the Supreme Court to rule on this because we feel they might make an adverse ruling [that would apply nationwide]."

78.     Several other news outlets have reported on Rand Hoch's lobbying for Defendants to strategically and temporarily repeal the ordinances. *See, e.g.*, John Riley, *South Florida Locales Repeal Conversion Therapy Bans*, Metro Weekly (Sept. 2, 2022), https://www.metroweekly.com/2022/09/south-florida-locales-repeal-conversion-therapy-bans/; Steve Stewart, *Florida Gay Rights Group Seeks to Avoid Supreme Court Review of 'Conversion Therapy' Ordinance*, The Florida Capital Star (Aug. 2, 2022), https://floridacapitalstar.com/2022/08/02/florida-gay-rights-group-seeks-to-avoid-supreme-court-

review-of-conversion-therapy-ordinance/. Indeed, an article in the *South Florida Sun-Sentinel* quoted Hoch as saying that "he was asking for the county and the city to drop their litigation, because the plaintiffs' attorneys 'clearly want to have this issue heard by the U.S. Supreme Court as soon as possible.'" Wells Dusenbury, *Gay-Rights Group Asks Boca Raton and Palm Beach County to Drop "Conversion Therapy" Bans Amid Legal Defeats*, South Florida Sun-Sentinel (Jul. 31, 2022), https://www.sun-sentinel.com/local/palm-beach/fl-ne-conversation-therapy-ban-20220731-k7xxc24qmnhztelstbwz7hr4eq-story.html. The story quoted Hoch stating: "[W]e are asking the county and the city of Boca Raton to repeal their ordinances. By repealing the ordinances, the legal issue before the District Court will be moot and the litigation will end." *Id*.

79. These statements confirm that Defendants' recent "repeals" of the Ordinances do not reflect a genuine concern or respect for Plaintiffs' First Amendments rights as upheld by the Eleventh Circuit but instead are merely attempts to defeat jurisdiction and moot Plaintiffs' claims for declaratory and injunctive relief, so that Defendants would retain the legal right to re-enact the unconstitutional Ordinances in the future.

80. Indeed, it is clear that, despite purported statements and promises to the contrary, Defendants would swiftly reenact the purportedly repealed Ordinances if and when Hoch determined that the legal winds in the Eleventh Circuit and Supreme Court were more favorable.

81. Further, Hoch's own statements to news media confirm that he is still directing Defendants' efforts. His statements also confirm that Defendants' conspiracy to deprive Plaintiffs of their fundamental First Amendment rights is active and ongoing. Accordingly, Plaintiffs are continuously suffering concrete acts of harm from Defendants' conspiracy.

### E.   RESEARCH ON SOCE COUNSELING.

82. The City Ordinance referenced the Report of the 2009 American Psychological

Association's Task Force on Appropriate Therapeutic Responses to Sexual Orientation ("APA Report") for the proposition that SOCE counseling is harmful and both the City and County Ordinances referencd the APA Resolution issued following the APA Report. (Ex. A at 2; Ex. B at 1).

83.     Defendants' use of the APA Report and Resolution as proof of harm caused by SOCE counseling misrepresents the findings of the report and ignores the substantial limitations the APA Report noted extensively throughout its findings. A copy of the APA Report is attached hereto as EXHIBIT C and incorporated herein.

84.     The APA Report specifically noted that "sexual orientation issues in children are **virtually unexamined**." (Ex. C at 91) (emphasis added).

85.     The APA Report stated that "[t]here is a lack of published research on SOCE among children." (*Id.* at 72).

86.     The APA Report also noted that it could make no conclusions about SOCE counseling **for those adolescents who request such counseling**. (*Id.* at 73) ("We found no empirical research on adolescents who request SOCE."); (*id.* at 76) (noting that its conclusions are not based on specific studies from individuals, including minors, who request SOCE counseling and stating that its conclusions were thus necessarily limited).

87.     The APA Report also concluded that "there is a dearth of scientifically sound research on the safety of SOCE. **Early and recent research studies provide no clear indication of the prevalence of harmful outcomes**." (*Id.* at 42) (emphasis added).

88.     But, from the research the APA Report examined, it found evidence of benefits achieved from SOCE counseling, while noting that there was "some" evidence of certain harm for others. (*Id.* at 91).

89.     Because it noted that there was evidence of benefits for some, the APA Report concluded that "it is still unclear which techniques or methods may or may not be harmful." (*Id.*).

90.     The APA Report also specifically noted that "for some, sexual orientation identity [is] fluid or has an indefinite outcome." (*Id.* at 2).

91.     In fact, the APA Report found among its studies that "[s]ome individuals report that they went on to lead outwardly heterosexual lives, developing a sexual relationship with an other-sex partner, and adopting a heterosexual identity." (*Id.* at 3).

92.     The APA Report does not support Defendants' conclusions that SOCE counseling causes harm to minors and therefore justifies Defendants' efforts to ban SOCE counseling.

93.     The APA Report itself is also highly partisan and politicized as a result of its researchers. Although many qualified conservative psychologists were nominated to serve on the task force, all of them were rejected.

94.     The director of the APA's Lesbian, Gay and Bisexual Concerns Office, Clinton Anderson, stated that such practitioners were rejected because the group could not take into account what are fundamentally negative religious perceptions of homosexuality because they do not fit into the APA's worldview.

95.     In seeking to reach conclusions in the APA Report, the APA operated with a litmus test when considering task force membership—the only views of homosexuality that were tolerated were those that uniformly endorsed same-sex behavior as a moral good. Thus, from the outset of the task force, it was predetermined that conservative or religious viewpoints would only be acceptable when they fit within their pre-existing worldview.

96.     One example of this is the APA Report's failure to recommend any religious

resources that adopt a traditional or conservative approach to addressing conflicts between religious beliefs and sexual orientation. This bias can hardly be said to respect religious diversity and had predictable consequences for how the task force addressed its work.

97.     The APA Report contains a significant contrast between the exceptionally rigorous methodological standards applied to SOCE outcomes and the considerably less rigorous and uneven standards applied to the question of harm. With regard to SOCE outcomes, the APA Report dismisses most of the relevant research because of methodological limitations, which are outlined in great detail (Ex. C at 26-34).

98.     Studies pertaining to SOCE outcomes that fall short of the task force's rigorous standards were deemed unworthy of examination and dismissed as containing no evidence of value to the questions at hand. But, the APA Report appears to adopt very different evidentiary standards for making statements about alleged harms attributed to SOCE.

99.     The standard as regards efficacy ruled out allegedly substandard studies as irrelevant; however, no such efficacy standards were employed in considering studies purporting to document harm. Additionally, the APA Report uses the absence of evidence to argue that SOCE is unlikely to produce change and thus strongly questions the validity of SOCE, but shows no parallel reticence to endorse affirmative therapy despite acknowledging that such therapy "has not been evaluated for safety and efficacy" (Ex. C at 91).

100.     Dr. Nicolas Cummings, former president of the American Psychological Association, has also noted that SOCE counseling can provide enormous benefits. A copy of Dr. Cummings article discussing SOCE counseling is attached hereto as EXHIBIT D and incorporated herein.

101.     Dr. Cummings noted that Defendants' premise for adopting the Ordinances is

22

damaging and incorrect. (*See* Ex. D. at 1) ("The sweeping allegation that [SOCE counseling] must be a fraud because homosexual orientation can't be changed is damaging.").

102.    Dr. Cummings personally counseled countless individuals in his years of mental health practice, and he reported that hundreds of those individuals seeking to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity were successful. (*Id.*) ("Of the patients I oversaw who sought to change their orientation, **hundreds were successful**." (emphasis added)).

103.    Dr. Cummings said that the assertion that same-sex sexual attractions, behaviors, or identity is one identical inherited characteristic is unsupported by scientific evidence and that "**contending that all same-sex attraction is immutable is a distortion of reality**." (*Id.* at 2) (emphasis added).

104.    Dr. Cummings went on to criticize efforts to prohibit SOCE counseling as violative of the client's right to self-determination and therapeutic choice. (*Id.*) ("Attempting to characterize all sexual reorientation therapy as unethical violates patient choice and gives an outside party a veto over patients' goals for their own treatment.").

105.    Dr. Cummings concluded that "[a] political agenda shouldn't prevent gays and lesbians who desire to change from making their own decisions." (*Id.*).

106.    Dr. Cummings concluded by condemning political efforts to prohibit SOCE counseling as harmful to clients and counselors. (*Id.*) ("Whatever the situation at an individual clinic, accusing professionals from across the country who provide treatment to fully informed persons seeking to change their sexual orientation of perpetrating a fraud **serves only to stigmatize the professional and shame the patient**." (emphasis added)).

107.    The American College of Pediatricians has noted that the political position statements of numerous mental health organizations, including many relied upon by the City here,

have "no firm basis" in evidentiary support. A copy of the American College of Pediatricians statement on SOCE counseling is attached hereto as EXHIBIT E and incorporated herein.

108.    The American College of Pediatricians noted that, "[t]he scientific literature, however, is clear: **Same-sex attractions are more fluid than fixed, especially for adolescents— many of whom can and do change**." (Ex. E) (emphasis added).

109.    The American College of Pediatricians also noted that "there is a body of literature demonstrating a variety of positive outcomes from SOCE." (*Id.*).

110.    Like Dr. Cummings, the American College of Pediatricians concluded that SOCE counseling is beneficial and that laws, such as the Ordinances here, that prohibit such counseling serve only to impose harm on minors who seek it. (*Id.*) ("Banning change therapy or SOCE will threaten the health and well-being of children wanting therapy.").

111.    The City and County claim that the Ordinances were necessary to protect the health, safety and welfare of minors living within their jurisdictions.

112.    Section 9.104 of the City Ordinances provided:

The Intent of this Ordinance is to protect the physical and psychological well-being of minors, including but not limited to lesbian, gay, bisexual, transgender and/ or questioning youth, from exposure to the serious harms and risks caused by conversion therapy or reparative therapy by licensed providers, including but not limited to licensed therapists. These provisions are exercises of the police power of the City for the public safety, health, and welfare; and its provisions shall be liberally construed to accomplish that purpose.

(Ex. A at 6).

113.    Section 1 of the County Ordinance provided:

The intent of this Ordinance is to protect the physical and psychological well-being of minors, including but not limited to lesbian, gay, bisexual, transgender and/or questioning youth, from exposure to the serious harms and risks caused by conversion therapy or reparative therapy by licensed providers, including but not limited to licensed therapists and the unlicensed individuals who perform

counseling as part of professional training to become a licensed provider. This Ordinance is an exercise of the County's police power for the benefit of the public health, safety, and welfare; and its sections are to be liberally construed to accomplish that purpose.

(Ex. B at 4).

114.     Despite the City and County's assertion that SOCE counseling causes serious harms and risks, in fact the Board of Medical Quality Assurance for the State of Florida has no records of any complaints against any licensed professionals in the State of Florida related to SOCE counseling, "conversion therapy" or "reparative therapy." A true and correct copy of the response from the Board of Medical Quality Assurance to a public records request seeking such records is attached, marked as EXHIBIT F, and incorporated herein.

### F.     VOLUNTARY COUNSELING PROVIDED BY PLAINTIFFS.

115.     Many of the position statements and studies referenced in the Ordinances improperly attempt to conflate involuntary, forced practices allegedly used by some in the past with the practices that Plaintiffs, along with all ethical SOCE practitioners, use in their counseling and therapy practices with clients who wish to reduce or eliminate same-sex sexual attractions, behaviors, or identity. The Ordinances indiscriminately ban both types.

116.     Plaintiffs do not engage in aversive techniques, nor are they aware of any practitioner who engages in such practices with clients seeking to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity.

117.     In their practices, Plaintiffs help clients with their unwanted same-sex attractions, behaviors, and identity by talking with them about root causes, about gender roles and identities, and about their anxieties and confusion that arises from these attractions.

118.     Speech is the only tool that Plaintiffs use in their counseling with minors seeking

to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity. The only thing that happens in their counseling sessions is speech. They sit down with their clients and talk to their clients about the clients' goals, objectives, religious beliefs, desires, and identity.

119.    Throughout the Ordinances, the position statements refer to SOCE counseling as that counseling with the single goal of changing an individual's sexual orientation or gender identity. But, Plaintiffs do not begin counseling with any predetermined goals other than those that the clients themselves identify and set. This is consistent with the clients' fundamental right of self-determination.

120.    Plaintiffs employ speech to help clients understand and identify their anxiety or confusion regarding their attractions, behaviors, or identity and then to help the client formulate the method of counseling that will most benefit that particular client.

121.    Often times, a client is not ready or does not desire to immediately begin to seek to reduce or eliminate their unwanted same-sex attraction, behaviors, or identity. When that is the case, Plaintiffs focus on helping the client and parents to heal any wounds or frustrations and to begin to work on loving and accepting the minor client despite any challenges that arise from the unwanted same-sex attractions, behaviors, or identity.

122.    The presumption of the Ordinances that all such counseling from Plaintiffs is premised on the notion that homosexuality is an illness, defect, or shortcoming does not accurately reflect Plaintiffs' practices, and it ignores the fact that Plaintiffs seek to treat the anxiety and confusion that arises from a client's unwanted same-sex attractions, behaviors, or identity.

123.    The presumption of the Ordinances that Plaintiffs seek to "cure" a client of same-sex attractions is false, because Plaintiffs seek only to assist a client with their stated desires and objectives in counseling, which sometime include reducing or eliminating the client's unwanted

same-sex attractions.

124.     The presumption of the Ordinances that SOCE counseling and Plaintiffs view homosexuality as an "illness" does not reflect the truth of such counseling, and it ignores the point of mental health counseling in general.

125.     The only relevant consideration in Plaintiffs' counseling is that same-sex attractions, behaviors, or identity are an adaption that the client has anxiety or distress over, and that the client seeks to eliminate that anxiety or distress.

126.     This is the same relevant consideration in all forms of mental health counseling, and is true of many things that clients seek counseling for, including many that are not mental illnesses but that nevertheless impose great stress, anxiety, confusion, or grief on the client.

### G.     CURRENT ETHICAL OBLIGATIONS PROTECTING MINOR CLIENTS IN MENTAL HEALTH COUNSELING.

127.     The City Ordinance falsely asserted that there are no other effective means, including state statutes, to protect minors from the purported harms of SOCE counseling. (Ex. A at 4).

128.     Licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, are already prohibited by law from engaging in false, deceptive, or misleading advertisements relating to their practice of marriage and family therapy. Fla. Stat. Ann. § 491.009(1)(d).

129.     Licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, are already prohibited from "[m]aking misleading, deceptive, untrue, or fraudulent representations in the practice of any profession licensed, registered, or certified" by Florida's Marriage and Family Therapy Board. Fla. Stat. Ann. § 491.009(1)(l).

130.     Licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, are

already prohibited by law from engaging in any practice that is harmful to clients or patients, such as "[f]ailing to meet minimum standards of performance in professional activities when measured against generally prevailing peer performance." Fla. Stat. Ann. 491.009(1)(r).

131.    Licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, are already prohibited by law from violating other ethical regulations governing the practice of marriage and family therapy. Fla. Stat. Ann. § 491.001(1)(t).

132.    Failure of licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, to abide by the legal requirements imposed upon them by Florida law or other ethical regulations subjects them to significant fines, suspension of licensing, and permanent revocation of licensing depending on the nature and extent of the violation. Fla. Admin. Code § 64B4-5.001.

133.    Other ethical regulations imposed upon marriage and family therapists, such as the American Association of Marriage and Family Therapists Code of Ethics ("AAMFT Code"), prohibit licensed marriage and family therapists from engaging in practices that harm clients or patients, and also prohibit them from refusing to recognize their clients' right to self-determination and informed consent.

134.    Standard 1 of the AAMFT Code requires that licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, "advance the welfare of families and individuals and make reasonable efforts to find the appropriate balance between conflicting goals."

135.    Standard 1.1 of the AAMFT Code prohibits licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, from discriminating against clients based on their sexual orientation or gender identity.

136.    Standard 1.2 of the AAMFT Code mandates that licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, obtain "appropriate informed consent to therapy or

related procedures" and that they inform the clients regarding all information necessary for the client to make such a decision.

137.     Standard 1.8 of the AAMFT Code requires licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, to "respect the rights of clients to make decisions and help them understand the consequences of these decisions."

138.     Standard 1.9 of the AAMFT Code prohibits licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, from continuing any therapeutic relationship if it becomes reasonably clear that the clients are not benefitting from the relationship.

139.     Thus, existing Florida law regulating licensed professionals and the other ethical obligations imposed upon such counselors, coupled with the absence of records of any complaints of harm related to SOCE counseling, demonstrate that the City's and County's stated rationales for adopting the Ordinances were fallacious, pretextual and unsupported by any governmental interest.

### H.     VAGUENESS PROBLEMS WITH THE ORDINANCES.

140.     Despite the Ordinances' presumptions that same-sex attractions, behaviors, or identity are easily understandable and measurable, it is widely understood that there are actually tremendous difficulties in measuring sexual orientation or gender identity.

141.     Because of the difficulty in measuring sexual orientation or gender identity, the prohibitions in the Ordinances were hopelessly vague and left Plaintiffs guessing at what practices are permitted or prohibited.

142.     Even in Defendants' own cited study, the APA Report, the difficulty in understanding exactly what is prohibited by the Ordinance is recognized. The APA Report states that "[s]ame-sex sexual attractions occur in the context of a variety of sexual orientations and

sexual orientation identities, and for some, sexual orientation identity (i.e., individual or group membership and affiliation, self-labeling) **is fluid or has an indefinite outcome**." (Ex. C at 2 (emphasis added)).

143.     The Ordinances prohibited Plaintiffs under any circumstances from engaging in any practice that seeks to reduce or eliminate same-sex sexual attractions, behaviors, or identity. This prohibition was virtually impossible for Plaintiffs to comply with because it is well understood in the mental health profession, and conceded by Defendants' own references, that sexual orientation and gender identity are difficult to define and encompass a number of factors, including behavior, practices, identity, attractions, sexual fantasy, romantic attractions, and erotic desires.

144.     Given that sexual orientation is considered "fluid," even among the references the Defendants cite in the Ordinances, Plaintiffs were left to guess at what counseling practices might constitute a violation of the Ordinance.

145.     The Ordinances did not specify which clients would be classified as seeking to "change" and those that would merely be deemed conforming their behavior with their original "sexual orientation." As Plaintiffs' clients do not always immediately present wanting to "change," they were left to guess at which point any of their counseling practices would be deemed to constitute efforts to reduce or eliminate unwanted same-sex attractions.

146.     Sexual orientation is also nearly impossible to measure, and there is no agreement on whether sexual orientation is a categorical construct or exists on a continuum. A client's motives, attractions, identification, and behaviors vary over time and circumstances with respect to one another, which makes them dynastically changing features of an individual's concept of self and sexual orientation.

147.     Despite the difficulty in measuring sexual orientation and its fluid and changing

nature, Plaintiffs were required to put their professional licenses in jeopardy when even discussing something that could be perceived as "changing" sexual orientation or identity.

148.    The Ordinances also permitted licensed counselors to provide counseling that provides "acceptance, support, and understanding" of a client's unwanted same-sex attractions, behaviors, or identity. This presented another major source of confusion, uncertainty, and vagueness for Plaintiffs.

149.    Under the Ordinances, it was impossible for Plaintiffs to provide acceptance and support to a client who comes in for counseling and requests assistance in seeking to eliminate unwanted same-sex attractions, behaviors, or identity.

150.    Many of Plaintiffs' clients do not initially request counseling to specifically reduce or eliminate their unwanted same-sex attractions, behaviors, or identity, but instead want help and counseling to understand the sources, causes, and origins of their anxiety over such feelings.

151.    During the course of such counseling, and without ever specifically setting out to reduce or eliminate unwanted same-sex attractions, behaviors, or identity, many clients will experience a change in their sexual attractions, behaviors, or identity, and this is true despite never specifically seeking to experience such a change or eliminate their unwanted feelings.

152.    Plaintiffs were left to guess at whether counseling simply discussing the confusion, anxiety, conflict, or stress a client feels about their unwanted same-sex attractions, behaviors, or identity, without specifically seeking to reduce or eliminate such feelings, runs afoul of the Ordinances' prohibitions.

153.    As the APA Report upon which the Ordinances relied admits, same-sex attractions, behaviors, or identities are fluid and can often spontaneously disappear, particularly in minors. If Plaintiffs were merely counseling an individual to understand the origins of their attractions or

helping them to understand and resolve the conflict with their religious beliefs, they were unable to know whether such counseling may result in a spontaneous change for the minor client, even though it was not the topic or goal of their counseling.

154.    Plaintiffs were left to guess at what topics are permissible when a minor client presents with anxiety, confusion, distress, or conflict over their unwanted same-sex attractions, behaviors, or identity, and the Ordinances provided no clear guideposts on such issues.

## I.    INDIVIDUALIZED EXEMPTIONS IN THE ORDINANCES.

155.    The City and County Ordinances also established a system of individualized exemptions.

156.    The City Ordinance permitted counseling on the broad topic of sexual orientation, gender identity, and attractions, behaviors, and identities of minors seeking counseling, but prohibited such counseling when the client desires to receive counseling to change, reduce, or eliminate same-sex attractions, behaviors, or identity. (Ex. A at 6).

157.    The City Ordinance, however, permitted counseling relating to change of gender identity when such a client is "undergoing gender transition." (*Id.*).

158.    Thus, the City Ordinance prohibited change when an individual desires to conform their gender identity or gender confusion to their own concept of self and biological identity, but specifically provided an individual exemption for identical counseling when a client is seeking to change their gender identity and expression.

159.    The City Ordinance permitted counseling seeking to affirm, accept, and support a client's unwanted same-sex attractions, behaviors, or identity, and permitted counseling to affirm, accept, and support a client's gender identity and expression, but prohibited counseling providing

acceptance and support for a client whose attractions, behaviors, expressions, or identity do not match their concept of self.

160.    Thus, the City Ordinance exempted counseling affirming a minor transitioning from one gender to another, but prohibited such counseling for a client seeking to eliminate the confusion or identity that does not match his or her biological makeup.

161.    The County Ordinance likewise permitted counseling on the broad topic of sexual orientation, gender identity, and attractions, behaviors, and identities of minors seeking counseling, but prohibited such counseling when the client desires to receive counseling to change, reduce, or eliminate same-sex attractions, behaviors, or identity. (Ex. B at 5).

162.    The County Ordinance, however, permitted counseling relating to change of gender identity when such a client is "undergoing gender transition." (*Id.*).

163.    Thus, the County Ordinance prohibited change when an individual desires to conform their gender identity or gender confusion to their own concept of self and biological identity, but specifically provided an individual exemption for identical counseling when a client is seeking to change their gender identity and expression.

164.    The County Ordinance permitted counseling seeking to affirm, accept, and support a client's unwanted same-sex attractions, behaviors, or identity, and permitted counseling to affirm, accept, and support a client's unwanted gender identity and expression, but prohibited counseling providing acceptance and support for a client whose attractions, behaviors, expressions, or identity do not match their concept of self.

165.    Thus, the County Ordinance exempted counseling affirming a minor transitioning from one gender to another, but prohibited such counseling for a client seeking to eliminate the confusion or identity that does not match his or her biological makeup.

**J.      PLAINTIFF ROBERT W. OTTO, PH.D., LMFT.**

166.    Plaintiff, Robert W. Otto, Ph.D, LMFT, is a licensed marriage and family therapist and is licensed to practice mental health counseling in Florida.

167.    Dr. Otto has lived in Palm Beach County continuously since 1998.

168.    Dr. Otto received his Master of Science and Doctor of Philosophy in Family Therapy from Nova Southeastern University.

169.    Dr. Otto maintains a counseling practice in the City of Boca Raton.

170.    Dr. Otto's practice includes voluntary SOCE counseling of minors who are experiencing unwanted same-sex attractions, behaviors, and identity.

171.    As a licensed marriage and family therapist who engages in SOCE counseling in the City of Boca Raton, which is located in Palm Beach County, Dr. Otto was subject to potential fines under the City Ordinance and County Ordinance.

172.    Prior to engaging in SOCE counseling with any client, Dr. Otto provides them with an extensive informed consent form and requires them to review and sign it prior to commencing SOCE counseling. This informed consent form outlines the nature of SOCE counseling, explains the controversial nature of SOCE counseling, including the fact that some therapists do not believe sexual orientation can or should be changed, and informs the client of the potential benefits and risks associated with SOCE counseling.

173.    Many of Dr. Otto's clients who desire SOCE counseling profess to be Christians with sincerely held religious beliefs that homosexuality is harmful and destructive and therefore seek SOCE counseling in order to live a lifestyle that is in congruence with their faith and to conform their identity, concept of self, attractions, and behaviors to their sincerely held religious

beliefs.

174.    Dr. Otto has never received any complaint or report of harm from any of his clients seeking and receiving SOCE counseling, including the many minors that he has counseled.

175.    Dr. Otto does not coerce his clients into engaging in SOCE counseling, but respects the clients' right of self-determination and treats each client with unconditional positive respect regardless of the client's concept of self or feelings of unwanted same-sex attractions, behaviors, or identity.

176.    One of Dr. Otto's clients was a minor who was surprised to receive a kiss from a same-sex friend. That caused confusion, and the minor wondered about being bisexual. The confusion caused conflicts in relationships at school. The minor was also experiencing depression, sadness, cutting, eating disorder issues, and suicide attempts. The client did not want the feelings of confusion regarding same-sex attractions and sought SOCE counseling, from which the client has benefitted.

177.    Dr. Otto also had an adolescent client who identified as homosexual and came seeking help for issues other than sexual orientation. Through the course of therapy, which never included efforts to change sexual orientation or discussion of sexual orientation as a therapeutic goal, the client migrated from lesbian to bisexual to heterosexual.

178.    Dr. Otto also had an adolescent client who has had unwanted homosexual feelings that are contrary to the client's sincerely held religious convictions. The client had not been able to reconcile this difference or understand why these feelings were present. The client sought help from the parents, and the parents did not know how to address the issue. As a result, the client and parents sought help in the form of family and individual counseling.

179.    Another of Dr. Otto's clients was seeking counseling to address feelings of

isolation, depression, hurt, and fear. The child began viewing homosexual pornography and toxic social media sites and engaging in sexting. The child lost friends, was confused, and sought help from a Christian counselor.

180.     In each of these cases, and other similar cases, Dr. Otto was prohibited from engaging in SOCE counseling with his minor clients or was forced to discontinue ongoing SOCE counseling despite the clients' and parents' consent and requests to continue, or he faced penalties under the City and County Ordinances.

181.     The City and County Ordinances prohibited Dr. Otto's patients from continuing to progress in their individually-determined course of counseling, and from continuing to receive counseling in accordance with their sincerely held religious beliefs. In addition, the Ordinances also adversely affected other clients. Dr. Otto periodically receives requests for therapy for both unwanted homosexual attractions and gender identity confusion, and he and other licensed professionals in the City and County were prohibited from providing and the clients prohibited from receiving help.

182.     The City and County Ordinances also left Dr. Otto on an irresolvable collision course with his ethical requirements as a marriage and family therapist. According to the AAMFT Code Standard 1.11, if a therapist stops treatment prior to termination, it is considered abandonment, which is unethical. Therefore, if he complied with the Ordinances, Dr. Otto would have violated the code of ethics, and if he did not comply and engaged in the requested therapy, then he would have violated the Ordinances.

183.     By prohibiting minors from receiving SOCE counseling, the Ordinances purported to make a portion of Dr. Otto's practice illegal and unethical despite the fact that SOCE counseling has not been declared illegal or unethical by the statewide licensing body or the State Legislature.

As a result, the Ordinances created an inconsistent patchwork of regulations under which certain counseling practices were permitted in one portion of the state but prohibited in neighboring portions of the state, creating conflict and confusion for Dr. Otto and for his clients.

### K.     PLAINTIFF JULIE H. HAMILTON, PH.D., LMFT.

184.    Plaintiff, Julie H. Hamilton, Ph.D., LMFT, is a licensed marriage and family therapist licensed to practice therapy in the state of Florida who practices marriage and family therapy in Palm Beach County.

185.    Dr. Hamilton received her Master of Science in Marriage and Family Therapy from Nova Southeastern University in 1995 and her Ph.D. in Marriage and Family Therapy from Nova Southeastern University in 1999.

186.    In her current practice, Dr. Hamilton provides individual, marital, and family therapy for a wide variety of issues, including the issues of unwanted same-sex attractions and gender identity confusion.

187.    Prior to engaging in therapy for any issue, Dr. Hamilton provides all of her clients with informed consent, in which she explains that, because there are many variables in psychotherapy, there is no guarantee that by pursuing therapy clients will be happier; that no particular treatment method can be guaranteed to be effective; and that therapy can be uncomfortable as clients talk about unresolved life experiences.

188.    Dr. Hamilton is a client-directed therapist, in that it is the client who sets the goals for therapy. Dr. Hamilton does not impose an agenda on her clients, nor does she determine clients' goals for therapy. Clients set their own goals for therapy. In family or marital situations, all parties are voluntary participants. One family member cannot determine the goals for another family member. This would include situations in which a parent brings a minor child to therapy. If a child

is not interested or willing to work on goals that the parent may have for him or her, Dr. Hamilton does not force or coerce the child to adopt such goals. Dr. Hamilton only works with voluntary clients who determine the goals that they have for themselves. Dr. Hamilton does not coerce her clients into engaging in therapy, but respects the clients' rights of self-determination and treats each client with unconditional positive respect regardless of the client's personal beliefs, concept of self or feelings of unwanted same-sex attractions, behaviors, or identity.

189.    Many of Dr. Hamilton's clients are referred through churches or word of mouth. Many of her clients uphold a Biblical worldview. Dr. Hamilton's clients with same-sex attractions, behaviors, or identity or gender identity confusion who adhere to a Biblical worldview believe that embracing a gay identity is not in accordance with God's plan for their lives, nor is adopting a gender identity that is different from their biological sex. They believe that attractions do not dictate behavior, nor do feelings and perceptions determine identity. Clients who identify as Christians, holding to a Biblical worldview, believe that their faith and their relationships with God supersede romantic attractions, and that God determines their identity, according to what He has revealed in the Bible, rather than their attractions or perceptions determining their identity.

190.    Many such clients who have same-sex attractions or gender identity confusion, who also prioritize their faith above their feelings, seek out therapy to clear up gender identity confusion, reduce same-sex attractions, change same-sex behaviors, and/or simply live a life consistent with their faith. Clients who have been living a life inconsistent with their faith often present with internal conflicts, depression, anxiety, substance abuse and so forth; therefore, they are seeking resolution to such turmoil.

191.    Dr. Hamilton has never received any complaint or report of harm from any of her clients seeking and receiving therapy for any issue, including the many minors that she has

counseled.

192.    Dr. Hamilton has had parents who have brought their minor child to therapy to address homosexual attractions or behaviors, and whose minor child did not share the same goal. In such cases where minors have expressed that they are happy identifying as gay, lesbian, or bi-sexual, and do not want help for changing identity, attractions, or behavior, Dr. Hamilton asks if there are any other goals that the minor is interested in pursuing. In many cases, minors ask for help with social issues, family relationships, parent-child communication, or helping to facilitate the parents' coping with the sexual identity of the child. Dr. Hamilton has helped a number of minors and parents with those goals of the minors, instead of trying to help minors change their attractions, behavior, or identity, when minor clients tell her that they are not seeking change of attractions, behavior, or identity. In other cases, minors have stated that they do not have a therapeutic goal, and therapy is terminated.

193.    Dr. Hamilton had a minor teen-aged client, who originally presented with the goal of reducing same-sex attractions and avoiding a homosexual identity. At the start of therapy, this client was self-identifying as "bi-curious." During the course of therapy, the client decided to pursue a homosexual relationship rather than pursue change. Dr. Hamilton offered to discontinue therapy at that time, and yet the minor client requested to continue therapy, and even requested more frequent visits, changing from bi-weekly to weekly sessions. Throughout the course of therapy, the client changed identity labels as well as therapeutic goals several times, pursuing both same-sex and opposite sex-relationships. Following one Easter season, Dr. Hamilton's client reported that his sincerely held religious beliefs convicted him (outside of therapy) and that he sincerely desires to pursue reducing and eliminating his unwanted same-sex attractions.

194.    Dr. Hamilton had another client who began counseling with a litany of changing

emotions regarding her perceived sexual orientation and identity. This minor client was 12-years-old at the beginning of counseling and indicated that her sexual identity was very fluid, fluctuating between homosexual, bisexual and pansexual. After engaging in counseling with Dr. Hamilton, who encouraged her to explore the reasons why she felt she needed a "label," the client began to understand the origins and nature of her confusion regarding her sexual orientation. On her own accord and through the process of counseling with Dr. Hamilton, this minor client determined that she was heterosexual and that her same-sex attractions and confusion did not represent her own concept of self.

195.    Dr. Hamilton's minor client noted in her counseling that she had many friends who identify as bisexual, homosexual, pansexual, transgender, asexual, etc., but that all of them had indicated they were confused and struggling. Many of her friends dealt with problems of cutting, depression, substance abuse, and a few even had thoughts of suicide. Dr. Hamilton's minor client actually witnessed one of her friends, who identifies as transgender and bisexual, try to harm himself through cutting. Her best friend identifies as bisexual and struggles with depression. This friend attempted suicide at the age of ten, and has attempted suicide other times as well.

196.    After engaging in counseling with Dr. Hamilton, this minor client believed she discovered her true self, that she was healthier, that she felt happy, and that she benefitted from her counseling with Dr. Hamilton. Dr. Hamilton's client also discussed with Dr. Hamilton her desire to have her friends and other minors be able to obtain the help and counseling she received. During her counseling with Dr. Hamilton, this client expressed her sincere love for these friends, stated that she has cried with her friends, cried for her friends, hugged and consoled her friends, called some of these friends siblings because they are so close, and hoped that these friends could also get assistance for the struggles and confusion they were experiencing.

197.    Dr. Hamilton had another client who was an elementary-aged child whose parents initiated therapy due to concerns about the child's apparent gender identity confusion, as the child was demonstrating a discontentment with the child's biological sex. Throughout the course of therapy, this child's gender identity confusion appeared to have decreased tremendously. This child reported to be much more comfortable with the child's own biological sex.

198.    With elementary-aged children who appear to have gender identity confusion, Dr. Hamilton spends most of the time in therapy working with the parents and a small portion of the time meeting with the child. The majority of therapy takes place with the parents, helping them to relate to the child in such a way that the child becomes more comfortable and confident in his or her identity as biologically male or female. In addition, a small amount of time is spent with the child addressing concerns, confusion, and perceptions of the child.

199.    The County Ordinance prohibited Dr. Hamilton from continuing to meet with this minor client to address gender identity. According to this Ordinance, the only therapy that would be permissible for gender identity confusion is therapy that supports a child in "gender transition" or helping the child to proceed down a path towards changing that child's biological sex.

200.    The County Ordinance and its restrictions were greatly problematic for this client for many reasons: It only allowed for gender transition rather than therapy that is gender affirming; gender transition was not the goal of this child or the child's parents; there is no scientific evidence that gender transition is safe or effective for children; there are many adverse side effects to gender transition; and this particular child's therapy with Dr. Hamilton, which had been gender affirming, had been very helpful. Abruptly stopping therapy would have been both unprofessional and potentially harmful to the client.

201.    Dr. Hamilton had also been approached by a pre-teenage gender confused client,

requesting counseling to address gender confusion. This client's gender confusion appeared to have originated externally, through cultural input, rather than internally as a genuine transgender condition. Because of the County Ordinance, Dr. Hamilton was forced to inform the client and family that this child was not permitted to receive the counseling they were seeking from Dr. Hamilton. Dr. Hamilton told the parents that they were free to attend counseling with Dr. Hamilton, but that she was prohibited by the County Ordinance from including the gender-confused client who desired the counseling. This harmed both the parents and their minor child, and Dr. Hamilton.

202.   After the passage of the County Ordinance, Dr. Hamilton was also contacted by the parents of another pre-teenage client who was experiencing gender confusion. This minor client also desired counseling to assist with her gender confusion, but Dr. Hamilton had to inform the minor client and parents that the County Ordinance prohibited the counseling that they sought. This harmed both the parents and their minor child, and Dr. Hamilton.

203.   In addition to Dr. Hamilton's actual clients, there were potential clients who were adversely affected by the County Ordinance. Dr. Hamilton periodically receives requests for therapy for both unwanted homosexual attractions and gender identity confusion. The Ordinance prevented clients from getting help.

204.   The County Ordinance also left Dr. Hamilton on an irresolvable collision course with her ethical requirements as a marriage and family therapist. According to the AAMFT Code Standard 1.11, if a therapist stops treatment prior to termination, it is considered abandonment, which is unethical. Therefore, if she complied with the County Ordinance, then she would have violated the code of ethics, and if she did not comply and engaged in the requested therapy, then she violated the County Ordinance.

205.   By prohibiting minors from receiving SOCE counseling, the County Ordinance

purported to make a portion of Dr. Hamilton's practice illegal and unethical despite the fact that SOCE counseling has not been declared illegal or unethical by the statewide licensing body or the State Legislature. As a result, the County Ordinance created an inconsistent patchwork of regulations under which certain counseling practices were permitted in one portion of the state but prohibited in neighboring portions of the state, creating conflict and confusion for Dr. Hamilton and for her clients.

### L.    HARM TO DR. OTTO, DR. HAMILTON, AND THEIR CLIENTS.

206.    Dr. Otto and Dr. Hamilton desired to advertise their counseling, including SOCE counseling, to clients and potential clients in the City and County, including minors.

207.    Consistent with their First Amendment rights, Dr. Otto and Dr. Hamilton wanted to offer their counseling, including SOCE counseling, to clients and potential clients in the City and County, including minors.

208.    Consistent with their First Amendment rights, Dr. Otto and Dr. Hamilton wanted to provide their counseling, including voluntary SOCE counseling, to clients and potential clients in the City and County, including minors.

209.    Consistent with their First Amendment rights, Dr. Otto and Dr. Hamilton would have liked to be able to inform religious leaders, organizations, and ministries that there was help from licensed mental health professionals with expertise in this area and that it was available to individuals desiring assistance in the area of unwanted same-sex attractions, behaviors, and identity.

210.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton were prohibited from advertising SOCE counseling to clients and potential clients, including minors, in the City and County.

211.   Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton were prohibited from offering voluntary SOCE counseling to clients and potential clients, including minors, in the City and County.

212.   Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton were prohibited from engaging in SOCE counseling with clients and potential clients, including minors who desire such counseling, in the City and County.

213.   Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton were restricted from engaging in constitutionally protected speech, including advertising their SOCE counseling to clients and potential clients in the City and County.

214.   Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton were prohibited from engaging in constitutionally protected speech, including offering their SOCE counseling to clients and potential clients in the City and County.

215.   Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton were prohibited from engaging in constitutionally protected speech, including providing their SOCE counseling to willing clients and potential clients in the City and County.

216.   Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton have been chilled in their constitutionally protected expression.

217.   Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton were prohibited from engaging in constitutionally protected speech, including providing their SOCE counseling to willing clients and potential clients in the City and County in violation of their clients' and potential clients' First Amendment right to receive information.

218.   Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton were forced

to deny voluntary SOCE counseling to their clients and potential clients in violation of their and their clients' sincerely held religious beliefs.

219.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton were forced to deny SOCE counseling to their willing clients and potential clients in violation of the clients' fundamental rights to self-determination.

220.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton suffered injury to their cherished First Amendment rights to freedom of speech.

221.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton suffered injury to their cherished First Amendment rights to free exercise of religion.

222.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton's clients suffered injury to their cherished First Amendment rights to receive information.

223.    Because of the City and County Ordinances, Dr. Otto's and Dr. Hamilton's minor clients were prohibited from receiving the SOCE counseling that the clients desired to obtain from a licensed professional with expertise in this area.

224.    Dr. Otto's and Dr. Hamilton's minor clients suffered injury to the clients' cherished First Amendment rights to receive information.

225.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton's clients suffered injury to their cherished First Amendment rights to free exercise of religion.

## COUNT I – THE CITY AND COUNTY ORDINANCES VIOLATED PLAINTIFFS' RIGHT TO FREEDOM OF SPEECH UNDER THE FIRST AMENDMENT.

226.    Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1–225.

227.    The Free Speech Clause of the First Amendment to the United States Constitution,

as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' freedom of speech.

228.    The City and County Ordinances, on their face and as applied, were unconstitutional prior restraints on Plaintiffs' speech.

229.    The City and County Ordinances, on their face and as applied, unconstitutionally discriminated on the basis of viewpoint.

230.    The City and County Ordinances, on their face and as applied, authorized only one viewpoint on SOCE counseling and unwanted same-sex sexual attractions, behaviors, and identity by forcing Plaintiffs to present only one viewpoint on the otherwise permissible subject matter of same-sex attractions, behaviors, or identity. The Ordinances also forced Plaintiffs' clients and their parents to receive only one viewpoint on this otherwise permissible subject matter.

231.    The City and County Ordinances, on their face and as applied, discriminated against Plaintiffs' speech on the basis of the content of the message they offered and that Plaintiffs' clients sought to receive.

232.    Defendants lacked compelling, legitimate, significant, or even rational governmental interests to justify the City and County Ordinances' infringement of the right to free speech.

233.    The City and County Ordinances, on their face and as applied, were not the least restrictive means to accomplish any permissible government purpose sought to be served by the law.

234.    Informed consent provisions outlining the required disclosure prior to engaging in SOCE counseling with a minor would have been far less restrictive of Plaintiffs' speech, and

mental health counseling organizations have urged legislatures to adopt informed consent provisions. A copy of the California mental health organizations' letter to the California legislature concerning legislation virtually identical to the City and County Ordinances is attached as EXHIBIT G and incorporated herein.

235.     The City and County Ordinances did not leave open ample alternative channels of communication for Plaintiffs.

236.     The City and County Ordinances, on their face and as applied, were irrational and unreasonable and imposed unjustifiable and unreasonable restrictions on constitutionally protected speech.

237.     The City and County Ordinances, on their face and as applied, unconstitutionally chilled and abridged the right of Plaintiffs to freely communicate information pertaining to unwanted same-sex sexual attractions, behaviors, or identity.

238.     The City and County Ordinances, on their face and as applied, unconstitutionally chilled and abridged the right of Plaintiffs' clients to freely receive information pertaining to unwanted same-sex sexual attractions, behaviors, or identity.

239.     The City and County Ordinances' prohibitions on licensed mental health counselors offering voluntary SOCE counseling that could change, reduce, or otherwise address a minor client's unwanted same-sex attractions, behaviors, or identity, which would include a referral to someone who offers SOCE counseling, on their face and as applied, abridged Plaintiffs' right to offer and Plaintiffs' clients' right to receive information.

240.     The City and County Ordinances vested unbridled discretion in government officials to apply or not apply the Ordinances in a manner that restricts free speech, and subjected Plaintiffs to ethical code violations.

241.    The City and County Ordinances, on their face and as applied, were impermissibly vague as they required licensed professionals subject to their dictates and government officials tasked with enforcing them to guess at their meaning and differ as to their application.

242.    The City and County Ordinances, on their face and as applied, were under-inclusive by limiting the prohibition on using SOCE counseling to minors.

243.    The City and County Ordinances, on their face and as applied, were unconstitutionally overbroad as they chilled and abridged the free speech rights of all licensed mental health providers in the City of Boca Raton and County of Palm Beach who use counseling techniques to provide assistance to minors seeking to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity, and did not leave open alternative methods of communication.

244.    The City and County Ordinances' violations of Plaintiffs' rights of free speech have caused Plaintiffs and their clients to suffer injury.

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

### COUNT II – THE CITY AND COUNTY ORDINANCES VIOLATED PLAINTIFFS' CLIENTS' FIRST AMENDMENT RIGHT TO RECEIVE INFORMATION

245.    Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1–225.

246.    The First Amendment, as applied to the states by the Fourteenth Amendment, protects an individual's freedom of speech, and the corollary to that right, the right to receive information.

247.    Plaintiffs' clients have sincerely held religious beliefs that shape their desire to receive SOCE counseling and the information that Plaintiffs can provide on reducing or eliminating unwanted same-sex attractions, behaviors, and identity.

248.     The City and County Ordinances prevented Plaintiffs' clients from receiving SOCE counseling and deprived them of the opportunity to even obtain the information about SOCE counseling from licensed mental health professionals in the City and County.

249.     The City and County Ordinances were not supported by compelling government interests.

250.     Even if The City and County Ordinances were supported by compelling government interest, they were not narrowly tailored to achieve that purpose and therefore violated the fundamental rights of Plaintiffs' clients to receive information.

251.     The City and County Ordinances, on their face and as applied, were not the least restrictive means to accomplish any permissible government purpose sought to be served by the law.

252.     The City and County Ordinances' violations of the fundamental rights of Plaintiffs' clients have caused injury.

WHEREFORE, Plaintiffs pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

**COUNT III – THE CITY AND COUNTY ORDINANCES VIOLATED PLAINTIFFS' RIGHT TO FREE EXERCISE OF RELIGION**

253.     Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1–225.

254.     The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' right to free exercise of religion.

255.     Many of Plaintiffs' clients have sincerely held religious beliefs that same-sex sexual attractions, behaviors, or identity are wrong, and they seek to resolve these conflicts between their

religious beliefs and their attractions in favor of their religious beliefs.

256.    Plaintiffs also have sincerely held religious beliefs to provide spiritual counsel and assistance to their clients who seek such counsel. Plaintiffs hold sincerely held religious beliefs that they should counsel clients on the subject matter of same-sex attractions, behaviors, or identity from a religious viewpoint that aligns with their religious beliefs and those of their clients.

257.    The City and County Ordinances, on their face and as applied, targeted Plaintiffs' and their clients' sincerely held religious beliefs regarding human nature, gender, ethics, morality, and SOCE counseling, which are informed by the Bible and constitute central components of their faith. The City and County Ordinances caused Plaintiffs and their clients a direct and immediate conflict with their religious beliefs by prohibiting them from offering, referring, and receiving counseling that is consistent with their religious beliefs.

258.    The City and County Ordinances, on their face and as applied, impermissibly burdened Plaintiffs' and their clients' sincerely held religious beliefs and compelled them to both change those religious beliefs and to act in contradiction to them. The Ordinances also forced Plaintiffs and their clients to choose between the teachings and requirements of their sincerely held religious beliefs and the value system imposed by the City and County.

259.    The City and County Ordinances placed Plaintiffs and their clients in an irresolvable conflict between compliance with their sincerely held religious beliefs and compliance with the Ordinances.

260.    The Ordinances also put substantial pressure on Plaintiffs and their clients to violate their sincerely held religious beliefs by ignoring the fundamental tenets of their faith concerning same-sex attractions, behaviors, or identity.

261.    The City and County Ordinances, on their face and as applied, were neither neutral

nor generally applicable, but rather specifically and discriminatorily targeted the religious speech, beliefs, and viewpoint of those individuals who believe change is possible, and thus expressly constituted a substantial burden on sincerely held religious beliefs that are contrary to the City- and County-approved viewpoints on same-sex attractions, behavior, or identity.

262.    The City's and County's alleged interests in protecting minors from the so-called harm of SOCE counseling were unsubstantiated and did not constitute compelling government interests.

263.    No compelling government interest justified the burdens Defendants imposed upon Plaintiffs and their clients' rights to the free exercise of religion.

264.    Even if the City and County Ordinances were supported by compelling government interests, they were not the least restrictive means to accomplish any permissible government purpose which the City and County Ordinances sought to serve.

265.    The City and County Ordinances, both on their face and as-applied, failed and refused to accommodate Plaintiffs' sincerely held religious beliefs.

266.    The City and County Ordinances, both on their face and as-applied, specifically targeted religion for disparate treatment and set up a system of individualized exemptions that permitted certain counseling on same-sex attractions, behaviors, or identity while denying religious counseling on the same subjects.

267.    The City and County Ordinances, both on their face and as-applied, constituted a religious gerrymander.

268.    The City and County Ordinances' violations of Plaintiffs' and their clients' rights to free exercise of religion have caused Plaintiffs and their clients to suffer injury.

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

### COUNT IV – THE CITY AND COUNTY ORDINANCES VIOLATED PLAINTIFFS' RIGHTS TO LIBERTY OF SPEECH UNDER ARTICLE 1, SECTION 4 OF THE FLORIDA CONSTITUTION

269.     Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1–225.

270.     Article I, §4 of the Constitution of the State of Florida states, "Every person may speak, write and publish sentiments on all subjects but shall be responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press."

271.     The City and County Ordinances, on their face and as applied, were unconstitutional prior restraints on Plaintiffs' speech.

272.     The City and County Ordinances, on their face and as applied, unconstitutionally discriminated on the basis of viewpoint.

273.     The City and County Ordinances, on their face and as applied, authorized only one viewpoint on SOCE counseling and unwanted same-sex sexual attractions, behaviors, and identity by forcing Plaintiffs to present only one viewpoint on the otherwise permissible subject matter of same-sex attractions, behaviors, or identity. The City and County Ordinances also forced Plaintiffs' clients to receive only one viewpoint on this otherwise permissible subject matter.

274.     The City and County Ordinances, on their face and as applied, discriminated against Plaintiffs' speech on the basis of the content of the message they offered or that Plaintiffs' clients sought to receive.

275.     Defendants lacked compelling, legitimate, significant, or even rational governmental interests to justify the City and County Ordinances' infringements of the right to

free speech.

276.     The City and County Ordinances, on their face and as applied, were not the least restrictive means to accomplish any permissible government purposes sought to be served by the laws.

277.     Informed consent provisions outlining the required disclosure prior to engaging in SOCE counseling with a minor would have been far less restrictive of Plaintiffs' speech, and mental health counseling organizations have urged legislatures to adopt informed consent provisions. (*See* Ex. G).

278.     The City and County Ordinances did not leave open ample alternative channels of communication for Plaintiffs.

279.     The City and County Ordinances, on their face and as applied, were irrational and unreasonable and imposed unjustifiable and unreasonable restrictions on constitutionally protected speech.

280.     The City and County Ordinances, on their face and as applied, unconstitutionally chilled and abridged the right of Plaintiffs to freely communicate information pertaining to unwanted same-sex sexual attractions, behaviors, or identity.

281.     The City and County Ordinances, on their face and as applied, unconstitutionally chilled and abridged the right of Plaintiffs' clients to freely receive information pertaining to unwanted same-sex sexual attractions, behaviors, or identity.

282.     The City and County Ordinances' prohibitions on licensed mental health counselors offering voluntary SOCE counseling that could change, reduce, or otherwise address a minor client's unwanted same-sex attractions, behaviors, or identity, which would include a referral to

someone who offers SOCE counseling, on their face and as applied, abridged Plaintiffs' rights to offer and Plaintiffs' clients' rights to receive information.

283.   The City and County Ordinances vested unbridled discretion in government officials, including Defendants, to apply or not apply the Ordinances in a manner that restricts free speech, and subjected Plaintiffs to ethical code violations.

284.   The City and County Ordinances, on their face and as applied, were impermissibly vague as they required licensed professionals subject to their dictates and government officials tasked with enforcing them to guess at their meaning and differ as to their application.

285.   The City and County Ordinances, on their face and as applied, were under-inclusive by limiting the prohibition on SOCE counseling to minors.

286.   The City and County Ordinances, on their face and as applied, were unconstitutionally overbroad as they chilled and abridged the free speech rights of all licensed mental health providers in the City of Boca Raton and County of Palm Beach who use voluntary counseling techniques that have the potential to help minors reduce or eliminate their unwanted same-sex attractions, behaviors, or identity and did not leave open alternative methods of communication.

287.   The City and County Ordinances' violation of Plaintiffs' rights of free speech have caused Plaintiffs and their clients to suffer injury.

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

## COUNT V – THE CITY AND COUNTY ORDINANCES VIOLATED PLAINTIFFS' RIGHT TO FREE EXERCISE AND ENJOYMENT OF RELIGION UNDER ARTICLE I, SECTION 3 OF THE FLORIDA CONSTITUTION

288.    Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1–225.

289.    Article I, § 3 of the Florida Constitution states, "There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof."

290.    Many of Plaintiffs' clients have sincerely held religious beliefs that same-sex sexual attractions, behaviors, or identity are wrong, and they seek to resolve these conflicts between their religious beliefs and their attractions in favor of their religious beliefs.

291.    Plaintiffs also have sincerely held religious beliefs to provide spiritual counsel and assistance to their clients who seek such counsel. Plaintiffs hold sincerely held religious beliefs that they should counsel clients on the subject matter of same-sex attractions, behaviors, or identity from a religious viewpoint that aligns with their religious beliefs and those of their clients.

292.    The City and County Ordinances, on their face and as applied, targeted Plaintiffs' and their clients' sincerely held religious beliefs regarding human nature, gender, ethics, morality, and SOCE counseling, which are informed by the Bible and constitute central components of their faith. The City and County Ordinances caused Plaintiffs and their clients a direct and immediate conflict with their religious beliefs by prohibiting them from offering, referring, and receiving counseling that is consistent with their religious beliefs.

293.    The City and County Ordinances, on their face and as applied, impermissibly burdened Plaintiffs' and their clients' sincerely held religious beliefs and compelled them to both change those religious beliefs and to act in contradiction to them. The City and County Ordinances also forced Plaintiffs and their clients to choose between the teachings and requirements of their sincerely held religious beliefs and the value system imposed by the City and County.

294. The City and County Ordinances placed Plaintiffs and their clients in an irresolvable conflict between compliance with their sincerely held religious beliefs and compliance with the Ordinances.

295. The City and County Ordinances put substantial pressure on Plaintiffs to violate their sincerely held religious beliefs by ignoring the fundamental tenets of their faith concerning same-sex attractions, behaviors, or identity.

296. The City and County Ordinances, on their face and as applied, were neither neutral nor generally applicable, but rather specifically and discriminatorily targeted the religious speech, beliefs, and viewpoint of those individuals who believe change is possible. The City and County Ordinances, expressly on their face and as applied, constituted a substantial burden on sincerely held religious beliefs that are contrary to the City- and County-approved viewpoints on same-sex attractions, behavior, or identity.

297. The City's and County's alleged interests in protecting minors from the so-called harm of SOCE counseling were unsubstantiated and did not constitute compelling government interests.

298. No compelling government interests justify the burdens Defendants imposed upon Plaintiffs' and their clients' rights to the free exercise of religion.

299. Even if the City and County Ordinances were supported by compelling government interests, they were not the least restrictive means to accomplish any permissible government purpose which the Ordinances sought to serve.

300. The City and County Ordinances, both on their face and as-applied, failed and refused to accommodate Plaintiffs' sincerely held religious beliefs.

301.    The City and County Ordinances, both on their face and as-applied, specifically targeted religion for disparate treatment and set up a system of individualized exemptions that permitted certain counseling on same-sex attractions, behaviors, or identity while denying religious counseling on the same subject.

302.    The City and County Ordinances, both on their face and as-applied, constituted a religious gerrymander.

303.    The City and County Ordinances' violations of Plaintiffs' and their clients' rights to free exercise of religion have caused Plaintiffs and their clients to suffer injury.

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

**COUNT VI – THE CITY AND COUNTY HAD NO AUTHORITY TO ENACT THE ORDINANCES AND THEIR ADOPTION WAS THUS *ULTRA VIRES* UNDER FLORIDA STATUTES AND ARTICLE VIII, SECTIONS 1(G) AND 2(B) OF THE FLORIDA CONSTITUTION.**

304.    Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1–225.

305.    Article VIII, §2(b) of the Florida Constitution provides that "[m]unicipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes except as otherwise provided by law."

306.    Fla. Stat. Ann. §166.021(1) provides: "municipalities shall have the governmental, corporate, and proprietary powers to enable them to conduct municipal government, perform municipal functions, and render municipal services, and may exercise any power for municipal purposes, except when expressly prohibited by law."

307.    Fla. Stat. Ann. §166.021(2) defines "municipal purpose" as "any activity or power

which may be exercised by the state or its political subdivisions."

308.     Fla. Stat. Ann. §166.021(3)(c) states that the legislative body of each municipality has the power to enact legislation concerning any subject matter upon which the state Legislature may act, except "[a]ny subject expressly preempted to state or county government by the constitution or by general law."

309.     As a municipality in the State of Florida, the City is limited to enacting ordinances for "municipal purposes" as provided in Fla. Stat. Ann. §166.021(2), but only to the extent that said purposes do not seek to impose regulations on any subject that has been preempted by the State of Florida.

310.     Article VIII, §1(g) of the Florida Constitution provides that "Counties operating under county charters shall have all powers of local self-government not inconsistent with general law, or with special law approved by vote of the electors. The governing body of a county operating under a charter may enact county ordinances not inconsistent with general law."

311.     The County of Palm Beach has enacted a home rule charter pursuant to Fla. Stat. Ann. §125.60 and therefore is empowered to enact county ordinances, but said ordinances cannot be inconsistent with general law as adopted by the State Legislature.

312.     The Legislature of the State of Florida has pre-empted the field of regulation of mental health professionals, through enactment of Florida Statutes, Title XXXII, Chapter 491.

313.     More particularly, the Legislature of the State of Florida has pre-empted the field of disciplinary actions for licensed mental health professionals in Fla. Stat. Ann. § §491.009 and the regulations promulgated thereunder, Fla. Admin. Code Ann. r. 64B-5001.

314.     Fla. Admin. Code Ann. r. 64B-5001 sets forth procedures for determining whether

a licensed mental health professional in the State of Florida has engaged in conduct that is subject to discipline, and establishes schedules of fees and penalties for said conduct.

315.     The Legislature of the State of Florida has not prohibited the use of so-called "conversion therapy" or SOCE counseling or otherwise included the use of such counseling in the list of conduct that can subject a licensed mental health professional to disciplinary action under Fla. Stat. Ann. §491.009 or Fla. Admin. Code Ann. r. 64B-5001.

316.     In fact, in its capacity as the sole regulator of mental health professionals in the State of Florida, the Legislature has specifically declined to adopt such restrictions on SOCE counseling. Indeed, H.B. 137, 2016 Leg. (Fla. 2016) and S.B. 258 2016 Leg. (Fla. 2016), which were both proposals to prohibit SOCE counseling, were defeated in committee and thus not adopted by the sole regulator of mental health professionals in Florida.

317.     The City and County Ordinances prohibited licensed mental health professionals from practicing a type of mental health counseling that is not prohibited by the state and that the state specifically chose not prohibit when it had the opportunity.

318.     The City and County had no authority to adopt any ordinance or provision that exceeds state law in a preempted field, and their actions were void *ab initio* as *ultra vires* acts in violation of the laws and Constitution of the State of Florida.

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

### COUNT VII – THE CITY AND COUNTY ORDINANCES VIOLATED PLAINTIFFS' RIGHTS UNDER THE FLORIDA PATIENT'S BILL OF RIGHTS AND RESPONSIBILITIES

319.     Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1–225.

320.    Plaintiffs' clients have the "right to impartial access to medical treatment or accommodations, regardless of . . . religion." Fla. Stat. Ann. §381.026(4)(d)(1).

321.    Plaintiffs' clients have the "right to access any mode of treatment that is, in his or her own judgment and the judgment of his or her health care practitioner, in the best interests of the patient, including complementary or alternative health care treatments, in accordance with the provisions of §456.41." Fla. Stat. Ann. §381.026(4)(d)(3).

322.    Plaintiffs Dr. Otto and Dr. Hamilton are "health care practitioners" under the Florida Patient's Bill of Rights and Responsibilities because they are health care practitioners under Fla. Stat. Ann. §456.41. *See* Fla. Stat. Ann. §456.41(2)(b) (defining "health care practitioner" as that terms is defined in Fla. Stat. Ann. §456.001(4), which includes marriage and family therapist licensed under Fla. Stat. Ann. §491.003(5)).

323.    Fla. Stat. Ann. §456.41 states that "[i]t is the intent of the Legislature that citizens be able to choose from all health care options, including the prevailing or conventional treatment methods as well as other treatments designed to complement or substitute for the prevailing or conventional treatment methods." Fla. Stat. Ann. §456.41(1).

324.    Fla. Stat. Ann. §456.41 states that "[i]t is the intent of the Legislature that health care practitioners be able to offer complementary or alternative health care treatments." *Id.*

325.    "Complementary or alternative health care treatment means **any treatment** that is designed to provide patients with an effective option to the prevailing or conventional treatments methods." Fla. Stat. Ann. §456.41(2)(a) (emphasis added).

326.    If SOCE counseling is considered "complementary or alternative health care treatment," Plaintiffs have a right to offer and their clients have a right to receive such counseling under Florida law.

327.     Plaintiffs Dr. Otto and Dr. Hamilton desired to offer SOCE counseling in the City and County to those minor clients who desire such counseling and are seeking their expertise in engaging in such counseling.

328.     Plaintiffs Dr. Otto and Dr. Hamilton complied with all requirements of Fla. Stat. Ann. §456.41(3), by providing all required information to their clients prior to engaging in SOCE counseling, and by obtaining informed consent from the client.

329.     In the informed and best judgment of Plaintiffs Dr. Otto and Dr. Hamilton, voluntary SOCE counseling is in the best interest of those clients experiencing unwanted same-sex attractions, behaviors, or identity.

330.     In the informed and best judgment of Plaintiffs' clients, voluntary SOCE counseling is in their best interest.

331.     By prohibiting voluntary SOCE counseling, the Ordinances violated Plaintiffs Dr. Otto's and Dr. Hamilton's right to offer SOCE counseling in compliance with Fla. Stat. Ann. §381.026(d)(2) and Fla. Stat. Ann. §456.41.

332.     By prohibiting voluntary SOCE counseling, the Ordinances violated Plaintiffs' clients' right to receive SOCE counseling under Fla. Stat. Ann. §381.026(d)(3).

333.     Plaintiffs' clients have sincerely held religious beliefs that they should seek counseling to aid them in reducing or eliminating their unwanted same-sex attractions, behaviors, and identity, and Plaintiffs Dr. Otto and Dr. Hamilton have sincerely held religious beliefs that they should offer such counseling to those clients who seek such counseling to conform their attractions, behaviors, and identity to their sincerely held religious beliefs.

334.     By prohibiting voluntary SOCE counseling, the Ordinances violated Plaintiffs'

clients' right to impartial access of medical treatment and accommodations based on their religious beliefs under Fla. Stat. Ann. §381.026(d)(1).

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

## COUNT VIII – THE CITY AND COUNTY ORDINANCES VIOLATED PLAINTIFFS' RIGHTS UNDER THE FLORIDA RELIGIOUS FREEDOM RESTORATION ACT

335.    Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1–225.

336.    Fla. Stat. Ann. § 761.03 prohibits the government from substantially burdening a person's exercise of religion, "even if the burden result from a rule of general applicability." Fla. Stat. Ann. § 761.03(1).

337.    If the government does burden an individual's exercise of religion, it must demonstrate that "application of the burden to the person: (a) Is in furtherance of a compelling government interest; and (b) Is the least restrictive mean of furthering that compelling government interest." Fla. Stat. Ann. § 761.03(1)(a)-(b).

338.    Any person whose religious beliefs were burdened by the government "may assert that violation as a claim or defense in a judicial proceeding." Fla. Stat. Ann. § 761.03(2).

339.    Plaintiffs and their clients have sincerely held religious beliefs that same-sex sexual attractions, behaviors, or identity are wrong, and they seek to resolve these conflicts between their religious beliefs and their attractions in favor of their religious beliefs.

340.    Plaintiffs also have sincerely held religious beliefs to provide spiritual counsel and assistance to their clients who seek such counsel. Plaintiffs hold sincerely held religious beliefs that they should counsel clients on the subject matter of same-sex attractions, behaviors, or identity from a religious viewpoint that aligns with their religious beliefs and those of their clients.

341.     The City and County Ordinances, on their face and as applied, targeted Plaintiffs' and their clients' sincerely held religious beliefs regarding human nature, gender, ethics, morality, and SOCE counseling, which are informed by the Bible and constitute central components of their faith. The Ordinances caused Plaintiffs and their clients a direct and immediate conflict with their religious beliefs by prohibiting them from offering, referring, and receiving counseling that is consistent with their religious beliefs.

342.     The City and County Ordinances, on their face and as applied, substantially and impermissibly burdened Plaintiffs' and their clients' sincerely held religious beliefs and compelled them to both change those religious beliefs and to act in contradiction to them. The Ordinances also forced Plaintiffs and their clients to choose between the teachings and requirements of their sincerely held religious beliefs and the value system imposed by the City and County.

343.     No compelling government interest justified the burdens Defendants imposed upon Plaintiffs and their clients' rights to the free exercise of religion.

344.     Even if the Ordinances were supported by a compelling government interest, they were not the least restrictive means to accomplish any permissible government purpose which the Ordinances sought to serve.

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

### COUNT IX – CONSPIRACY TO VIOLATE PLAINTIFFS' CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. § 1985(3)

345.     Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1–225.

346.     Federal law prohibits two or more persons from conspiring "for the purpose of

depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws….” 42 U.S.C. § 1985(3).

347.    Defendants conspired with each other and with Rand Hoch and the Palm Beach County Human Rights Council to deny Plaintiffs' equal enjoyment of their First Amendment right to free speech and free exercise of their sincerely held religious beliefs.

348.    As evidenced by the numerous emails between Defendants and Hoch and the Council, there was a meeting of the minds to engage in a conspiracy to deprive Plaintiffs of their First Amendment rights by targeting their SOCE counseling.

349.    Defendants' conspiracy with Hoch and the Council was motivated by discriminatory animus toward Plaintiffs' religion, specifically their Christian viewpoints on human sexuality and their desire to exercise their Christian beliefs through their counseling.

350.    Religion, which includes Plaintiffs' religious beliefs and practices, is a protected class subject to equal protection under the law.

351.    As a result of Defendants' conspiracy to violate Plaintiffs' civil rights, Plaintiffs have suffered injury.

352.    Plaintiffs' injuries were a consequence of overt acts committed by Defendants in connection with the conspiracy, including planning with Hoch and the Council to draft, enact, and enforce the Ordinances.

353.    These acts are ongoing as Defendants are still scheming and conspiring with Hoch to chill Plaintiffs' protected speech and to suppress Plaintiffs' First Amendment rights under the guise of protecting children.

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter

set forth in their prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.   That this Court issue a Permanent Injunction enjoining Defendants, Defendants' officers, agents, employees, attorneys, and all other persons acting in active concert or participation with them, from enforcing the City and County Ordinances or re-enacting them so that:

      i.   Defendants will not use the City and County Ordinances or any subsequent re-enactments in any manner to infringe Plaintiffs' constitutional and statutory rights in the counseling of their clients or from offering a viewpoint on an otherwise permissible subject matter;

      ii.   Defendants will not use the City and County Ordinances or any subsequent re-enactments in any manner to prohibit Plaintiffs from engaging in SOCE counseling with those minor clients who seek such counseling;

      iii.   Defendants will not use the City and County Ordinances or any subsequent re-enactments to prohibit Plaintiffs' clients from seeking or receiving SOCE counseling for unwanted same-sex sexual attractions, behaviors, or identity; and

      iv.   Defendants will not use the City and County Ordinances or any subsequent re-enactments in any manner to punish Plaintiffs or their clients for engaging, referring to, seeking, or receiving voluntary SOCE counseling.

B.   That this Court render a Declaratory Judgment declaring the City and County Ordinances and Defendants' actions in applying the City and County Ordinances

unconstitutional under the United States Constitution and Florida Constitution, and declaring that:

i.   Defendants violated Plaintiffs' and their clients' right to freedom of speech by prohibiting them from providing, referring to, seeking, or receiving information concerning SOCE counseling;

ii.   Defendants violated Plaintiffs' and their clients' right to free exercise of religion by prohibiting Plaintiffs from providing, referring to, seeking, or receiving information concerning SOCE counseling in accordance with their sincerely held religious beliefs;

iii.   Defendants acted without authority under Florida law and Article VIII, § 2(b) of the Florida Constitution, and their *ultra vires* actions in adopting and approving the City and County Ordinances were void *ab initio* such that the City and County Ordinances are of no force and effect;

iv.   Defendants violated Fla. Stat. Ann. §381.026(d)(3) by infringing Plaintiffs' right to offer, and their clients' right to receive, available methods of treatment that Plaintiffs and their clients believe are in their best interest;

v.   Defendants violated Fla. Stat. Ann. §381.026(d)(1) by infringing Plaintiffs' clients' right to receive medical treatment regardless of their religious beliefs;

vi.   Defendants violated Fla. Stat. Ann. § 763.01 by substantially burdening Plaintiffs' and their clients' free exercise of religion, that Defendants had no compelling interest in enacting the City and County Ordinances, and that the Ordinances are not narrowly tailored to achieve any government interest; and

vii.   Defendants violated 42 U.S.C. § 1985(3) by conspiring to violate Plaintiffs'

civil rights.

      C.    That this Court award Plaintiffs nominal damages for the violation of Plaintiffs' constitutional rights;

      D.    That this Court award Plaintiffs actual damages in an amount to be determined at trial;

      E.    That this Court adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy so that such declaration shall have the force and effect of final judgment;

      F.    That this Court retain jurisdiction of this matter for the purpose of enforcing this Court's order;

      G.    That this Court award Plaintiffs the reasonable costs and expenses of this action, including attorney's fees, in accordance with 42 U.S.C. § 1988; and

      H.    That this Court grant such other and further relief as this Court deems equitable and just under the circumstances.

Dated: October 28, 2022

/s/ Horatio G. Mihet
Mathew D. Staver (FL Bar 0701092)
Horatio G. Mihet (FL Bar 026581)
Roger K. Gannam (FL Bar 240450)
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Email: court@lc.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this October 28, 2022, I caused a true and correct copy of the foregoing to be filed electronically with the Court's CM/ECF system. Service upon all counsel of record will be effectuated by the Court's electronic notification system.

/s/ Horatio G. Mihet
Horatio G. Mihet
*Attorney for Plaintiffs*